# EXHIBIT "1"

Exhibit 1
Page 1



**PHILADELPHIA INDEMNITY INSURANCE COMPANY**

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
(a member of the Tokio Marine Group and hereinafter "the Insurer")
Telephone: 610.617.7990   Fax: 610.617.7940



# COMMUNITY ASSOCIATION EXECUTIVE ADVANTAGE
# APPLICATION FOR COMMUNITY ASSOCIATION POLICY

---

**THIS IS AN APPLICATION FOR A CLAIMS-MADE POLICY. THE POLICY FOR WHICH THIS APPLICATION IS MADE COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDTITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED TO THE APPLICABLE RETENTION.**

**THE POLICY PROVIDES THE DUTY ON THE PART OF THE INSURER TO DEFEND.**

---

*Instructions*
- *Please complete all questions.*
- *The term "Insured Organization" means the parent organization whose directors and officers are proposed to be insured under the Community Association Policy for which this Application is made, along with any other entities in which such parent organization has or controls the right to elect more than 50% of the Board of Directors or other governing body of such entity if such right exists.*

## 1.  General Information

**Policy Effective Date:** 03/25/22          **Quote#:** 500366

a)  Name of the **Insured Organization**:    Del Mar Woods

b)  Address of the **Insured Organization**:  265 Stratford Court
                                              Del Mar, CA 92014

c)  Property Manager Information:  Lyna Neak                    Property Manager

    Telephone:                    858-795-7009

    Fax:

    E-Mail Address:               lneak@nnj.com

## 2.  Association Type

Condominium

## 3.  Previous Insurance

a)  Has the **Insured Organization** previously held or does it now have any directors and officers liability insurance or similar insurance? ............................................................................................... Yes

b)  Have you had any claim, notice of circumstance, or wrongful act which has been the subject of notice under such insurance in the last 5 years? ............................................................................................... No

c)  Has any Insurer declined, cancelled, or refused to renew any directors and officers liability insurance or similar insurance within the past 5 years? ............................................................................................... No

Exhibit 1
Page 2

## 4.   Underwriting Information

a) Total Number of Units:   126

b) Number of Commercial Units:   0

c) Number of Employees:   0

d) Average Unit Value:   1000000

e) Does the association have the following recreational facilities:     Golf course ................. No

Boat slips .................... No

f) Are the recreational facilities exclusive to only members of the association? ............................. n/a

g) Has the association completed in the past year or does it plan a major improvement which may require a special assessment of the association members? .................................................... No

## 5.   Loss History

During the last 5 years has the **Insured Organization** or any of its directors, officers, or employees been involved in any litigation that could have a material impact on the **Insured Organization**?...... No

## 6.   Prior Knowledge

Does anyone for whom insurance is sought have any knowledge or information of any act, error, omission, fact, or circumstance which may give rise to a **Claim** which may fall within the scope of the proposed insurance? ................................................................................................ No

**IT IS UNDERSTOOD AND AGREED THAT IF ANYONE FOR WHOM THIS INSURANCE IS SOUGHT HAS ANY KNOWLEDGE OF ANY SUCH ACT, ERROR, OMISSION, FACT, OR CIRCUMSTANCE, ANY CLAIM EMANATING THEREFROM SHALL BE EXCLUDED FROM COVERAGE UNDER THE PROPOSED INSURANCE.**

### FRAUD STATEMENT AND SIGNATURE SECTIONS

**The Undersigned states that he/she is an authorized representative of the Applicant and declares to the best of his/her knowledge and belief and after reasonable inquiry, that the statements set forth in this Application (and any attachments submitted with this Application) are true and complete and may be relied upon by Company \* in quoting and issuing the policy. If any of the information in this Application changes prior to the effective date of the policy, the Applicant will notify the Company of such changes and the Company may modify or withdraw the quote or binder.**

**The signing of this Application does not bind the Company to offer, or the Applicant to purchase the policy.**

**\*Company refers collectively to Philadelphia Indemnity Insurance Company and Tokio Marine Specialty Insurance Company**

### FRAUD NOTICE STATEMENTS

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THAT PERSON TO CRIMINAL AND CIVIL PENALTIES (IN OREGON, THE AFOREMENTIONED ACTIONS MAY CONSTITUTE A FRAUDULENT INSURANCE ACT WHICH MAY BE A CRIME AND MAY SUBJECT THE PERSON TO PENALTIES). (IN NEW YORK, THE CIVIL PENALTY IS NOT TO EXCEED FIVE THOUSAND DOLLARS ($5,000) AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION). **(NOT APPLICABLE IN AL, AR, AZ, CO, DC, FL, KS, LA, ME, MD, MN, NM, OK, PA, RI, TN, VA, VT, WA AND WV).**

**APPLICABLE IN AL, AR, AZ, DC, LA, MD, NM, RI AND WV:** ANY PERSON WHO KNOWINGLY (OR WILLFULLY IN MD) PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY (OR WILLFULLY IN MD) PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES OR CONFINEMENT IN PRISON.

**APPLICABLE IN COLORADO:** IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

**APPLICABLE IN FLORIDA AND OKLAHOMA:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY (IN FL, A PERSON IS GUILTY OF A FELONY OF THE THIRD DEGREE).

Exhibit 1
Page 3

**APPLICABLE IN KANSAS:** AN ACT COMMITTED BY ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN, ELECTRONIC, ELECTRONIC IMPULSE, FACSIMILE, MAGNETIC, ORAL, OR TELEPHONIC COMMUNICATION OR STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO.

**APPLICABLE IN KENTUCKY:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSONS FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

**APPLICABLE IN MAINE, TENNESSEE, VIRGINIA AND WASHINGTON:** IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS.

**APPLICABLE IN PENNSYLVANIA:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**APPLICABLE IN NEW YORK:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATE VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

**This Application must be currently dated and signed by the association's insurance agent, broker, property manager or by a member of governing board of the association.**

NAME (PLEASE PRINT/TYPE): Glenn Robinson

TITLE: Agent
(MUST BE SIGNED BY THE PRINCIPAL, PARTNER OR OFFICER, SEE ABOVE STATEMENT)

SIGNATURE: Glenn Robinson
(Electronically Signed)

SIGNATURE DATE: 03/23/22


**SECTION TO BE COMPLETED BY THE PRODUCER/BROKER/AGENT**

PRODUCER: Glenn Robinson

AGENCY: AR-INS, Inc. (Robco)
(If this is a Florida Risk, Producer means Florida Licensed Agent)

PRODUCER LICENSE NUMBER _____
(If this a Florida Risk, Producer means Florida Licensed Agent)

ADDRESS (STREET, CITY, STATE, ZIP)

830 Roosevelt
Suite 200
Irvine, CA 92620

Exhibit 1
Page 4

**PHILADELPHIA INDEMNITY INSURANCE COMPANY** PI-CAP-002 (11/17)

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004

**610.617.7900   Fax: 610.617.7940**

# COMMUNITY ASSOCIATION EXECUTIVE ADVANTAGE POLICY

## DECLARATIONS

NOTICE:  THIS IS A CLAIMS-MADE POLICY.  THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD.  PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED AGAINST THE APPLICABLE RETENTION.

THE INSURER HAS THE DUTY TO DEFEND.

**POLICY NUMBER:** PCAP033390-0122          **PRODUCER: GIG Insurance Group, Inc.**

**RENEWAL OF:**

**ITEM I. NAME AND ADDRESS OF PARENT ORGANIZATION:**

Physical:                          Mailing: N.N. Jaeschke, Inc.
Del Mar Woods                      Del Mar Woods
265 Stratford Court                9610
Del Mar, CA 92014                  Waples St
                                   SAN DIEGO, CA 92121

| | | |
|---|---|---|
| **ITEM II.** | **POLICY PERIOD:** | Inception Date: 03/25/22      Expiration Date: 03/25/2023 <br> (12:01 A.M. at the address set forth in Item I) |
| **ITEM III.** | **LIMIT OF LIABILITY:** | $1,000,000       in the aggregate for the **Policy Year** |
| **ITEM IV.** | **RETENTION:** | $1,000       in the aggregate each **Claim** |
| **ITEM V.** | **PRIOR LITIGATION DATE:** | 03/25/22 |
| **ITEM VI.** | **PREMIUM:** | $1,698.00       TRIA Premium: $0.00 |

**ITEM VII.     ENDORSEMENTS FORMING PART OF THIS POLICY AT ISSUANCE:**

CA.PCAP-ILN1779V-PremiumRe  PCAP-PIBELL1-BELL.          PCAP-PICAP020-ENHANCEMEI PCAP-PICAPETS-OFAC.

PCAP-PICME1-CRISIS.          PCAP-PISLD001-TRIACAPLOSS PCAP-PICAP021-WAGEHOUR.  PCAP-PITERDN1-TRIANOTICE.

This Declarations page, together with the **Application**, the attached Community Association Policy Form, and all endorsements thereto, shall constitute the contract between the Insurer and the **Insureds**.  This Policy is valid only if signed below by a duly authorized representative of the Insurer.

This policy has been signed by the Company's President and Secretary.

_____          _____
President                Secretary

Authorized Representative

500366

Exhibit 1
Page 5

PHILADELPHIA INDEMNITY INSURANCE COMPANY          PI-CAP-001 (11/17)

## COMMUNITY ASSOCIATION EXECUTIVE ADVANTAGE POLICY

**NOTICE: THIS IS A CLAIMS-MADE POLICY. THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE, AND REPORTED TO THE INSURER AS SOON AS PRACTICABLE BUT IN NO EVENT LATER THAN 90 DAYS AFTER THE END OF THE POLICY PERIOD. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**UNLESS AMENDED BY ENDORSEMENT, AMOUNTS INCURRED AS DEFENSE COSTS SHALL BE IN ADDITION TO THE LIMIT OF LIABILITY AND SHALL NOT BE APPLIED AGAINST THE APPLICABLE RETENTION.**
**THE INSURER HAS THE DUTY TO DEFEND.**

(Words and phrases printed in **bold** , other than in the headings, are defined in Section 23 below.)

In reliance upon the truthfulness and accuracy of the statements made in the **Application**, in consideration of, and subject to, the payment of premium when due, and subject to the terms, conditions, and exclusions of this Policy, the Insurer and the **Insureds** agree as follows:

1.     **Insuring Agreement:** The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**.

2.     **Defense Costs and Settlements:**

   2.1     It shall be the right and duty of the Insurer to defend any **Claim**. The Insurer may investigate, as it deems appropriate, any **Claim**, circumstance, or **Wrongful Act** involving the **Insureds**.

   2.2     The **Insureds** shall not incur any **Defense Costs**, admit any liability, assume any obligation, agree to any settlement, or make any settlement offer with respect to any **Claim** without the Insurer's prior written consent, which shall not be unreasonably withheld. The Insurer shall not be liable for any **Defense Costs** incurred or any admissions, obligations, agreements, or settlements made by the **Insureds** without the Insurer's prior written consent.

   2.3     The Insurer has the right to negotiate the settlement of any **Claims** it deems expedient, but only with the **Insured's** consent. If the **Insureds** withhold consent to such settlement, the Insurer's liability for such **Claim** is limited to the amount in excess of the Retention which the Insurer would have contributed to the settlement had the **Insured** consented to the settlement, plus **Defense Costs** covered by the Policy incurred prior to the date of such refusal to settle.

3.     **Cooperation**: As a condition precedent to the **Insureds'** rights under this Policy, they shall give to the Insurer all information and cooperation as the Insurer reasonably may require and shall do nothing that may prejudice the Insurer's position or its rights of recovery.

4.     **Claim Exclusions:** This Policy does not apply to any **Claim** made against any **Insured** for:

PI-CAP-001 (11/17)

Exhibit 1
Page 6

PHILADELPHIA INDEMNITY INSURANCE COMPANY          PI-CAP-001 (11/17)

**4.1**

    **(a)**    bodily injury, sickness, disease, death; or

    **(b)**    emotional distress, mental anguish, false arrest or imprisonment, abuse of process, malicious prosecution, libel, slander, defamation, violation or invasion of any right of privacy or private occupancy, trespass, nuisance or wrongful entry or eviction; or

    **(c)**    damage to, destruction of, or loss of use of any tangible property;

    provided, however, that part (b) of this exclusion shall not apply to any **Claim** brought by or on behalf of any **Third Person** or past, present or prospective **Insured Person** for an **Employment Practices Wrongful Act**;

**4.2**    for any error, misstatement, misleading statement, act, omission, neglect or breach of duty by **Insured Persons** of any **Subsidiary** in such capacity or by the **Subsidiary** itself if such error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly occurred, in whole or in part, when such entity was not a **Subsidiary**;

**4.3**    based upon, arising from, or in any way related to any error, misstatement, misleading statement, act, omission, neglect or breach of duty which has been reported or has been the subject of any notice   under any insurance policy of which this Policy is a renewal or replacement or under any other policy which it may succeed in time;

**4.4**    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, amendments thereto or similar federal, state, local or common law;

**4.5**    based upon, arising from, or in any way related to:

    **(a)**    any demand, suit, or other proceeding against any **Insured** which has been made, which existed, or was pending prior to the applicable Prior Litigation Date set forth in Item V of the Declarations; or

    **(b)**    the same or substantially the same facts, circumstances or allegations involved in such demand, suit, or other proceeding;

**4.6**    brought or maintained by or on behalf of the **Insured Organization**;

**4.7**    based upon, arising from, or in any way related to the actual, alleged, or threatened discharge, dispersal, release or escape of **Pollutants, Fungi** or **Microbes**, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants, Fungi** or **Microbes**;

**4.8**    based upon, arising from, or in any way related to an **Insured Person** serving as a director, officer, trustee, regent, governor, volunteer, employee, or similar position of any entity other than the **Insured Organization;** or

**4.9**    based upon, arising from, or in any way related to:

    **(a)**    any **Insureds** gaining in fact any personal profit, remuneration or advantage to which

Exhibit 1
Page 7

they were not legally entitled; or

**(b)**     any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any **Insured;** provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred.

For purposes of determining the applicability of Section 4.9, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**

**4.10**     based upon, arising from, or in any way related to any **Employment Practices Wrongful Act** alleged by or on behalf of an employee of the **Property Manager** .

**4.11**     based upon, arising from, or in any way related to any **Construction Defect**.

**4.12**     based upon, arising from, or in any way related to any actual or alleged liability of an **Insured**, in whole or in part, in the capacity as a builder or developer, or in the capacity of a sponsor of the **Organization**, or of an **Insured** affiliated with such a builder, developer or sponsor, and which is related to actual or alleged misconduct on the part of such builder, developer or sponsor, including but not limited to actual or alleged conflict of interest, self- dealing, or disputes concerning conversion, construction or development.

**5.**     **Loss Exclusions:** The Insurer shall not be liable to pay any **Loss** in connection with any **Claim**:

**5.1**     for any obligation of the **Insured Organization** to modify any building or property in order to affect compliance with the Americans With Disabilities Act and any amendments thereto or any similar federal, state or local statute, regulation, or common laws; or

**5.2**     for any actual or alleged liability of any **Insured** under any contract or agreement, express or implied, written or oral, except for employment related obligations which would have attached absent such contract or agreement;

Provided, however, that these exclusions shall not apply to the Insurer's duty to defend and to pay **Defense Costs**.

**6.**     **Application Representations and Severability**:

**6.1**     The **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy.  This Policy is issued in reliance upon   the truth of such statements and representations.

**6.2**     The **Insureds** agree that if the **Application** contains any material statements or representations  that are untrue, this Policy shall be void as to the **Insured Organization** and any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person**.

**7.**     **Reporting Requirements:**

**7.1**     The **Insureds**, as a condition precedent to their rights under this Policy, shall report every **Claim** to the Insurer as soon as practicable from the date any **Executive Officer** has knowledge of the **Claim**, and in no event later than ninety (90) days after the end of the **Policy Period**.

Exhibit 1
Page 8

PHILADELPHIA INDEMNITY INSURANCE COMPANY          PI-CAP-001 (11/17)

**7.2**    Notice of any **Claim**, circumstance, or **Wrongful Act** shall be forwarded to **Philadelphia Insurance Companies, Attention: Claims Department, One Bala Plaza Suite 100, Bala Cynwyd, Pa 19004-0950  1.800.765.9749 (phone) 1.800.685.9238 (fax)** claimsreport@phly.com

**7.3**    All notices under this Policy shall be sent in writing by mail, prepaid express courier, or facsimile and shall be effective upon receipt thereof by the addressee.

**8.**    **Notice of Circumstance or Wrongful Act:**  If during the **Policy Period** or the **Discovery Period** the **Insureds**  become  aware  of  any circumstance  or  **Wrongful Act**  that  reasonably may be expected to give rise to a **Claim,** and if such circumstance or **Wrongful Act** is reported to the Insurer during the **Policy Period** in writing with details as to the nature and date of such circumstance or **Wrongful Act**, the identity of any potential claimant, the identity of any **Insured Person** involved in such circumstance or **Wrongful Act**, and the manner in which the **Insureds** first became aware of such circumstance or **Wrongful Act**, then any **Claim** subsequently arising from such circumstance or **Wrongful Act** shall be deemed under this Policy to be a **Claim** made during the **Policy Period** in which the circumstance or **Wrongful Act** was first duly reported to the Insurer.

**9.**    **Limit of Liability:**

**9.1**    The Insurer's maximum aggregate Limit of Liability for all **Loss** under this Policy shall be the amount set forth in Item III of the Declarations. Amounts incurred as **Defense Costs** shall be in addition to the Limit of Liability.

**9.2**    All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability.  Such **Claim** shall be deemed first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

**9.3**    With respect to all **Claims** deemed to have been made in a **Policy Year**, should the Limit of Liability be exhausted by payment of **Loss** resulting from one or more of such **Claims**, the Insurer's duty to defend shall cease and any and all obligations of the Insurer hereunder shall be deemed to be completely fulfilled and extinguished and the Insurer shall have no further obligations hereunder of any kind or nature.

**10.**    **Retention:**  The Insurer shall be liable to pay only the amount of covered **Loss** in excess of the applicable Retention amount set forth in **Item IV** of the Declarations. Such applicable Retention shall be uninsured, shall not be applicable to **Defense Costs** and shall be borne by the **Insured Organization.**

**11.**    **Allocation**: If a **Claim** gives rise to **Loss** covered under this Policy and loss not covered under this Policy, either because a **Claim** includes both covered and uncovered matters or both covered and uncovered parties, the **Insureds** and the Insurer shall allocate such amount between covered **Loss** and uncovered loss.

**12.**    **Other Insurance**:  If any **Loss** arising from any **Claim** is insured by other valid and collectible insurance, then this Policy shall apply only in excess of the amount of any deductibles, retentions and limits of liability under such other policy or policies, whether such other policy or policies are

PI-CAP-001 (11/17)

Exhibit 1
Page 9

**PHILADELPHIA INDEMNITY INSURANCE COMPANY**          PI-CAP-001 (11/17)

stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically excess of this Policy by reference in such other policy to this Policy's Policy Number.

**13.    Discovery Period:**

**13.1**    If the Insurer or the **Parent Organization** fails or refuses to renew this Policy or if the **Parent Organization** cancels this Policy, any **Insured** shall have the right to an extension of the coverage granted by this Policy following the effective date of such cancellation or non-renewal. Such extension of coverage shall apply solely with respect to **Wrongful Acts** taking place before the effective date of such cancellation or non-renewal.

**13.2**    If the Insurer refuses to renew this Policy the **Discovery Period** shall be the period of ninety (90) days from the end of the **Policy Period**, and there shall be no charge for this **Automatic Discover Period** of ninety (90) days.  If prior to the end of the **Automatic Discovery Period** the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional twelve (12) months from the end of the **Automatic Discovery Period.**  Such Discovery Period shall be deemed fully earned as of such date.  This extension shall not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

**13.3**    If the **Parent Organization** fails or refuses to renew or cancels this Policy, the **Parent Organization** may purchase a **Discovery Period** of twelve (12) month from the end of the **Policy Period**, provided that the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy within thirty (30) days of the end of the **Policy Period**.  Such Discovery Period Premium shall be deemed fully earned as of such date.

**13.4**    The extension of coverage for the **Discovery Period** shall not in any way increase the Limit of Liability set forth in Item III of the Declarations. For purposes of the Limit of Liability, the **Discovery Period** is considered to be part of and not in addition to the last **Policy Year**.

**14.    Conversion to Automatic Run-off:**

**14.1**    In the event of a **Change in Control** during the **Policy Period**, coverage under this Policy shall continue until the end of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** taking place prior to the effective date of such **Change in Control**. The entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**.

**14.2**    The **Parent Organization** shall give written notice of such **Change in Control** to the Insurer as soon as practicable, together with such information as the Insurer may reasonably require.

**15.    Subrogation**:  If the Insurer pays any **Loss** under this Policy, the Insurer shall be subrogated to the extent of such payment to all rights of recovery thereof.   The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Insureds**.  The obligations of the **Insureds** pursuant to this Section 15 survive the termination of the **Policy Period**.

**16.    Parent Organization as Authorized Representative** : The **Insureds** agree that the **Parent Organization** shall act on their behalf with respect to all matters under this Policy,

Exhibit 1
Page 10

PHILADELPHIA INDEMNITY INSURANCE COMPANY                    PI-CAP-001 (11/17)

including without limitation the giving and receiving of notices hereunder, the payment or return of premiums, and the negotiation and acceptance of endorsements.

**17.**    **Amendment, Assignment and Headings**:

**17.1**    Any amendment to this Policy or assignment of an interest in this Policy, in whole or in part, shall be effective only if made by endorsement to this Policy signed by an authorized representative of the Insurer.

**17.2**    The headings to the provisions in this Policy, including those found in any endorsements attached hereto, are provided for convenience only and do not affect the construction hereof.

**18.**    **Territory**:  This Policy applies to **Wrongful Acts** occurring anywhere in the world, provided that a **Claim** is brought against the **Insured** within the United States of America, its territories or possessions or Canada.

**19.**    **Spousal Benefit**:  If a **Claim** against an **Insured Person** for a **Wrongful Act** otherwise covered under this Policy includes a claim against his/her legal spouse where the claimant asserts such claim by reason of spousal status or seeks to obtain recovery against property in which such spouse has an interest, the amount which such spouse becomes legally obligated to pay in respect of such **Claim** (including defense costs) shall be deemed the **Loss** and **Defense Costs** of such **Insured Person**, and subject to this Policy's terms, conditions, and exclusions.  In any event, this extension shall not cover any conduct or wrongful act committed by such legal spouse.

**20.**    **Estates and Legal Representatives**:  In the event of the death, incapacity, or bankruptcy of an **Insured Person**, any **Claim** made against the estate, legal representatives, heirs, or the assigns of such **Insured Person** for a **Wrongful Act** by such **Insured Person** shall be deemed to be a **Claim** against such **Insured Person**.

**21.**    **Termination**:

**21.1**    The Insurer may not cancel this Policy except for non-payment of premium when due.  Such cancellation shall be effective as of the inception date of the **Policy Period**.

**21.2**    The **Parent Organization** may cancel this Policy by sending notice of cancellation to the Insurer. Such cancellation shall be effective on the date the Insurer receives such notice. The **Parent Organization** may not cancel this Policy in anticipation of or after the effective date of a **Change in Control**.  In the event the **Parent Organization** cancels this Policy, the Insurer shall retain the customary short rate premium.  Payment of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

**21.3**    If the Insurer elects not to renew this Policy, the Insurer shall provide the **Parent Organization** with not less than sixty (60) days advance notice thereof.

**22.**    **Action Against Insurer**:

**22.1**    No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, or the amount of the **Insureds'**

PI-CAP-001 (11/17)

Exhibit 1
Page 11

PHILADELPHIA INDEMNITY INSURANCE COMPANY          PI-CAP-001 (11/17)

obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial, or by written agreement of the **Insureds**, the claimant and the Insurer.

**22.2**   No person or organization shall have the right under this Policy to join the Insurer as a party to any action against the **Insureds**, nor shall the Insurer be impleaded by the **Insureds** or their legal representatives.

**23.**   **Definitions:**

**23.1**   "**Application**" means all signed applications, including attachments and materials submitted therewith or as a part thereof, or incorporated therein, for this Policy and for any policy in an uninterrupted series of policies issued by the Insurer of which this Policy is a direct or indirect renewal or replacement.  All such applications, attachments, and materials are deemed attached to and incorporated into this Policy.

**23.2**   **"Change in Control"** means:

**(a)**   the acquisition by another entity of voting rights resulting in voting control by such other entity of more than 50% of the outstanding voting rights representing the present right to vote for election of directors or equivalent positions of the **Parent Organization**;

**(b)**   the merger of the **Parent Organization** into another entity such that the **Parent Organization** is not the surviving entity, or the consolidation of the **Parent Organization** with another entity; or

**(c)**   the loss of the **Parent Organization's** not-for-profit tax status.

**23.3**   **"Claim"** means:

**(a)**   a written demand for monetary or non-monetary relief against an **Insured**;

**(b)**   the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**;

**(c)**   the commencement of a formal criminal, administrative or regulatory proceeding or investigation against an **Insured,** including any brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency ; or

including any appeal therefrom.  A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

**23.4**   **"Defense Costs"** means reasonable and necessary fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a **Claim** and cost of attachment or similar  bonds, but shall not include the wages, salaries, benefits or expenses of any directors, officers or employees of the **Insured Organization**.

**23.5**   **"Discovery Period"** means the period of time set forth in Section 13.

**23.6**   **"Employment Practices Wrongful Act"** means:

Exhibit 1
Page 12

PHILADELPHIA INDEMNITY INSURANCE COMPANY          PI-CAP-001 (11/17)

**(a)**    wrongful dismissal or discharge or termination of employment, whether actual or constructive;

**(b)**    discrimination, whether based upon race, sex, age, national origin, religion, sexual orientation or disability;

**(d)**    sexual or other harassment in the workplace;

**(e)**    employment related misrepresentation;

**(f)**    violation of employment laws;

**(g)**    wrongful failure to employ, promote or grant tenure;

**(h)**    wrongful discipline; **(i)**negligent evaluation; **(j)**retaliation; and/or

**(l )**    failure to provide adequate workplace or employment policies or procedures.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Wrongful Act** means any actual or alleged, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Insured Person** in his/her capacity as an **Insured Person** or by the **Insured Organization**.

**23.7**    **"Executive Officer"** means the president, chief executive officer, chief operating officer, chief financial officer, managing director, any executive vice president and any equivalent executive position of the **Insured Organization**.

**23.8**    **"Fungi"** means any form of fungus, including but not limited to yeast, mold, mildew, rust, smut or mushroom, and any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of fungi.

**23.9**    **"Insolvency"** means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage, or liquidate the **Insured Organization**, or the **Insured Organization** becoming an insolvent debtor-in-possession.

**23.10**    **"Insured(s)"** means the **Insured Persons** and the **Insured Organization**. Insured(s) also means any **Property Manager**, but only if the **Property Manager** is acting pursuant to the written authority granted by the **Parent Organization** or on behalf of and at the direction of the **Parent Organization** or any **Subsidiary**.

**23.11**    **"Insured Organization"** means any entity named in Item I of the Declarations and any **Subsidiary**, including any such entity operating as a debtor-in-possession.

**23.12**    **"Insured Person(s)"** means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization,** or, with respect to a **Subsidiary** operating outside the United States, their functional equivalent, regardless of title. It also means one or more natural persons who were, now are, or shall hereafter be duly elected or appointed directors, trustees, officers, employees, committee members or volunteers of any **Property Manager**, but only if

Exhibit 1
Page 13

PHILADELPHIA INDEMNITY INSURANCE COMPANY          PI-CAP-001 (11/17)

such persons are acting within the scope of their employment with the **Property Manager** and on behalf of the **Parent Organization** or any **Subsidiary**.

23.13  **"Interrelated Wrongful Acts"** means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes.

23.14  **"Loss"** means:

  **(a)**      sums which the **Insureds** are legally obligated to pay solely as a result of any **Claim** insured by this Policy, including damages, judgments, settlement amounts, legal fees and costs awarded pursuant to judgments, punitive or exemplary damages, and the multiple portion of any multiplied damage award; and

  **(b)**      any excise tax equal to ten percent (10%) of an excess benefit which has been assessed by the Internal Revenue Service against any **Insured Person** pursuant to Section 4658 of the Internal Revenue Code for participation of an organization manager in an excess benefit transaction.

             **Loss** shall not include any other taxes, fines, penalties, or matters uninsurable pursuant to any applicable law.

23.15  **"Microbes"** means any non-fungal microorganisms or non-fungal colony-form organisms that causes infection or disease including but not limited to any spores, mycotoxins, odors or any other substances, products, or by products produced by, released by, or arising out of the current or past presence of microbes.

23.16  **"Parent Organization"** means the  **Insured Organization** first named in Item I of the Declarations.

23.17  **"Policy Period"** means the period from the inception date set forth in Item II of the Declarations to the expiration date set forth in Item II of the Declarations, or its earlier termination pursuant to Section 21.

23.18  **"Policy Year"** means the period of one year following the effective date and hour of this Policy or the period of one year following any anniversary date thereof falling within the **Policy Period**; or if the time between the effective date or any anniversary date and the termination of this Policy is less than one year, such lesser period.

23.19  **"Pollutants"** means any substance exhibiting hazardous characteristics as is or may be identified on any list of hazardous substances issued by the United States Environmental Protection Agency, or any state, local, or foreign counterpart.  This definition shall include, without limitation, any solid, liquid, gaseous or thermal irritant, or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products, waste (including material to be recycled, reconditioned or reclaimed), and any electric, magnetic or electromagnetic field of any frequency, as well as any air emission, waste water, infectious medical waste, nuclear materials, or nuclear waste.

23.20  **"Subsidiary"** means any entity which qualifies as a not-for-profit organization under the Internal Revenue Code and for which the **Parent Organization** has or controls the right to elect or

PI-CAP-001 (11/17)

Exhibit 1
Page 14

PHILADELPHIA INDEMNITY INSURANCE COMPANY          PI-CAP-001 (11/17)

appoint more than fifty percent (50%) of the Board of Directors or other governing body of such entity if such right exists:

**(a)**     prior to inception date of the **Policy Period**;

**(b)**     after  the  inception  date  of  the  **Policy Period** and the assets of such entity do not exceed thirty-    five percent (35%) of the total consolidated assets of the **Insured Organization** as  reflected  in  the  **Parent Organization's**  most  recent  audited  consolidated  financial statement;

**(c)**     after the inception date of the **Policy Period** and the assets of such entity exceed thirty-five percent (35%) of the total consolidated assets of the **Insured Organization** as reflected in the  **Parent Organization's** most recent audited consolidated financial statement but only upon the condition that the **Parent Organization**:

**(i)**     give written notice of such transaction to the Insurer within 90 days after the effective date of such     transaction;

**(i)**     provide the Insurer with such information as the Insurer may require; and

**(ii)**     pay any additional premium required by the Insurer.

**23.21 "Third Party"** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Insured Organization**.

**23.22 "Wrongful Act"** means:

**(a)**     any  actual  or  alleged  error,  misstatement,  misleading  statement,  act,  omission, neglect, or breach of duty, or **Employment Practices Wrongful Act** committed or attempted by the **Insured Persons** in their capacities as such or by the **Insured Organization**; or

**(b)**     any matter claimed against the **Insured Persons** solely by reason of their status as **Insured Persons**.

**23.23 "Construction Defect**" means any actual or alleged defective, faulty or delayed construction or any other matter recognized as a construction defect under applicable common or statutory law, whether or not as a result of:

**(a)**     faulty or incorrect design or architectural plans;

**(b)**     improper soil testing;

**(c)**     inadequate or insufficient protection from subsoil, ground water or earth movement or subsidence;

**(d)**     the construction, manufacture or assembly of any tangible property;

**(e)**     the failure to provide construction related goods or services as represented or to pay for such goods or services; or

**(f)**     the supervision of such activities.

PI-CAP-001 (11/17)

Exhibit 1
Page 15

**PHILADELPHIA INDEMNITY INSURANCE COMPANY**          PI-CAP-001 (11/17)

**23.24** **"Property Manager"** means any entity providing real estate property management services to the **Insured Organization** pursuant to a written contract.

Exhibit 1
Page 16

PI-CAP-020 (11/17)

**PHILADELPHIA INDEMNITY INSURANCE COMPANY**

**<u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>**

# ENHANCEMENT ENDORSEMENT FOR COMMUNITY ASSOCIATION RISKS

This endorsement modifies insurance provided under the following:

**COMMUNITY ASSOCIATION EXECUTIVE ADVANTAGE POLICY**

It is agreed that the Policy is hereby amended as follows:

(1.) It is agreed that **Section 2.3** of the Policy is hereby deleted in its entirety and replaced with the following:

The Insurer has the right to negotiate the settlement of any **Claims** it deems expedient for any amount up to $15,000.  If the **Insureds** withhold consent to any negotiated settlement up to $15,000, the Insurer shall waive payment of the Retention by the **Insured Organization** up to an amount of $5,000.  The Retention in excess of $5,000 shall be borne by the **Insured Organization**.  In addition, if the **Insureds** withhold consent to any such settlement in excess of $15,000, the Insurer's liability for such **Claim** is limited to the amount in excess of the Retention which the Insurer would have contributed to the settlement had the **Insured** consented to the settlement, and 70 percent (70%) of any additional covered **Loss,** including **Defense Costs**, incurred subsequent to such refusal to settle.

(2.) **Section 4.1** of the Policy is hereby deleted in its entirety and replaced with the following:

**4.1** based upon, arising from, or in any way related to:

**(a)** bodily injury, sickness, disease, death; or

**(b)** emotional distress, mental anguish; or

**(c)** damage to, destruction of, or loss of use of any tangible property;

provided, however, that part (b) of this exclusion shall not apply to any **Claim** brought by or on behalf of any **Third Person** or past, present or prospective **Insured Person** for an **Employment Practices Wrongful Act**;

PI-CAP 020 (11/17)

@2017 Philadelphia Consolidated Holding Corp.

Exhibit 1
Page 17

PI-CAP-020 (11/17)

**PHILADELPHIA INDEMNITY INSURANCE COMPANY**

(3.) **Section 4.6** of the Policy is hereby deleted in its entirety and replaced with the following:

brought or maintained by or on behalf of the **Insured** against any **Property Manager**;

(4.) **Section 4** of the Policy is hereby amended as follows:

The last paragraph of **Section 4.9** is deleted and replaced with the following:

For purposes of determining the applicability of **Sections 4.1** through **4.9**, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person.**

(5.) **Section 6** of the Policy is hereby deleted in its entirety and replaced with the following:

6. **Application Representations and Severability**:

   6.1   The **Insureds** represent that the statements and representations contained in the **Application** are true and shall be deemed material to the acceptance of the risk or the hazard assumed by the Insurer under this Policy.  This Policy is issued in reliance upon the truth of such statements and representations.

   6.2   The **Insureds** agree that if the **Application** contains any statements or representations that are untrue, this Policy shall be void as to:

   (a) any **Insured Person** who knew the facts that were not truthfully disclosed, provided that such knowledge shall not be imputed to any other **Insured Person**.  This provision shall also apply to the **Insured Organization** to the extent that it indemnifies such **Insured Person**; and/or

   (b) the **Insured Organization**, if it is established that any director or any executive officer of the **Insured Organization** knew the facts that were not truthfully disclosed;

   whether or not such director or executive officer knew of such untruthful disclosure in the Application.

   Except as set forth above, and solely with respect to **Loss** that is not indemnified due to the **Insured Organization's** financial insolvency or because indemnification

PI-CAP 020 (11/17)

Exhibit 1
Page 18

PI-CAP-020 (11/17)

### PHILADELPHIA INDEMNITY INSURANCE COMPANY

is not legally permissible, this Policy shall not be rescinded by the Insurer in whole or in part for any reason, however, such coverage will be subject to all other terms, conditions and exclusions of the Policy.

(6.) **Sections 7.2 and 7.3** of the Policy are hereby deleted in their entirety and replaced with the following:

**7.2**     Notice of any **Claim**, circumstance, or **Wrongful Act** shall be forwarded in writing by mail, prepaid express courier, or facsimile to [**Philadelphia Insurance Companies Attention: Claims Department, One Bala Plaza Suite 100, Bala Cynwyd, PA 19004-0950]** and shall be effective upon receipt thereof by the addressee.

**7.3**     In addition to the postal address set forth in **Section 7.2**, such notice may also be given in writing to the **Insurer** by email at the following email address:

claimsreport@phly.com

Your email must reference the policy number for this Policy.  The date of the **Insurer's** receipt of the emailed notice shall constitute the date of notice.

(7.) **Section 9** of the Policy is hereby amended by the addition of the following:

**9.4**     If **Loss** becomes due and payable, the Insurer shall pay such **Loss** in the following order of priority:

(a)     The Insurer shall first pay such **Loss** on behalf of the **Insured Persons**; and

(b)     whatever amount of the Limit of Liability remains after the payment of such **Loss,** the Insurer then shall pay such **Loss** on behalf of the **Insured Organization**.

(8.) **Sections 13.2 and 13.3** of the Policy are hereby deleted in their entirety and replaced with the following:

**13.2**     If the Insurer refuses to renew this Policy the **Discovery Period** shall be the period of ninety (90) days from the end of the **Policy Period**, and there shall be no charge for this **Automatic Discovery Period** of ninety (90) days.  If prior to the end of the **Automatic Discovery Period** the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional twelve (12) months from the end of the **Automatic Discovery Period**.  The **Parent**

PI-CAP 020 (11/17)

Exhibit 1
Page 19

PI-CAP-020 (11/17)

### PHILADELPHIA INDEMNITY INSURANCE COMPANY

**Organization** shall also have the option of paying seventy percent (70%) of the annual premium for an additional twenty-four (24) months from the end of the **Automatic Discovery Period** or one hundred percent (100%) of the annual premium for an additional thirty-six (36) months from the end of the **Automatic Discovery Period**. Such Discovery Period Premium shall be deemed fully earned as of such date. This extension shall not apply if this Policy is terminated by the Insurer for failure to pay any premium when due.

**13.3** If the **Parent Organization** fails or refuses to renew or cancels this Policy the **Parent Organization** may purchase a **Discovery Period** of twelve (12) month from the end of the **Policy Period**, provided that the **Parent Organization** pays the Insurer an additional amount equal to thirty-five percent (35%) of the annual premium of this Policy within thirty (30) days of the end of the **Policy Period**. The **Parent Organization** shall also have the option of paying seventy percent (70%) of the annual premium for an additional twenty-four (24) months from the end of the **Policy Period** or one hundred percent (100%) of the annual premium for an additional thirty-six (36) months from the end of the **Policy Period**. Such Discovery Period Premium shall be deemed fully earned as of such date

(9.) **Section 18** of the Policy is hereby deleted in its entirety and replaced with the following:

**18.** **Territory**: This Policy applies to **Wrongful Acts** occurring anywhere in the world.

(10.) **Section 19** of the Policy is hereby deleted in its entirety and replaced with the following:

**19.** **Spousal Benefit**: If a **Claim** against an **Insured Person** for a **Wrongful Act** otherwise covered under this Policy includes a claim against his/her legal spouse or domestic partner where the claimant asserts such claim by reason of status as a spouse or domestic partner or seeks to obtain recovery against property in which such spouse or domestic partner has an interest, the amount which such spouse or domestic partner becomes legally obligated to pay in respect of such **Claim** (including defense costs) shall be deemed the **Loss** and **Defense Costs** of such **Insured Person**, and subject to this Policy's terms, conditions, and exclusions. In any event, this extension shall not cover any conduct or wrongful act committed by such legal spouse or domestic partner.

PI-CAP 020 (11/17)

@2017 Philadelphia Consolidated Holding Corp.

Exhibit 1
Page 20

PI-CAP-020 (11/17)

### PHILADELPHIA INDEMNITY INSURANCE COMPANY

(11.)    The definition of **Claim** under **Section 23.3** of the Policy is hereby deleted in its entirety and replaced with the following:

23.3        **"Claim"** means:

(a)    a written demand for monetary or non-monetary relief against an **Insured**;

(b)    the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**;

(c)    the commencement of a formal criminal, administrative or regulatory proceeding or formal investigation against an **Insured,** including any brought before the Equal Employment Opportunity Commission or any similar state, local or territorial governmental agency ;

(d)    a written request to any **Insured** by a prospective claimant to toll or waive any statute of limitation;

including any appeal therefrom.  A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

(12.)    The definition of **Employment Practices Wrongful Act(s)** under **Section 23.6** of the Policy is hereby deleted in its entirety and replaced with the following:

23.6        **"Employment Practices Wrongful Act"** means:

(a)    wrongful dismissal or discharge or termination of employment, whether actual or constructive;

(b)    discrimination, whether based upon race, sex, age, national origin, religion, sexual orientation, marital status, gender identity or expression, disability, health status, military status or other protected status established under federal, state or local law;

(c)    sexual harassment, whether quid pro quo or hostile work environment,  or other unlawful harassment or bullying in the workplace;

(d)    employment related misrepresentation;

(e)    violation of employment laws;

PI-CAP 020 (11/17)

@2017 Philadelphia Consolidated Holding Corp.

Exhibit 1
Page 21

PI-CAP-020 (11/17)

### PHILADELPHIA INDEMNITY INSURANCE COMPANY

**(f)**    wrongful deprivation of career opportunity, wrongful demotion, or wrongful failure to employ, promote or grant tenure;

**(g)**    wrongful discipline;

**(h)**    wrongful evaluation, supervision, training or retention of employees;

**(i)**    retaliation; and/or

**(j)**    failure to provide adequate workplace or employment policies or procedures.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Wrongful Act** means any actual or alleged, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Insured Person** in his/her capacity as an **Insured Person** or by the **Insured Organization**.

(13.)    The definition of **Pollutants** under **Section 23.19** of the Policy is hereby amended as follows:

The word "noise" is deleted.

(14.)    The definition of **Third Party** under **Section 23.21** of the Policy is hereby deleted in its follows:

**23.21    "Third Party"** means any natural person who is not an employee or applicant for employment.

All other terms, conditions, and exclusions of this Policy remain unchanged.

PI-CAP 020 (11/17)

@2017 Philadelphia Consolidated Holding Corp.

Exhibit 1
Page 22

IL N 177 09 12

# CALIFORNIA PREMIUM REFUND DISCLOSURE NOTICE

In accordance with CAL. INS. CODE § 481.(c), we are notifying you that in the event that the first Named Insured cancels the insurance policy, we shall retain 10% of the unearned premium. The premium refunded to you will therefore be calculated as 90% of the pro rata unearned premium. But if cancellation takes place during the first year of a multiyear prepaid policy, we will return 90% of the pro rata unearned premium for the first year and the full annual premium for the subsequent years.

If you have an Equipment Breakdown policy or your policy contains an Equipment Breakdown Coverage Part, then the following premium refund calculation applies instead of that provided in the preceding paragraph. For the Equipment Breakdown policy premium or for the premium attributable to the Equipment Breakdown Coverage Part, we shall retain 25% of the unearned premium. The premium refunded to you will therefore be calculated as 75% of the pro rata unearned premium. But if cancellation takes place during the first year of a multiyear prepaid policy, we will return 75% of the pro rata unearned premium for the first year and the full annual premium for the subsequent years.

However, the penalties set forth in the preceding paragraphs will not apply under the following circumstances, even if the first Named Insured cancels the policy:

**1.** The Insured(s) no longer has a financial or insurable interest in the property or business operation that is the subject of insurance;

**2.** Cancellation takes place after the first year for a prepaid policy written for a term of more than one year; or

**3.** The policy is rewritten in the same insuring company or company group.

Exhibit 1
Page 23

PI-BELL-1 (11/09)

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## BELL ENDORSEMENT



Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

I.    **SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS**

The following is a summary of Limits of Liability or Limits of Insurance and/or additional coverages provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| Business Travel Accident Benefit | $50,000 |
| Conference Cancellation | $25,000 |
| Donation Assurance | $50,000 |
| Emergency Real Estate Consulting Fee | $50,000 |
| Fundraising Event Blackout | $25,000 |
| Identity Theft Expense | $50,000 |
| Image Restoration and Counseling | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Kidnap Expense | $50,000 |
| Political Unrest | $5,000 per employee; $25,000 policy limit |
| Temporary Meeting Space Reimbursement | $25,000 |
| Terrorism Travel Reimbursement | $50,000 |
| Travel Delay Reimbursement | $1,500 |
| Workplace Violence Counseling | $50,000 |

© 2009 Philadelphia Indemnity Insurance Company

Exhibit 1
Page 24

PI-BELL-1 (11/09)

## II.   CONDITIONS

### A.   Applicability of Coverage

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

### B.   Limits of Liability or Limits of Insurance

**1.**   When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limits of liability or limits of insurance will apply.  In no instance will multiple limits apply to coverages which may be duplicated within this policy.  Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum limits of liability or limits of insurance under all such coverage parts or policies combined shall not exceed the highest applicable limits of liability or limits of insurance under any one coverage part or policy.

**2.**   Limits of liability or limits of insurance identified in Section **I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS** above are not excess of, but are in addition to the applicable Limits of Liability or Limits of Insurance stated in the Declarations.

### C.   Claim Expenses

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

## III.   ADDITIONAL COVERAGES

### A.   Business Travel Accident Benefit

We will pay a Business Travel Accident Benefit to the insured if a director or officer suffers injury or death while traveling on a common carrier for your business during the policy period.

For the purpose of Business Travel Accident Benefit coverage, injury means:

**1.**   Physical damage to the body caused by violence, fracture, or an accident that results in loss of life not later than one hundred eighty (180) days after the policy expiration, the date of cancellation or the date of non-renewal;

**2.**   Accidental loss of limbs or multiple fingers;

**3.**   Total loss of sight, speech or hearing.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

The Business Travel Accident Benefit shall not be payable if the cause of the injury was:

**1.**   An intentional act by the insured;

**2.**   An act of suicide or attempted suicide;

**3.**   An act of war; or

**4.**   A disease process.

© 2009 Philadelphia Indemnity Insurance Company

Exhibit 1
Page 25

PI-BELL-1 (11/09)

**B. Conference Cancellation**

We will reimburse the insured for any business-related conference expenses, paid by the insured and not otherwise reimbursed, for a canceled conference that an employee was scheduled to attend.  The cancellation must be due directly to a "natural catastrophe" or a "communicable disease" outbreak that forces the cancellation of the conference.

With respect to a conference cancellation claim, it is further agreed as follows:

**1.**  The insured employee must have registered for the conference at least thirty (30) days prior to the cancellation; and

**2.**  The cancellation must be ordered by a local, state or federal Board of Health or other governmental authority having jurisdiction over the location of the conference.

The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**C. Donation Assurance**

If the insured is a 501(c)(3) status non-profit organization as defined in the United States Internal Revenue Code, we will reimburse the insured for "failed donation claim(s)."

With respect to any "failed donation claim," it is further agreed as follows:

**1.**  The donor must not have been in bankruptcy, nor have filed for bankruptcy or reorganization in the past seven (7) years prior to the time said pledge was made to the insured;

**2.**  For non-cash donations, our payment of a "failed donation claim" shall be based on the fair market value of said non-cash donation at the time of the "failed donation claim";

**3.**  In the case of unemployment or incapacitation of a natural person donor and as a condition of payment of the "failed donation claim":

    **a.**  Neither the natural person donor nor the insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date; and

    **b.**  The donor shall be unemployed for at least sixty (60) days prior to a claim being submitted by the insured;

**4.**  No coverage shall be afforded for a written pledge of funds or other measurable, tangible property to the insured dated prior to the policy period; and

**5.**  A donation amount which is to be collected by the insured over more than a twelve (12) month period shall be deemed a single donation.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**D. Emergency Real Estate Consulting Fee**

We will reimburse the insured any realtor's fee or real estate consultant's fee necessitated by the insured's need to relocate due to the "unforeseeable destruction" of the insured's "principal location" listed in the Declarations during the policy period.  The limit of insurance for this

© 2009 Philadelphia Indemnity Insurance Company

Exhibit 1
Page 26

PI-BELL-1 (11/09)

coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

### E.  Fundraising Event Blackout

We will reimburse the insured for "fundraising expenses" that are incurred due to the cancellation of a fundraising event caused by the lack of electric supply resulting in a power outage, provided the fundraising event is not re-scheduled.  The fundraising event must have been planned at least thirty (30) days prior to the power outage.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

### F.  Identity Theft Expense

We will reimburse any present director or officer of the named insured for "identity theft expenses" incurred as the direct result of any "identity theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the insured's first policy with us.  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

### G.  Image Restoration and Counseling

We will reimburse the insured for expenses incurred for image restoration and counseling arising out of "improper acts" by any natural person.

Covered expenses are limited to:

1.  The costs of rehabilitation and counseling for the accused natural person insured, provided the natural person insured is not ultimately found guilty of criminal conduct; this reimbursement to occur after acquittal of the natural person insured;

2.  The costs charged by a recruiter or expended on advertising, for replacing an officer as a result of "improper acts"; and

3.  The costs of restoring the named insured's reputation and consumer confidence through image consulting.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

### H.  Key Individual Replacement Expenses

We will pay "key individual replacement expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the policy period which results in the loss of life during the policy period.  The limit of insurance for this coverage is the lesser of $50,000 or ten (10) times the annual premium paid for this policy.  No deductible applies to this coverage.

### I.  Kidnap Expense

We will pay on behalf of any director or officer of the insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner," parent or child during the policy period.  Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

© 2009 Philadelphia Indemnity Insurance Company

Exhibit 1
Page 27

1.  Fees and costs of independent negotiators;

2.  Interest costs for any loan from a financial institution taken by you to pay a ransom demand or extortion threat;

3.  Travel costs and accommodations incurred by the named insured;

4.  Reward money paid to an informant which leads to the arrest and conviction of parties responsible for loss covered under this insurance; and

5.  Salary, commissions and other financial benefits paid by you to a director or officer.  Such compensation applies at the level in effect on the date of the kidnap and ends upon the earliest of:

    a.  Up to thirty (30) days after their release, if the director or officer has not yet returned to work;

    b.  Discovery of their death;

    c.  One hundred twenty (120) days after the last credible evidence following abduction that they are still alive; or

    d.  Twelve (12) months after the date of the kidnapping.

The limit of insurance for this coverage is $50,000 each policy period for all insureds combined.  No deductible applies to this coverage.

**J.  Political Unrest Coverage**

We will reimburse any present director, officer, employee or volunteer of the named insured while traveling outside the United States of America for "emergency evacuation expenses" that are incurred as a result of an incident of "political unrest."  This "political unrest" must occur during the policy period.  No coverage is granted for travel to countries in a state of "political unrest" at the time of departure of the travel.  The limit of insurance for this coverage is $5,000 per covered person, subject to a maximum of $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**K.  Temporary Meeting Space Reimbursement**

We will reimburse the insured for rental of meeting space which is necessitated by the temporary unavailability of the insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period.  Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**L.  Terrorism Travel Reimbursement**

We will reimburse any present director or officer of the named insured in the event of a "certified act of terrorism" during the policy period which necessitates that he/she incurs "emergency travel expenses."  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

© 2009 Philadelphia Indemnity Insurance Company

Exhibit 1
Page 28

**M. Travel Delay Reimbursement**

We will reimburse any present director or officer of the named insured for any "non-reimbursable expenses" they incur as a result of the cancellation of any regularly scheduled business travel on a common carrier.  The limit of insurance for this coverage is $1,500 per policy period for all insureds combined.  A seventy-two (72) hour waiting period deductible applies to this coverage.

**N. Workplace Violence Counseling**

We will reimburse the insured for emotional counseling expenses incurred directly as a result of a "workplace violence" incident at any of the insured's premises during the policy period.  The emotional counseling expenses incurred must have been for:

**1.** Your employees who were victims of, or witnesses to the "workplace violence";

**2.** The spouse, "domestic partner," parents or children of your employees who were victims of, or witnesses to the "workplace violence"; and

**3.** Any other person or persons who directly witnessed the "workplace violence" incident.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**IV. DEFINITIONS**

For the purpose of this endorsement, the following definitions apply:

**A.** "Certified act of terrorism" means any act so defined under the Terrorism Risk Insurance Act, and its amendments or extensions.

**B.** "Communicable disease" means an illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by an infection or a contagion directly or indirectly through human contact, or contact with human fluids, waste, or similar agent, such as, but not limited to Meningitis, Measles or Legionnaire's Disease.

**C.** "Domestic partner" means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the named insured.

**D.** "Emergency evacuation expenses" mean:

**1.** Additional lodging expenses;

**2.** Additional transportation costs;

**3.** The cost of obtaining replacements of lost or stolen travel documents necessary for evacuation from the area of "political unrest"; and

**4.** Translation services, message transmittals and other communication expenses.

provided that these expenses are not otherwise reimbursable.

**E.** "Emergency travel expenses" mean:

Exhibit 1
Page 29

PI-BELL-1 (11/09)

**1.** Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of a "certified act of terrorism"; and

**2.** The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "certified act of terrorism";

provided that these expenses are not otherwise reimbursable.

**F.** "Failed donation claim" means written notice to the insured during the policy period of:

**1.** The bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable, tangible property to the insured; or

**2.** The unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable, tangible property to the insured.

**G.** "Fundraising expenses" mean deposits forfeited and other charges paid by you for catering services, property and equipment rentals and related transport, venue rentals, accommodations (including travel), and entertainment expenses less any deposits or other fees refunded or refundable to you.

**H.** "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of any director or officer (or spouse or "domestic partner" thereof) of the named insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

**I.** "Identity theft expenses" mean:

**1.** Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

**2.** Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors; and

**3.** Loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

**J.** "Improper acts" means any actual or alleged act of:

**1.** Sexual abuse;

**2.** Sexual intimacy;

**3.** Sexual molestation; or

**4.** Sexual assault;

committed by an insured against any natural person who is not an insured. Such "improper acts" must have been committed by the insured while in his or her capacity as an insured.

**K.** "Injury" whenever used in this endorsement, other than in Section **III. A. Business Travel**,

© 2009 Philadelphia Indemnity Insurance Company

Exhibit 1
Page 30

means any physical damage to the body caused by violence, fracture or an accident.

**L.** "Key individual replacement expenses" mean the following necessary expenses:

    **1.** Costs of advertising the employment position opening;

    **2.** Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

    **3.** Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up an employment contract.

**M.** "Natural catastrophe" means hurricane, tornado, earthquake or flood.

**N.** "Non-reimbursable expenses" means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, and for which your director or officer produces a receipt:

    **1.** Meals and lodging;

    **2.** Alternative transportation;

    **3.** Clothing and necessary toiletries; and

    **4.** Emergency prescription and non-prescription drug expenses.

**O.** "Political unrest" means:

    **1.** A short-term condition of disturbance, turmoil or agitation within a foreign country that poses imminent risks to the security of citizens of the United States;

    **2.** A long-term condition of disturbance, turmoil or agitation that makes a foreign country dangerous or unstable for citizens of the United States; or

    **3.** A condition of disturbance, turmoil or agitation in a foreign country that constrains the United States Government's ability to assist citizens of the United States, due to the closure or inaccessibility of an embassy or consulate or because of a reduction of its staff

for which either an alert or travel warning has been issued by the United States Department of State.

**P.** "Principal location" means the headquarters, home office or main location where most business is substantially conducted.

**Q.** "Unforeseeable destruction" means damage resulting from a "certified act of terrorism," fire, collision or collapse which renders all of the insured's "principal locations" completely unusable.

**R.** "Workplace violence" means any intentional use of or threat to use deadly force by any person with intent to cause harm and that results in bodily "injury" or death of any person while on the insured's premises.

PI-CAP-ETS (11/17)

## PHILADELPHIA INDEMNITY INSURANCE COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# U.S. ECONOMIC AND TRADE SANCTIONS CLAUSE ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

**Community Association Executive Advantage Policy**

The policy is amended as follows:

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void. Similarly, any coverage relating to or referred to in any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

All other terms, conditions, and exclusions of this Policy remain unchanged.

PI-CAP-ETS (11/17)        @2017 Philadelphia Consolidated Holding Corp.

Exhibit 1
Page 32

PI-CME-1 (10/09)

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CRISIS MANAGEMENT ENHANCEMENT ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

Solely for the purpose of this endorsement:  1) The words  "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  2) The words "we," "us" and "our" refer to the company providing this insurance.

**I.    SCHEDULE OF ADDITIONAL COVERAGE AND LIMITS**

The following is the Limit of Liability provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

Crisis Management Expense                                                        $25,000

**II.    CONDITIONS**

**A.    Applicability of Coverage**

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.  All other terms and conditions of the policy or coverage part to which this endorsement is attached remain unchanged.

**B.    Limits of Liability or Limits of Insurance**

When coverage is provided by this endorsement and any other coverage form or endorsement attached to this policy, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Liability or Limit of Insurance.

**C.    Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III.    ADDITIONAL COVERAGES**

**A.**    We will reimburse you for "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies.  The amount of such reimbursement is limited as described in Section **II. CONDITIONS, B. Limits of Liability or Limits of Insurance**.  No other obligation or liability to pay sums or perform acts or services is covered.

**B.**    We will reimburse only those "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six (6) months of the date the "crisis" was initiated.

©2016 Philadelphia Consolidated Holding Corp

PI-CME-1 (10/09)

Exhibit 1
Page 33

PI-CME-1 (10/09)

## IV.   DEFINITIONS

**A.**  "Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

**B.**  "Crisis management emergency response expenses" mean those expenses incurred for services provided by a "crisis management firm."  However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

**C.**  "Crisis management firm" means any service provider you hire that is acceptable to us.  Our consent will not be unreasonably withheld.

**D.**  "Incident" means an accident or other event, including the accidental discharge of pollutants, resulting in death or "serious bodily injury" to three or more persons.

**E.**  "Serious bodily injury" means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

©2016 Philadelphia Consolidated Holding Corp

PI-CME-1 (10/09)

Exhibit 1
Page 34

PI-SLD-001 (01/15)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

DIRECTORS AND OFFICERS LIABILITY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism subject to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**3.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

Exhibit 1
Page 35

PI-CAP-021 (11/17)

## PHILADELPHIA INDEMNITY INSURANCE COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## WAGE AND HOUR ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

**Community Association Executive Advantage Policy**

The policy is amended as follows:

In consideration of the premium paid, it is hereby understood and agreed that this Policy is amended as follows:

1. The following sublimited coverage shall be added to this Policy subject to all terms and conditions unless noted herein:

   ### WAGE AND HOUR EXPENSE COSTS SUBLIMIT

   The Insurer shall pay on behalf of the **Insureds** for **Wage and Hour Expense Costs** incurred by the **Insured Organization** with the Insurer's consent, resulting from a **Wage and Hour Wrongful Act** that is brought and maintained by or on behalf of any past or present full-time, part-time or leased employee of the **Insured Organization.**  The **Wage and Hour Wrongful Act** must first be made against such **Insured Organization** during the **Policy Period** for a **Wrongful Act** taking place before or during the **Policy Period**.

2. As respects coverage afforded by this Endorsement, Section 7.   REPORTING REQUIREMENTS is amended to include the following:

   If an **Insured Organization** chooses to seek coverage for a **Wage and Hour Wrongful Act**, they must notify the Insurer in writing as soon as practicable after any **Executive Officer** becomes aware of such **Wage and Hour Wrongful Act**, but in no event later than 90 days after the end of the **Policy Period**, if applicable.

   Notice of any Wage and Hour Wrongful Act shall be forwarded to [**Philadelphia Insurance Companies Attention: Claims Department, One Bala Plaza Suite 100, Bala Cynwyd, PA 19004-0950**] claimsreport@phly.com

   All notices under this **Policy** shall be sent in writing by mail, email, prepaid express courier or facsimile and shall be effective upon receipt thereof by the addressee.

3. For purposes of coverage provided by this Endorsement, the following exclusion shall apply:

   The Insurer shall not be liable for **Loss** on account of any **Claim** made against any **Insured** for an actual or alleged violation of the responsibilities, obligations or duties imposed by the Fair Labor Standards Act (except the Equal Pay Act) or any other similar state or local law concerning wage and hour practices, including but not limited to any **Claim** for overtime, off-the-clock work, failure to provide rest or meal periods, failure to reimburse expenses, improper classification of employees as exempt or non-exempt, failure to timely pay wages, conversion, unjust enrichment or unfair business practices; however, the Insurer shall

PI-CAP-021 (11/17)

@2017 Philadelphia Consolidated Holding Corp.

Exhibit 1
Page 36

PI-CAP-021 (11/17)

## PHILADELPHIA INDEMNITY INSURANCE COMPANY

provide an Aggregate Sublimit of Liability of $150,000 and subject to a Retention of $1,000 for **Wage and Hour Expense Costs**.

Such Sublimit of Liability shall be part of, and not in addition to, the Limit of Liability applicable to this coverage part.

4. For purposes of this Endorsement, the following definitions shall apply:

**Wage and Hour Wrongful Act** means any actual or alleged violation of the responsibilities or duties imposed by any federal, state or local statutory or common law (including, but not limited to, the Fair Labor Standards Act) governing wage, hour and payroll practices, including but not limited to any overtime, off-the-clock work, failure to provide rest or meal periods, failure to reimburse expenses, improper classification of employees as exempt or non-exempt, failure to timely pay wages, conversion, unjust enrichment or unfair business practices (excluding the Equal Pay Act, as amended).

**Wage and Hour Expense Costs** means the reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Insured Organization** or other overhead of the **Insured Organization**) incurred by the **Insureds** in defending a **Wage and Hour Wrongful Act** against such **Insured** and the premium for appeal, attachment or similar bonds although the Insurer has no obligation to apply for or secure such bond.

All other terms, conditions, and exclusions of this Policy remain unchanged.

PI-CAP-021 (11/17)

@2017 Philadelphia Consolidated Holding Corp.

Exhibit 1
Page 37

Policy Number: PCAP033390-0122          Named Insured: Del Mar Woods



PHILADELPHIA
INSURANCE COMPANIES
A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

Terrorism Premium (Certified Acts) $0.00

# PHILADELPHIA INSURANCE COMPANIES
## DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE REJECTION OPTION

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED ABOVE AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

**Your attached proposal (or policy) includes a charge for terrorism. We will issue (or have issued) your policy with terrorism coverage unless you decline by placing an "X" in the box below.**

**NOTE 1:** If –included is shown on your proposal (or policy) for terrorism you WILL NOT have the option to reject the coverage.

**NOTE 2:** You will want to check with entities that have an interest in your organization as they may require that you maintain terrorism coverage (e.g. mortgagees).

**EXCEPTION:** If you have property coverage on your policy, the following Standard Fire Policy states do not permit an Insured to reject fire ensuing from terrorism: CA, CT, GA, HI, IA, IL, ME, MA,MO, NJ, NY, NC, OR, RI, VA, WA, WV, WI. Therefore, if you are domiciled in the above states and reject terrorism coverage, you will still be charged for fire ensuing from terrorism as separately designated on your proposal.

Exhibit 1
Page 38

| | **I decline to purchase terrorism coverage. I understand that I will have no coverage for losses arising from "certified" acts of terrorism, EXCEPT as noted above.** |
|---|---|

**You, as the Insured, have 30 days after receipt of this notice to consider the selection/rejection of "terrorism" coverage.  After this 30 day period, any request for selection or rejection of terrorism coverage WILL NOT be honored.**

**REQUIRED IN GA – LIMITATION ON PAYMENT OF TERRORISM LOSSES** (applies to policies which cover terrorism losses insured under the federal program, including those which only cover fire losses)

The provisions of the Terrorism Risk Insurance Act, as amended, can limit our maximum liability for payment of losses from certified acts of terrorism.  That determination will be based on a formula set forth in the law involving the national total of federally insured terrorism losses in an annual period and individual insurer participation in payment of such losses.  If one or more certified acts of terrorism in an annual period causes the maximum liability for payment of losses from certified acts of terrorism to be reached, and we have satisfied our required level of payments under the law, then we will not pay for the portion of such losses above that maximum.  However, that is subject to possible change at that time, as Congress may, under the Act, determine that payments above the cap will be made.

INSURED'S SIGNATURE_____

DATE_____

FROM: Mozzi, Sharon <Sharon.Mozzi@phly.com>
TO: Claim Mail-Prod
SENT: Wednesday, November 9, 2022 10:58:17 AM Eastern Standard Time
SUBJECT: FW: Del Mar Woods HOA adv. Haidet - lawsuit filed - Claim# 1513802
ATTACHMENTS: image008.png; image014.png; image015.png; image002.png; image003.png; image004.png; image006.png; image007.jpg; image009.jpg; image010.jpg; image011.jpg; image012.jpg; image013.jpg; 10.31.22 Haidet Lawsuit.pdf;
=========================================================

**Sharon Mozzi AIC SCLA**
**Sr. Claims Examiner**
**Philadelphia Insurance Companies**
**A member of the Tokio Marine Group**

**Claims Department**
**PO Box 950**
**Bala Cynwyd, PA 19004**
**Email;** claimmail@phly.com
(please include the last 7 digits of claim# in subject line)
**One Bala Plaza Suite 100**
**Bala Cynwyd Pennsylvania 19004**
**Direct Dial:** 716.541.9568
Sharon.mozzi@phly.com
Hear what our agents are saying about their experience  with The PHLY *Difference*

From: Sylvia Salas <Sylvia.Salas@aleragroup.com>
Sent: Thursday, November 3, 2022 2:48 PM
To: Mozzi, Sharon <Sharon.Mozzi@phly.com>
Cc: Lyna Neak <lneak@nnj.com>; Dana Hopkins Mendes <dhopkins@nnj.com>; Jwhitaker@nnj.com
Subject: FW: Del Mar Woods HOA adv. Haidet - lawsuit filed - Claim# 1513802

CAUTION: Be mindful prior to opening non-TMNA attachments and/or links.

Hello Sharon,

Please see attached lawsuit received. It does not appear they have been served, however it was filed 10/26/2022.

Please reopen the claim and review for coverage.

Please let me know if there are any questions.

**\*\*PLEASE NOTE OUR NEW ADRESS BELOW\*\***

Thank you,
**Sylvia Salas, CAWC**
Claims Advocate
sylvia.salas@aleragroup.com | Direct 949-381-7722 | Mobile 949-383-6434
1500 Quail St., Suite #100 | Newport Beach, CA 92660 | CA Lic. #0M10410
www.aleragroup.com



*This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or telephone and delete the message. Thank you for your assistance.*

Exhibit 1
Page 40

From: Dana Hopkins Mendes <dhopkins@nnj.com>
Sent: Wednesday, September 2, 2022 7:19 AM
To: Sylvia Salas <Sylvia.Salas@aleragroup.com>; Lyna Neak <lneak@nnj.com>
Cc: Glenn Robinson <Glenn.Robinson@aleragroup.com>; Dana Hopkins Mendes <dhopkins@nnj.com>; Jayne Whitaker <Jwhitaker@nnj.com>
Subject: RE: Del Mar Woods HOA adv. Haidet - lawsuit filed

CAUTION: External Email.

Sylvia,

Yes, it is the same as the noise complaint received months ago. Please include Jayne (my supervisor) on all correspondence as I am going out of town on November 10.

See attached document.

*Please note: I will be on vacation from November 10 - 18, 2022 with no access to email or phone.*
*From November 19 - 30, I will be working remotely with full access to email and phone.*

Thank you!

*Dana Hopkins Mendes, CMCA®*
Community Association Manager

**N.N. Jaeschke, Inc. - An Associa Company**
**9610 Waples Street, San Diego CA 92121**

**How am I doing?** RATE MY SERVICE ON GOOGLE!

**Direct Office:** 858 795-7006
**Cell:** 619-592-1253
**Main Office:** 858 550-7900
**FAX:** 858-550-7929
**Email:** dhopkins@nnj.com - Preferred communication



From: Sylvia Salas <Sylvia.Salas@aleragroup.com>
Sent: Tuesday, November 1, 2022 6:48 PM
To: Lyna Neak <lneak@nnj.com>; Dana Hopkins Mendes <dhopkins@nnj.com>
Cc: Glenn Robinson <Glenn.Robinson@aleragroup.com>; Sylvia Salas <Sylvia.Salas@aleragroup.com>
Subject: FW: Del Mar Woods HOA adv. Haidet - lawsuit filed
Importance: High

Caution: [EXTERNAL EMAIL] This email originated from outside the company.

Hello Lyna & Dana,

Do you have a copy of the complaint? Is this related to the claim previously filed for a noise complaint? Please forward a copy of the complaint as soon as possible.

Exhibit 1
Page 41

Please note, I will be out most of the day tomorrow at client meetings. I will get the complaint to the carrier as soon as I have a copy and return to the office.

Please let me know if there are any questions.

**\*\*PLEASE NOTE OUR NEW ADRESS BELOW\*\***

Thank you,
**Sylvia Salas, CAWC**
Claims Advocate
sylvia.salas@aleragroup.com | Direct 949-381-7722 | Mobile 949-383-6434
1500 Quail St., Suite #100 | Newport Beach, CA 92660 | CA Lic. #0M10410
www.aleragroup.com



*This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply email or telephone and delete the message. Thank you for your assistance.*

From: Lyna Neak <lneak@nnj.com>
Sent: Tuesday, November 1, 2022 10:39 AM
To: Jacqueline Madera <Jacqueline.Madera@aleragroup.com>
Subject: FW: Del Mar Woods HOA adv. Haidet - lawsuit filed
Importance: High

CAUTION: External Email.

---

Hi Jackie,

The attached lawsuit was filed. Can you please open a claim for Del Mar Woods. The best point of contact will be the community manager, Dana Hopkins Mendes. Her contact info is in her email below.

Kind Regards,
Lyna Neak
Insurance Coordinator
N. N. Jaeschke, Inc. | The Prescott Companies | Professional Community Management
Associa® – To bring positive impact and meaningful value to every community.
SoCal Insurance Dept Address: 9610 Waples Street, San Diego, CA 92121-2992

*Please note – I will be out of the office  November 17 and 18.*

From: Dana Hopkins Mendes <dhopkins@nnj.com>
Sent: Monday, October 31, 2022 11:41 AM
To: Lyna Neak <lneak@nnj.com>
Cc: Alyssa Ponn <aponn@nnj.com>; Dana Hopkins Mendes <dhopkins@nnj.com>; Jayne Whitaker <Jwhitaker@nnj.com>
Subject: FW: Del Mar Woods HOA adv. Haidet - lawsuit filed
Importance: High

Lyna,

See attached document. Please inform Del Mar Woods insurance that a lawsuit was filed. We found out today that this was filed on Wednesday.

Please note: I will be on vacation from November 10 - 18, 2022 with no access to email or phone.
From November 19 - 30, I will be working remotely with full access to email and phone.

Exhibit 1
Page 42

Thank you!

*Dana Hopkins Mendes, CMCA®*
Community Association Manager

**N.N. Jaeschke, Inc. - An Associa Company**
**9610 Waples Street, San Diego CA 92121**

**How am I doing?** RATE MY SERVICE ON GOOGLE!

**Direct Office:** 858 795-7006
**Cell:** 619-592-1253
**Main Office:** 858 550-7900
**FAX:** 858-550-7929
**Email:** dhopkins@nnj.com - Preferred communication



From: David A. Kline <DKline@epsten.com>
Sent: Monday, October 31, 2022 11:39 AM
To: Dana Hopkins Mendes <dhopkins@nnj.com>
Cc: Darwin Thomas <darwin.sandiego@gmail.com>; Karen Lare <karen.lare@yahoo.com>; Brianna Becker <briannabecker@gmail.com>; Jayne Whitaker <Jwhitaker@nnj.com>; Delmarwoods <Delmarwoods@associa.us>
Subject: RE: Del Mar Woods HOA adv. Haidet - lawsuit filed

> Caution: [EXTERNAL EMAIL] This email originated from outside the company.

**Attorney-Client Privileged Confidential Communication:  For Association Manager and Board Members Only**

Hi Dana,

Thanks.  Please tender this to all applicable Association insurance carriers.

Darwin, I received your voicemail.  I will call you later today after I review the complaint.

**David A. Kline**
**Senior Attorney at Law**
10200 Willow Creek Road, Suite 100 | San Diego, CA 92131
Phone: 1.858.527.0111 | Fax: 1.858.527.1531 | Extension: 280 | www.epsten.com

To opt out of future email communications from Epsten, APC, please visit www.epsten.com/opt-out/

This message contains information which may be confidential or legally privileged. Unless you are the addressee (or are authorized to receive e-mail for

Exhibit 1
Page 43

the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message or any attachment. If you have received the message in error, please advise the sender by reply e-mail and delete the message and any attachments and destroy all hard copies. Thank you.

Federal Law Disclosure – If you are a person receiving this email communication in relation to a debt you owe, please be advised of the following, as required by Federal law: **This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose.**  California license number pending.

Important Notice Regarding Courtesy Items – Document templates, forms and/or publications provided as a courtesy should be reviewed with legal counsel to ensure they address legal issues that may be specific to your community or situation.

From: Dana Hopkins Mendes <dhopkins@nnj.com>
Sent: Monday, October 31, 2022 11:01 AM
To: David A. Kline <DKline@epsten.com>
Cc: Dana Hopkins Mendes <dhopkins@nnj.com>; Darwin Thomas <darwin.sandiego@gmail.com>; Karen Lare <karen.lare@yahoo.com>; Brianna Becker <briannabecker@gmail.com>; Jayne Whitaker <Jwhitaker@nnj.com>; Delmarwoods <Delmarwoods@associa.us>
Subject: FW: Del Mar Woods HOA adv. Haidet - lawsuit filed

Good Morning David,

Please see the attached document that was sent to us by Adams Stirling regarding a lawsuit that was filed on October 26: Haidet vs. Del Mar Woods.

Please review and advise the next steps needed by the Board. I have copied Jayne Whitaker, my supervisor on this email as I am going out of town on November 10 and she will be the NNJ representative assisting in my absence.

Please note: I will be on vacation from November 10 - 18, 2022 with no access to email or phone.
From November 19 - 30, I will be working remotely with full access to email and phone.

Thank you!

*Dana Hopkins Mendes, CMCA®*
Community Association Manager

**N.N. Jaeschke, Inc. - An Associa Company**
**9610 Waples Street, San Diego CA 92121**

**How am I doing?**  RATE MY SERVICE ON GOOGLE!

**Direct Office:** 858 795-7006
**Cell:** 619-592-1253
**Main Office:** 858 550-7900
**FAX:** 858-550-7929
**Email:** dhopkins@nnj.com - Preferred communication



From: Dana Hopkins Mendes <dhopkins@nnj.com>
Sent: Monday, October 31, 2022 10:53 AM
To: Alain Dommissey <alaindomissy@gmail.com>; Brianna Becker <briannabecker@gmail.com>; Claude Fauquet <cfauquet@gmail.com>; Darwin Thomas <darwin.sandiego@gmail.com>; Diana Ambrose <diana.ambrose11@gmail.com>; Karen Lare <karen.lare@yahoo.com>; Linda Judd <lindadearlinda@gmail.com>
Cc: Dana Hopkins Mendes <dhopkins@nnj.com>; Delmarwoods <Delmarwoods@associa.us>
Subject: FW: Del Mar Woods HOA adv. Haidet - lawsuit filed

Exhibit 1
Page 44

Importance: High

Board,

See attached letter that Jamie Hendrick sent from Adams Stirling. I will send this David Kline now. The lawsuit was filed on October 26 (last Wednesday).

Please note: I will be on vacation from November 10 - 18, 2022 with no access to email or phone.
From November 19 - 30, I will be working remotely with full access to email and phone.

Thank you!

*Dana Hopkins Mendes, CMCA®*
Community Association Manager

**N.N. Jaeschke, Inc. - An Associa Company**
**9610 Waples Street, San Diego CA 92121**

**How am I doing?** RATE MY SERVICE ON GOOGLE!

**Direct Office:** 858 795-7006
**Cell:** 619-592-1253
**Main Office:** 858 550-7900
**FAX:** 858-550-7929
**Email:** dhopkins@nnj.com - Preferred communication



---

From: Jamie Handrick <jhandrick@adamsstirling.com>
Sent: Monday, October 31, 2022 10:39 AM
To: Brianna Becker <briannabecker@gmail.com>; Dana Hopkins Mendes <dhopkins@nnj.com>; Ali Quintas <aquintas@roadrunner.com>; nance brisbois <nbrisbois2020@gmail.com>
Subject: Del Mar Woods HOA adv. Haidet - lawsuit filed

> Caution: [EXTERNAL EMAIL] This email originated from outside the company.

Hello All:

Our firm monitors the court's register of actions.

Attached is information regarding a breach of contract lawsuit filed by Gregory & Kathleen Haidet against Del Mar Woods Homeowners Association. We believe this may be your Association. We know you have general counsel and that our firm is not acting in that capacity, but we wanted to pass this along in case you are not aware of it. You should contact general counsel about this as soon as possible.

Sincerely,

Jamie L. Handrick, Esq. | Partner

Exhibit 1
Page 45

**ADAMS | STIRLING PLC**
591 Camino de la Reina | Suite 920 | San Diego, CA 92108

(619) 374-7710
(800) 464-2817 | toll free

AS website | bio | vCard | email | sendfile | LinkedIn | DS website

California's Premier Law Firm Dedicated to Residential and Commercial Associations

LOS ANGELES | MURRIETA | ORANGE COUNTY | PALM DESERT | SACRAMENTO | SAN DIEGO | SAN FRANCISCO | SAN JOSE | SAN LUIS OBISPO | STOCKTON

Exhibit 1
Page 46

# SUMMONS
## (CITACION JUDICIAL)

<div style="text-align:right">
FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**10/26/2022** at 09:27:26 AM

Clerk of the Superior Court
By: Brenda Ramirez, Deputy Clerk
</div>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
DEL MAR WOODS HOMEOWNERS ASSOCIATION, a California Domestic
Nonprofit: DAVID YU, an individual, CAROLYN YU, an individual,
MATILDE CABRERA, as trustee of the MATILDE CABRERA FAMILY TRUST, and DOES 1
through 20, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
GREGORY HAIDET, an individual; and KATHLEEN
HAIDET, an individual

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* | CASE NUMBER<br>*(Número del Caso)*  37-2022-00043096-CU-BC-CTL |

SUPERIOR COURT OF CALIFORNIA
330 West Broadway
San Diego, CA 92101

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Stephen C. Grebing 178046, WINGERT GREBING BRUBAKER & JUSKIE LLP
1230 Columbia Street, Suite 400, San Diego, California 92101
619-232-8151

| | | | |
|---|---|---|---|
| DATE:  10/27/2022<br>*(Fecha)* | Clerk, by  B. Ramirez<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☑ on behalf of *(specify):* Del Mar Woods Homeowners association, a California Domestic non profit

   under:
   ☑ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☑ by personal delivery on *(date):* 10/3/22

*Page 1 of 1*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

<div style="text-align:right">
Haidet v. Del Mar Woods

Exhibit 1
Page 47
</div>

STEPHEN C. GREBING, State Bar No. 178046
sgrebing@wingertlaw.com
WINGERT GREBING BRUBAKER & JUSKIE LLP
1230 Columbia Street, Suite 400
San Diego, CA 92101-3370
(619) 232-8151; Fax (619) 232-4665

Attorneys for Plaintiffs
GREGORY HAIDET and KATHLEEN HAIDET

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**10/26/2022** at 09:27:26 AM

Clerk of the Superior Court
By Brenda Ramirez, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN DIEGO - CENTRAL DIVISION

GREGORY HAIDET, an individual; and
KATHLEEN HAIDET, an individual,

Plaintiffs,

vs.

DEL MAR WOODS HOMEOWNERS
ASSOCIATION, a California Domestic
Nonprofit; DAVID YU, an individual,
CAROLYN YU, an individual, MATILDE
CABRERA, as trustee of THE MATILDE
CABRERA FAMILY TRUST, and DOES 1
through 20, inclusive,

Defendants.

Case No.:    37-2022-00043098-CU-BC-CTL

**COMPLAINT FOR:**

1. **NUISANCE;**
2. **BREACH OF CONTRACT;**
3. **BREACH OF FIDUCIARY DUTY; AND**
4. **DECLARATORY RELIEF**

Action Filed:
Trial Date:

COMES NOW, Plaintiffs GREGORY and KATHLEEN HAIDET and complain against

Defendants DEL MAR WOODS HOMEOWNERS ASSOCIATION, DAVID YU, CAROLYN YU,

MATILDE CABRERA as trustee of THE MATILDE CABRERA FAMILY TRUST and DOES 1-20,

as follows:

### PARTIES AND VENUE

1.      Plaintiffs GREGORY and KATHLEEN HAIDET at all times relevant to this action

were and are husband and wife jointly owning real property located in the County of San Diego.

2.      Plaintiffs allege at all times relevant to this action Defendant DEL MAR WOODS

HOMEOWNERS ASSOCIATION [hereinafter "DMWHOA"] was and is a California non-profit

Exhibit 1
Page 48

1    mutual benefit corporation duly organized under the laws of the State of California. Defendant

2    DMWHOA operates and manages Del Mar Woods, a residential condominium development located

3    on Sea Forest Drive, Surfview, Spinnaker, Stratford Court, and Dolphin Cove Ct in Del Mar, County

4    of San Diego, California 92104 [the "DEVELOPMENT"].

5        3.    Plaintiffs allege at all times relevant to this action Defendants DAVID YU and

6    CAROLYN YU, as husband and wife [hereinafter "YU"], owned real property in San Diego County.

7        4.    Plaintiffs allege at all times relevant to this action Defendant MATILDE CABRERA

8    was and is the trustee of THE MATILDE CABRERA FAMILY TRUST [collectively as

9    "CABRERA"] who resides in San Diego County.

10       5.    The incidents that give rise to this action all took place and the real property involved

11    in the same is located in San Diego County.

12       6.    The true names and capacities, whether individual, corporate, associate, or otherwise,

13    of Defendants DOES 1 through 20, inclusive, are unknown to Plaintiffs at this time who, therefore,

14    sues these Defendants by such fictitious names.  When the true names and capacities of these

15    Defendants are ascertained, Plaintiffs will amend this Complaint to allege their true names and

16    capacities. Plaintiffs are informed and believe and thereon allege that each of these fictitiously named

17    Defendants is responsible in some manner for the occurrences herein alleged and in receipt of the

18    funds specified.

19       7.    Plaintiffs are informed and believe and thereon allege that at all times relevant hereto

20    each of the Defendants was the agent, employee, or representative of each and every other Defendant

21    herein and, in doing the things herein alleged, Defendants acted within the course and scope of their

22    agency and employment, and with the permission, consent, or ratification of each and every other

23    Defendant in performing the acts or defalcations hereinafter alleged.

24                            **GENERAL ALLEGATIONS**

25       8.    Plaintiffs own, possess and control real property located in San Diego County,

26    California, commonly known as 248 Dolphin Cove Court, Del Mar, California 92014 ("HAIDET

27    UNIT").

28       9.    YU was, at all times mentioned in this complaint until October 2022, the owner in

WINGERT GREBING BRUBAKER & JUSKIE LLP

{00770144 DOCX}

2
COMPLAINT

Exhibit 1
Page 49

WINGERT GREBING BRUBAKER & JUSKIE LLP

1  possession and control of a single-family residence located in San Diego County, California,

2  commonly known as 250 Dolphin Cove Court, Del Mar, California 92014 [the "YU UNIT"]. The YU

3  UNIT is a single-family residence within the DEVELOPMENT managed by DMWHOA.

4       10.    On October 11, 2022, CABRERA became the legal owner of the YU UNIT.

5       11.    Defendant DMWHOA recorded with the San Diego County Recorder's Office a

6  Declaration of Restrictions [the "CC&Rs"]. A true and correct copy of the CC&Rs is attached hereto

7  as Exhibit 1.

8       12.    The covenants and restrictions contained in the CC&Rs constitute equitable servitudes

9  under Civil Code Section 5975 which inure to the benefit of, and are binding on, all owners of single-

10  family residences within the DEVELOPMENT, including Plaintiffs, YU and CABRERA.

11       13.    In addition to the CC&Rs, DMWHOA's governing documents include, among others,

12  both its Bylaws as well as its Architectural Procedures and Standards, [collectively, the

13  "GOVERNING DOCUMENTS"]. True and correct copies of DMWHOA Bylaws and Architectural

14  Procedures and Standards are attached hereto collectively as Exhibit 2.

15       14.    Section 7.2 of the CC&Rs provides in pertinent part: "Modifications to the interior of

16  Units which involve alterations to the floor plan, removal or modification of a wall, or which may

17  have the potential to affect the Common Area, including the walls, roofs and mechanical or utility

18  systems, shall require prior approval."

19       15.    Section 12.2 of the CC&Rs provides in pertinent part: "Nuisance. The result of every

20  act or omission, whereby any provision, condition, restriction, covenants, easement or reservation

21  contained in the Governing Documents is violated in whole or in part, is declared to be and constitute

22  a nuisance, and every remedy allowed by law or equity against a nuisance, either public or private,

23  shall be applicable against every such result and may be exercised by any Owner and the

24  Association."

25       16.    Section D.1 of the GOVERNING DOCUMENTS states: "Any homeowner who plans

26  any change or any improvements shall first apply for plan approval of the proposed improvement."

27       17.    The GOVERNING DOCUMENTS Policy Number 03 "Flooring Replacement – Sound

28  Control" section C. provides in pertinent part: "WOOD AND SIMULATED WOOD: […] For upper

1    units on the east side of Stratford Court, homeowners must obtain written permission from the owner

2    of the unit below and submit with [Architectural Review Committee] request."

3        18.      The HAIDET UNIT is located directly below the YU UNIT.

4        19.      In 2009, YU caused hardwood flooring to be improperly installed at the YU UNIT. In

5    doing so, YU failed to prepare and submit to DMWHOA a "plan approval of the proposed

6    improvement." YU did not obtain "written permission from the owner of the unit below". As a

7    result, the installation of the hard wood flooring, support wall removal and gas line in the YU UNIT

8    were not approved by DMWHOA. Subsequently, YU has admitted the required approval was never

9    obtained.

10       20.      In addition to not having submitted a plan for approval with below unit owner

11    approval, Plaintiffs allege the flooring was not installed in compliance with the specifications

12    provided for in the GOVERNING DOCUMENTS with respect to the installation of hard wood

13    flooring within the DEVELOPMENT.

14       21.      As a result of YU's failure to install the hard wood flooring in the YU UNIT in

15    compliance with the GOVERNING DOCUMENTS, Plaintiffs are daily, constantly and continuously

16    subjected to the transmission of sound and noise from the YU UNIT to their unit below. The noise is

17    caused by walking on the non-compliant hard wood flooring and incorrect sound barrier. It has

18    interrupted their use and enjoyment of the HAIDET UNIT.

19       22.      Plaintiffs complained of the sound transmission to YU and DMWHOA. YU's agent

20    and DMWHOA's property manager came to the HAIDET UNIT to observe the sound transmission

21    from the YU UNIT. YU's agent and DMWHOA's property manager both acknowledged the

22    existence of the sound transmission from the hard wood flooring.

23       23.      Thereafter, Plaintiffs made multiple demands on YU to remove the hard wood flooring

24    from the YU UNIT. To date, YU has refused.

25       24.      With YU refusing to remove the hard wood flooring from the YU UNIT, Plaintiffs

26    demanded DMWHOA enforce the CC&Rs and GOVERNING DOCUMENTS by ordering YU to

27    remove the hard wood flooring from the YU UNIT.

28       25.      After investigating Plaintiffs' complaint, on or about January 24, 2022, DMWHOA

WINGERT GREBING BRUBAKER & JUSKIE LLP

Exhibit 1
Page 51

1  issued a Notice of Violation to YU concerning the existence of the hard wood flooring in the YU

2  UNIT.

3      26.    In February 2022, a second Notice of Violation was sent by DMWHOA to YU

4  concerning the hard wood flooring in the YU UNIT.

5      27.    After sending two (2) Notices of Violation, DMWHOA has refused to take further

6  action against YU.

7      28.    As a result of both YU's refusal to remove the hard wood flooring, DMWHOA's

8  refusal to enforce the CC&Rs and GOVERNING DOCUMENTS, and the ongoing and continuing

9  interruption of their use and enjoyment of the HAIDET UNIT, Plaintiffs were left with no other

10  alternative but to instigate this litigation.

## FIRST CAUSE OF ACTION

### Nuisance

### (Against Defendants YU, CABRERA and DOES 1-20)

15      29.    Plaintiffs re-allege and incorporate Paragraphs 1 through 28 as though fully set forth

16  herein.

17      30.    Plaintiffs allege YU's and CABRERA's conduct in refusing to remove the hard wood

18  flooring from the YU UNIT has and continues to constitute a nuisance within the meaning of the

19  GOVERNING DOCUMENTS and the CC&Rs, as well as California Code of Civil Procedure section

20  3479 and other applicable law. With the continual and constant transmission of sound intrusion into

21  the HAIDET UNIT from the YU UNIT as a direct result of the existence of the hard wood flooring in

22  the YU UNIT, YU did, and CABRERA continues to unreasonably interfere with Plaintiffs' use and

23  enjoyment of the HAIDET UNIT.

24      31.    Plaintiffs are informed, believe, and thereon allege YU and CABRERA, at all times

25  mentioned herein, have been acting and/or failing to act as alleged to interfere with Plaintiffs' use and

26  enjoyment and use of the HAIDET UNIT so as to annoy, disturb, vex, and irritate Plaintiffs resulting

27  in ongoing and continuing damage to them.

28      32.    Plaintiffs are informed, believe, and thereon allege ordinary persons in Plaintiffs'

WINGERT GREBING BRUBAKER & JUSKIE LLP

1    position would be reasonably annoyed and/or disturbed by the conduct of YU and CABRERA and the

2    resulting transmission of sound from the YU UNIT to the HAIDET UNIT.

3        33.    The actions of YU and CABRERA have caused harm to Plaintiff and Defendant's

4    actions are a substantial factor in causing Plaintiffs harm in excess of $100,000 and is continuing and

5    ongoing while the hard wood floors in the YU UNIT remain in existence, including a diminution in

6    value of the HAIDET UNIT.

7        34.    The CC&Rs contain an attorney's fees provision. As a result of the breach of the

8    CC&Rs, Plaintiffs have necessarily incurred attorney's fees and costs in dealing with the nuisance

9    created, caused and maintained by YU and CABRERA.

10    <center>**SECOND CAUSE OF ACTION**</center>

11    <center>**Breach of Contract**</center>

12    <center>**(Against DMWHOA, YU, CABRERA and DOES 1-20)**</center>

13        35.    Plaintiffs re-allege and incorporate Paragraphs 1 through 34 as though fully set forth

14    herein.

15        36.    The covenants and restrictions contained in the CC&Rs constitute equitable servitudes

16    under Civil Code Section 5975 which inure to the benefit of, and are binding on, all owners of single-

17    family residences within the DEVELOPMENT, including Plaintiffs, YU and CABRERA.

18        37.    Pursuant to Section 5.1 of the CC&Rs, DMWHOA and any other owner has the right

19    to enforce the "all restrictions, conditions, covenants, reservations, liens and charges now or hereafter

20    imposed by the Governing Documents."

21        38.    The GOVERNING DOCUMENTS require owners to seek and obtain approval from

22    DMWHOA for the installation of hard wood flooring in units. YU failed to obtain said approval from

23    DMWHOA prior to the installation of hard wood flooring in the YU UNIT.

24        39.    Plaintiffs have performed all obligations imposed upon them by the CC&Rs and

25    GOVERNING DOCUMENTS.

26        40.    DMWHOA has failed to perform the obligations imposed upon it by refusing to

27    enforce the CC&Rs and GOVERNING DOCUMENTS against YU and CABRERA by refusing to

28    demand the unapproved hard wood flooring in the YU UNIT be removed. Further, DMWHOA has

WINGERT GREBING BRUBAKER & JUSKIE LLP

Exhibit 1
Page 53

1   failed to perform the obligations imposed upon it by refusing to cure a nuisance within the

2   DEVELOPMENT after said nuisance was reported by Plaintiffs and acknowledged by DMWHOA's

3   property manager.

4       41.     After investigating Plaintiffs complaint of sound transmission from the YU UNIT,

5   DMWHOA investigated the complaint and ultimately issued two (2) Notices of Violation to YU. The

6   violations were based upon the CC&Rs and GOVERNING DOCUMENTS. However, DMWHOA

7   has not taken any further action.

8       42.     YU and CABRERA have failed to perform the obligations imposed upon them by

9   refusing to abide by the CC&Rs and GOVERNING DOCUMENTS by refusing to remove the

10  unapproved hard wood flooring in the YU UNIT after it was installed without DMWHOA approval

11  and in a manner not in compliance with the requirements of the GOVERNING DOCUMENTS.

12  Further, YU and CABRERA have failed to perform the obligations imposed upon them by refusing to

13  cure a nuisance within the DEVELOPMENT after said nuisance was reported by Plaintiffs and

14  acknowledged by YU's agent.

15      43.     As a direct and proximate result of the breach of the CC&Rs and GOVERNING

16  DOCUMENTS by DMWHOA, YU and CABRERA, Plaintiffs have been harmed and damaged.

17      44.     The CC&Rs contain an attorney's fees provision. As a result of the breach of the

18  CC&Rs, Plaintiffs have necessarily incurred attorney's fees and costs in dealing with the nuisance

19  created, caused and maintained by YU and CABRERA as aided by DMWHOA.

20                        **THIRD CAUSE OF ACTION**

21                         **Breach of Fiduciary Duty**

22                      **(Against DMWHOA and DOES 1-20)**

23      45.     Plaintiffs re-allege and incorporate Paragraphs 1 through 44 as though fully set forth

24  herein.

25      46.     The covenants and restrictions contained in the CC&Rs constitute equitable servitudes

26  under Civil Code Section 5975 which inure to the benefit of, and are binding on, all owners of single-

27  family residences within the DEVELOPMENT, including Plaintiffs, YU and CABRERA.

28

*WINGERT GREBING BRUBAKER & JUSKIE LLP*

Exhibit 1
Page 54

WINGERT GREBING BRUBAKER & JUSKIE LLP

47.     Under California law and authority, DMWHOA owes a fiduciary duty to each member to enforce the CC&Rs and GOVERNING DOCUMENTS: A homeowners' association, through its board of directors, has a duty to enforce its governing documents. (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 373-374, 380-383.) The enforcement of CC&Rs must be "in good faith, not arbitrary or capricious, and by procedures which are fair and uniformly applied." (*Liebler v. Point Loma Tennis Club* (1995) 40 Cal.App.4th 1600, 1610; *Nahrstedt, supra,* 8 Cal.4th at p. 383; *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App. 3d 642, 650-652.) "This statutory presumption of reasonableness requires that recorded covenants and restrictions be enforced "'unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit.'" (*Market Lofts v. 9th Street Market Lofts.*)

48.     The GOVERNING DOCUMENTS require owners to seek and obtain approval from DMWHOA for the installation of hard wood flooring in units. YU failed to obtain said approval from DMWHOA prior to the installation of hard wood flooring in the YU UNIT. After investigating Plaintiffs complaint of sound transmission from the YU UNIT, DMWHOA investigated the complaint and ultimately issued two (2) Notices of Violation to YU. The violations were based upon the CC&Rs and GOVERNING DOCUMENTS.

49.     Even after issuing the Notices of Violation, DMWHOA has refused to enforce the CC&Rs and GOVERNING DOCUMENTS.

50.     In doing so, DMWHOA has failed to use reasonable care and has breached the fiduciary duty it owes to Plaintiffs and all owners in the DEVELOPMENT by refusing to enforce the CC&Rs and GOVERNING DOCUMENTS against YU and CABRERA even after its own property manager acknowledged the existence of unwarranted sound transmission from the YU UNIT to the HAIDET UNIT as a result of the hard wood floors – a clear violation of the CC&Rs and GOVERNING DOCUMENTS.

51.     As a result of the conduct of DMWHOA, Plaintiffs have been and continue to be harmed. DMWHOA's conduct was and is a substantial factor in causing the harm suffered by Plaintiffs. This harm includes the diminution in value of the HAIDET UNIT.

Exhibit 1
Page 55

52.    The CC&Rs contain an attorney's fees provision. As a result of the breach of the CC&Rs and GOVERNING DOCUMENTS, Plaintiffs have necessarily incurred attorney's fees and costs in the prosecution of this action.

### FOURTH CAUSE OF ACTION

#### Declaratory Relief

#### (Against DMWHOA)

53.    Plaintiffs re-allege and incorporate Paragraphs 1 through 52 as though fully set forth herein.

54.    An actual controversy now exists between Plaintiffs and DMWHOA in that Plaintiffs maintain the CC&Rs and GOVERNING DOCUMENTS forbid YU's installation of hard wood flooring in the YU UNIT without DMWHOA approval and consent. DMWHOA has not provided its approval and consent. Plaintiffs have demanded DMWHOA enforce the CC&Rs and GOVERNING DOCUMENTS by requiring YU and/or CABRERA to remove the hard wood flooring from the YU UNIT and DMWHOA has refused to do so. Accordingly, Plaintiffs requests the Court adjudicate said controversy, interpret the GOVERNING DOCUMENTS and the CC&Rs, and issue its declaration of the rights, duties, and obligations of parties to said written documents and as to whether or not DMWHOA shall be ordered to enforce the CC&Rs and GOVERNING DOCUMENTS as requested by Plaintiffs as against YU and CABRERA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment against DMWHOA, YU and CABRERA and requests the following be awarded:

    i.    Compensatory, general and consequential damages according to proof;

    2.    Attorney's fees and costs of suit as allowed by the CC&Rs and law;

    3.    An Order from this Court requiring DMWHOA to enforce the CC&Rs and GOVERNING DOCUMENTS against YU and CABRERA; and

///

///

///

WINGERT GREBING BRUBAKER & JUSKIE LLP

[00790144.DOCX]

9

**COMPLAINT**

Exhibit 1
Page 56

1     4.  Such other further relief as the Court deems just and proper.

2

3  Dated:  October 24, 2022       WINGERT GREBING BRUBAKER & JUSKIE LLP

4

5

6

7               By:_____

8                  STEPHEN C. GREBING
                    Attorneys for Plaintiffs

9                  GREGORY HAIDET and KATHLEEN
                  HAIDET

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

Exhibit 1
Page 58

Recording Requested By:

When Recorded, Return To:

Susan M. Hawks McClintic, Esq.
EPSTEN GRINNELL & HOWELL, APC
9980 Carroll Canyon Road, Second Floor
San Diego, CA 92131

For Recorder's Use

## 2003 AMENDED AND RESTATED

## DECLARATION OF RESTRICTIONS

## FOR

## DEL MAR WOODS
*A Residential Condominium Development*

Exhibit 1
Page 59

## TABLE OF CONTENTS

R E C I T A L S ...................................................................................................................1

**ARTICLE 1 - DEFINITIONS**..............................................................................................2
    1.1        *"Articles"* ......................................................................................2
    1.2        *"Association"* ................................................................................2
    1.3        *"Board"* .........................................................................................2
    1.4        *"Bylaws"* .......................................................................................2
    1.5        *"Common Area"* ...........................................................................2
    1.6        *"Condominium"*............................................................................2
    1.7        *"Condominium Plan"* ..................................................................2
    1.8        *"Exclusive Use Common Area"* ..................................................3
    1.9        *"Governing Documents"* .............................................................3
    1.10      *"Lender"* .......................................................................................3
    1.11      *"Member"* ......................................................................................3
    1.12      *"Mortgage"* ...................................................................................3
    1.13      *"Owner"* ........................................................................................3
    1.14      *"Person"* .......................................................................................4
    1.15      *"Phase Lot"* ..................................................................................4
    1.16      *"Project"* .......................................................................................4
    1.17      *"Property"* .....................................................................................4
    1.18      *"Restated Declaration"* ...............................................................4
    1.19      *"Rules and Regulations"* .............................................................4
    1.20      *"Unit"* ............................................................................................4

**ARTICLE 2 - THE PROPERTY**.........................................................................................4
    2.1        *Project Subject to Restated Declaration* ....................................4
    2.2
        *Area*...............................................................................................4
    2.3        *Equitable Servitudes*....................................................................5
    2.4        *Prohibition Against Partition*......................................................5
    2.5        *Presumption Regarding Boundaries of Units*..............................5
    2.6        *Prohibition Against Severance of Elements* ................................5

Exhibit 1
Page 60

ARTICLE 3 - ASSOCIATION ........................................................................................................ 5
    3.1          *Organization of the Association* ..................................................................... 5
    3.2          *Board of Directors* ............................................................................................. 6
    3.3          *Membership* ........................................................................................................ 6
    3.4          *Membership Class; Voting Rights* ................................................................. 6
    3.5          *General Powers and Authority* ....................................................................... 6
    3.6          *Duties of the Association* .................................................................................. 8

ARTICLE 4 - ASSESSMENTS AND COLLECTION PROCEDURES ......................................... 9
    4.1          *Covenant to Pay* ................................................................................................ 9
    4.2          *Purpose of Assessments* ................................................................................. 9
    4.3          *Regular Assessments* ....................................................................................... 9
    4.4          *Special Assessments* ........................................................................................ 10
    4.5          *Limitations on Regular and Special Assessments* ................................... 10
    4.6          *Owner Notice of Regular and Special Assessments* ............................... 10
    4.7          *Individual Assessments* .................................................................................. 11
    4.8          *Utility Assessments* .......................................................................................... 11
    4.9          *Monetary Penalty Assessments* ................................................................... 11
    4.10        *Units Not Subject To Assessment* ................................................................ 12
    4.11        *Costs, Late Charges and Interest* ................................................................ 12
    4.12        *Priority of Payments* ........................................................................................ 12
    4.13        *No Offsets* ........................................................................................................... 12
    4.14        *Enforcement of Assessments and Late Charges* ..................................... 12
    4.15        *Priority of Assessment Lien* ........................................................................... 13
    4.16        *Statement of Delinquent Assessment* ......................................................... 14

ARTICLE 5 - USE RESTRICTIONS AND COVENANTS .......................................................... 14
    5.1          *General* ................................................................................................................ 14
    5.2          *Common Area* ..................................................................................................... 14
    5.3          *General Restrictions on Use* .......................................................................... 17
    5.4          *Damage Liability* ............................................................................................... 20
    5.5          *Vacating Unit; Costs* ......................................................................................... 20

Exhibit 1
Page 61

**ARTICLE 6 - REPAIR AND MAINTENANCE**................................................................................20
    6.1        *General; Standards of Maintenance* .............................................................20
    6.2        *Division of Responsibility* ..........................................................................21
    6.3        *Owner Improvements* ...............................................................................21
    6.4        *Access over Common Area* ........................................................................21
    6.5        *Failure to Maintain* ..................................................................................21
    6.6        *Damage During Repairs* ...........................................................................21
    6.7        *Termite Control* .......................................................................................22
    6.8        *Damage Caused by Owner or Item Under Control of Owner*.....................22
    6.9        *Limitation of Liability* ...............................................................................23

**ARTICLE 7 - ARCHITECTURAL AND DESIGN CONTROL**......................................................23
    7.1        *General*...................................................................................................23
    7.2        *General Changes Requiring Prior Approval* ................................................23
    7.3        *Specific Changes* ......................................................................................24
    7.4        *Procedure for Obtaining Approval of Architectural Changes* ......................24
    7.5        *Architectural Rules* ...................................................................................25
    7.6        *Standard of Architectural Review* ...............................................................25
    7.7        *Architectural Committee* ...........................................................................25
    7.8        *Fee for Review* .........................................................................................26
    7.9        *Compensation* .........................................................................................26
    7.10      *Liability* ..................................................................................................26
    7.11      *Enforcement* ...........................................................................................26
    7.12      *Non-Compliance with Laws*.......................................................................28
    7.13      *Governmental Permits and Approvals* ........................................................28

**ARTICLE 8 - INSURANCE**......................................................................................................28
    8.1        *Fire and Casualty Insurance* ......................................................................28
    8.2        *General Liability Insurance* ........................................................................28
    8.3        *Directors and Officers Liability Insurance* ...................................................29
    8.4        *Fidelity Coverage* .....................................................................................29
    8.5        *Other Association Insurance* ......................................................................29
    8.6        *Review of Insurance; Notice of Cancellation or Modification* ........................29
    8.7        *Qualifications of Insurance Carriers* ...........................................................29

SD 155245v3

Exhibit 1
Page 62

| 8.8 | Failure to Acquire Insurance | 29 |
| 8.9 | Trustee for Policies | 30 |
| 8.10 | Insurance Premiums | 30 |
| 8.11 | Insurance Policy Deductibles | 30 |
| 8.12 | Insurance Disclosures | 31 |
| 8.13 | Individual Property Insurance | 31 |
| 8.14 | Individual Liability Insurance | 31 |
| 8.15 | Liability | 31 |

**ARTICLE 9 - DAMAGE OR DESTRUCTION** .......... 32

| 9.1 | Duty to Restore | 32 |
| 9.2 | Cost of Repair | 32 |
| 9.3 | Repair Plans | 32 |
| 9.4 | Replacement of Less Than Entire Project | 32 |
| 9.5 | Insurance Proceeds | 33 |
| 9.6 | Disbursements to Owners and Lenders | 33 |
| 9.7 | Certificates By Board | 33 |
| 9.8 | Certificates by Attorneys or Title Insurance Companies | 33 |

**ARTICLE 10 - EMINENT DOMAIN** .......... 33

| 10.1 | Representation by Association | 33 |
| 10.2 | Common Area Taking | 34 |
| 10.3 | Condominium Unit Taking | 34 |
| 10.4 | Substantial Taking | 34 |

**ARTICLE 11 - RIGHTS OF LENDERS** .......... 34

| 11.1 | General | 34 |
| 11.2 | No Right of First Refusal | 34 |
| 11.3 | Unpaid Dues or Charges | 35 |
| 11.4 | Payment of Taxes and Insurance | 35 |
| 11.5 | Priority of Proceed or Award Distribution | 35 |
| 11.6 | Inspection of Documents, Books and Records | 35 |
| 11.7 | Non-Curable Breach | 35 |

Exhibit 1
Page 63

11.8     *Loan to Facilitate* ................................................................ 35
11.9     *Lenders Furnishing Information* .................................... 35

**ARTICLE 12 - ENFORCEMENT** ............................................... 36
12.1     *Right to Enforce; Remedies* ........................................ 36
12.2     *Nuisance* ......................................................................... 36
12.3     *Failure to Enforce* ......................................................... 36
12.4     *Violation of Law* ............................................................ 36
12.5     *Compliance with Statute* ............................................. 36

**ARTICLE 13 - AMENDMENTS** ................................................ 36
13.1     *Owner Approval of Amendments* ................................ 36
13.2     *Amendment of Restated Declaration or Bylaws by Board Vote.* ... 37
13.3     *Statute of Limitations to Challenge Amendments* ...... 37

**ARTICLE 14 - GENERAL PROVISIONS** ................................... 38
14.1     *Term* ................................................................................ 38
14.2     *Nonwaiver of Remedies* ................................................ 38
14.3     *Severability; Invalidity* .................................................. 38
14.4     *Binding* ........................................................................... 38
14.5     *Interpretation* ................................................................ 38
14.6     *Limitation of Liability* .................................................... 38
14.7     *Fair Housing* .................................................................. 38
14.8     *Number and Headings* ................................................. 38
14.9     *Attorneys' Fees* ............................................................. 39
14.10    *Variances* ....................................................................... 39
14.11    *Governing Document Priorities* ................................... 40
14.12    *Conflict with Statutes* ................................................... 40

Exhibit 1
Page 64

# 2003 AMENDED AND RESTATED

## DECLARATION OF RESTRICTIONS

### FOR

### DEL MAR WOODS

THIS 2003 AMENDED AND RESTATED DECLARATION OF RESTRICTIONS is made on the day and year hereinafter written, by Del Mar Woods, a California nonprofit mutual benefit corporation ("Association"), with reference to the following Recitals.

## R E C I T A L S

A.    The Association is a corporation whose Members are the Owners of all the Condominium Units within that certain real property in the City of Del Mar, County of San Diego, State of California, more particularly described as follows:

Lots 1 through 5, inclusive, according to Map thereof No. 7285 filed in the Office of the County Recorder of San Diego County, California, on May 17, 1972.

B.    The Property was developed as a Condominium Project, as defined in section 1351(f) of the California Civil Code, and consists of one hundred twenty six (126) Condominium Units and related Common Areas.  The development and sale of the Condominium Units occurred in three (3) phases, as follows:  Phase 1 consisted of twenty- four (24) Condominium Units, Phase 2 consisted of forty (40) Condominium Units and Phase 3 consisted of sixty-two (62) Condominium Units.

C.    Ownership of the Property is currently subject to the covenants, conditions, restrictions, rights, reservations, easements, equitable servitudes, liens and charges set forth in the Declaration of Restrictions recorded October 4, 1972, as File/Page No. 72-266901, recorded in the Official Records of the County Recorder of San Diego County, and is hereinafter referred to as "*Declaration*," unless the context clearly indicates otherwise.

1

SD 155245v3

Exhibit 1
Page 65

D.    The Association now desires to amend and restate the Declaration and replace it in its entirety with this Restated Declaration.  The Association further desires that, upon recordation of this Restated Declaration, the Property shall be subject to the covenants, conditions, restrictions, rights, reservations, easements, equitable servitudes, liens and charges contained herein, and that this Restated Declaration take the place of and relate back in time to the recording of the original Declaration.

E.    The Declaration, in Section 16, provides that it may be amended by the affirmative vote or written consent of seventy-five percent (75%) of the total voting power of the Association.  The undersigned President and Secretary of the Association certify that, to the best of their knowledge, the affirmative vote or written consent of at least the required percentage of Association Members has been obtained.

NOW, THEREFORE, the Association hereby declares that all of the Property is and shall continue to be held, conveyed, hypothecated, encumbered, leased, rented, used, occupied, and improved subject to the declarations, limitations, covenants, conditions, restrictions, reservations, rights, and easements set forth in this Restated Declaration, and as may be amended from time to time, all of which are declared and agreed to be in furtherance of a plan established for the purpose of enhancing and perfecting the value, desirability, and attractiveness of the Property.  All provisions of this Restated Declaration shall constitute covenants running with the land and enforceable equitable servitudes upon the Property, and shall be binding on and for the benefit of all of the Property and all parties having or acquiring any right, title, or interest in all or any part of the Property, including the heirs, executors, administrators, and assigns of these parties and all subsequent owners and lessees of all or any part of a Condominium.

## D E C L A R A T I O N

### 1ARTICLE  - DEFINITIONS

1.1    *"Articles"* means the Articles of Incorporation of Del Mar Woods , filed in the Office of the Secretary of State of the State of California on April 14, 1972 as File No. 0649461, and any amendments thereto now existing or hereafter adopted.

1.2    *"Association"* means Del Mar Woods, a California nonprofit mutual benefit corporation created for the purpose of managing a common interest development.

1.3    *"Board"* means the Board of Directors of the Association.

2

Exhibit 1
Page 66

1.4    **"Bylaws"** means the Bylaws of the Association and any duly adopted amendments thereto, which are incorporated herein by reference.

1.5    **"Common Area"** means the entire Property except all Units as defined in this Restated Declaration and as shown on the Condominium Plan.

1.6    **"Condominium"** means an estate in real property consisting of a separate interest in a Unit, the boundaries of which are shown and described on the Condominium Plan, a fractional undivided interest as a tenant-in-common in the Common Area, a membership in the Association, and the exclusive right to use any Exclusive Use Common Area appurtenant to the Unit as shown on the Condominium Plan or deed of conveyance.

1.7    **"Condominium Plan"** means collectively those certain condominium plans as follows:

1.7.1    The Condominium Plan for Phase 1, recorded September 19, 1972, as File/Page No. 72-250300.

1.7.2    The Condominium Plan for Phase 2, recorded February 1, 1973, as File/Page No. 73-029170.

1.7.3    The Condominium Plan for Phase 3, recorded May 1, 1973, as File/Page No. 73-116641.

All of the above documents are of Official Records of the County Recorder of San Diego County. Condominium Plan shall include any amendments to the above documents.

1.8    **"Exclusive Use Common Area"** means those portions of the Common Area designated herein for the exclusive use of one (1) or more, but fewer than all, of the Owners and which is appurtenant to a Unit or Units as shown on the Condominium Plan or deed of conveyance and pursuant to the provisions herein. "Exclusive Use Common Areas" and "Restricted Common Areas" shall have the same meaning, and shall consist of patios, balconies, covered and open parking spaces and garages as shown and described on the Condominium Plan, and any doorsteps, stoops, porches, exterior doors and hardware incident thereto, screens and windows and related fixtures, and internal and external telephone wiring designed to serve a Unit but located outside the boundaries of the Unit as provided by section 1351(i) of the Civil Code.

3

Exhibit 1
Page 67

1.9    **"Governing Documents"** means this Restated Declaration and any other documents such as the Articles, Bylaws, Condominium Plan or Rules and Regulations which govern the operation of the Association.

1.10    **"Lender"** means a Person to whom a Mortgage is made and includes the beneficiary of a deed of trust and any guarantor or insurer of a mortgage.

1.11    **"Member"** means every person or entity entitled to membership in the Association as provided in this Restated Declaration.

1.12    **"Mortgage"** means a mortgage or deed of trust encumbering a Condominium or any other portion of the Project. "First Mortgage" means a mortgage that has priority over all other mortgages encumbering the same Condominium or other portions of the Project.

1.13    **"Owner"** means any natural person, firm, corporation, partnership, trust or other entity which owns a fee simple interest in any Unit, including the Association, and any contract sellers under recorded contracts of sale. "Owner" shall not include any persons or entities who hold an interest in a Condominium merely as security for performance of an obligation. For purposes of exercising membership rights and incurring membership obligations when an Owner is a corporation, any director, officer, employee or agent designated by corporate resolution may exercise the membership rights attributable to the corporation. When an Owner is a trust, the trustee may exercise the membership rights attributable to the trust unless otherwise designated in writing by the trustee.

1.14    **"Person"** means a natural individual, a corporation, or any other entity with the legal right to hold title to real property.

1.15    **"Phase Lot"** means the Phase 1 Lot, the Phase 2 Lot and/or the Phase 3 Lot as shown and described in the three Condominium Plans referred to in Section 1.7 herein.

1.16    **"Project"** means the common interest development which is a condominium project developed on the Property described herein and on the Condominium Plan, including all improvements thereon.

1.17    **"Property"** means the real property described in Recital "A" herein.

Exhibit 1
Page 68

1.18    **"Restated Declaration"** means this Amended and Restated Declaration of Restrictions and any amendments thereto.

1.19    **"Rules and Regulations"** means any Rules and Regulations for the Association regulating the use of the Units, Exclusive Use Common Areas, Common Areas, the Project and any facilities located thereon adopted by the Board pursuant to Subsection  herein.

1.20    **"Unit"** means that portion of a Condominium that consists of a separate interest. "Unit" does not include the other elements of the Project. Each Unit shall be a separate freehold estate, as separately shown, numbered, and designated on the Condominium Plan. Each Unit consists of a living area space or spaces bounded by and contained within the interior finished surfaces of the perimeter walls, floors, ceilings, windows, and doors (including the wall coverings and floor coverings), the boundaries of which are described on the Condominium Plan.

## 2ARTICLE - THE PROPERTY

2.1    **Project Subject to Restated Declaration** .  The entire Project shall be subject to this Restated Declaration.

2.2    **Description of Land and Improvements; Ownership of Common Area** . The Property shall consist of the Phase 1 Lot, the Phase 2 Lot, the Phase 3 Lot, and Lot 5 (referred to in the description of the Property set forth in Recital "A" herein). The Phase 1 Lot Common Area is owned by Owners of Units in the Phase 1 Lot in equal undivided one-twenty-fourth (1/24) interests.  The Phase 2 Lot Common Area is owned by Owners of Units in the Phase 2 Lot in equal undivided one-fortieth (1/40) interests. The Phase 3 Lot Common Area is owned by Owners of Units in the Phase 3 Lot in equal undivided one-sixty-second (1/62) interests.  Lot 5 is owned by the Association.  The Owners of Units in any Phase Lot shall have a nonexclusive easement over the Common Area of such Phase Lot, and over the Common Area of all other Phase Lots and Lot 5.  Such nonexclusive easements shall be subordinate to any separate ownership interests and any exclusive easements in such other Phase Lots and Lot 5.

2.3    **Equitable Servitudes**. The covenants and restrictions set forth in this Restated Declaration shall be enforceable equitable servitudes and shall inure to the benefit of and bind all Owners.  These servitudes may be enforced by any Owner or by the Association or by both.

2.4    **Prohibition Against Partition** . There shall be no judicial partition of the Project or any part of it, nor shall the Association or any person acquiring an interest in the

5

Exhibit 1
Page 69

Project or any part of it seek any judicial partition, except upon showing that such partition is consistent with the requirements of section 1359 of the California Civil Code.

2.5    ***Presumption Regarding Boundaries of Units***. In interpreting deeds, declarations and plans, the existing physical boundaries of a Unit, including any Unit reconstructed in substantial accordance with the Condominium Plan and the original construction plans for the Project, shall be conclusively presumed to be its boundaries, rather than the description expressed in the deed, Condominium Plan, or this Restated Declaration. This presumption applies regardless of settling or lateral movement of the building and regardless of minor variances between boundaries shown on the Condominium Plan or described in the deed and those of the building as constructed or reconstructed. In the event a structure is partially or totally destroyed and then repaired or rebuilt, the Owners agree that minor encroachments over adjoining Condominiums or Common Area shall be permitted and that there shall be appropriate rights for the maintenance of said encroachments so long as they shall exist.

2.6    ***Prohibition Against Severance of Elements***. Any conveyance, judicial sale, or other voluntary or involuntary transfer of a Unit shall include all interests and appurtenances as shown in the original deed of conveyance. Any conveyance, judicial sale, or other voluntary or involuntary transfer of the Owner's entire estate shall also include the Owner's membership interest in the Association, as provided in Article 3 herein. Any transfer that attempts to sever those component interests shall be void.

## 3ARTICLE - ASSOCIATION

3.1    ***Organization of the Association***. The Association is incorporated as a nonprofit corporation organized under the California Nonprofit Mutual Benefit Corporation Law. The Association is created for the purpose of managing the Project and is charged with the duties and granted the powers prescribed by law and set forth in the Governing Documents.

3.2    ***Board of Directors***. The affairs of the Association shall be managed and its duties and obligations performed by an elected Board of Directors, as provided in Article 3 of the Bylaws.

3.3    ***Membership***. Every Owner, upon becoming an Owner, shall automatically become a Member of the Association. Ownership of a Condominium is the sole qualification for membership. Each Member shall have the rights, duties, privileges, and obligations as set forth in the Governing Documents. Membership shall automatically cease when the Owner no longer holds an ownership interest in a Condominium. All memberships shall be appurtenant to the Con-

Exhibit 1
Page 70

dominium conveyed, and cannot be transferred, assigned, conveyed, hypothecated, pledged, or alienated except as part of a transfer of the Owner's entire ownership interest, and then only to the transferee.  Any transfer of the Owner's title to his or her Condominium shall automatically transfer the appurtenant membership to the transferee.

3.4  **Membership Class; Voting Rights** .  The Association shall have one class of membership and the rights, duties, obligations and privileges of the Members shall be as set forth in the Governing Documents.  Each Member shall be entitled to cast one (1) vote for each Unit owned, subject to the provisions set forth in the Bylaws.

3.5  **General Powers and Authority** .  The Association shall have all the powers of a nonprofit mutual benefit corporation organized under the California Nonprofit Mutual Benefit Corporation Law, subject to any limitations set forth in the Governing Documents. It may perform all acts that may be necessary for or incidental to the performance of the obligations and duties imposed upon it.  Its powers shall include, but are not limited to:

3.5.1    The power to establish, fix, levy, collect, and enforce the payment of assessments against the Owners in accordance with the procedures set forth in Article  herein.

3.5.2    The power to adopt reasonable Rules and Regulations governing the use of the Units, the Common Area, any common facilities and Association owned property, and the conduct at Board and Members' meetings, in accordance with the following:

(a)    The Rules and Regulations may include, but are not limited to:

(i)    Reasonable restrictions on use of the Common Area, Units and Exclusive Use Common Areas by the Owners and their families, guests, employees, tenants and invitees.

(ii)    Reasonable restrictions on the conduct of Owners and their families, guests, employees, tenants and invitees as to activities on the Common Area, Units and Exclusive Use Common Areas.

(iii)    The setting of reasonable fees, deposits and use fees for any Common Area facilities.

7

Exhibit 1
Page 71

(iv)          In accordance with Section 3.13 of the Bylaws, the establishment of reasonable hearing procedures and a schedule of monetary penalties and fines which may be imposed for violations of any provisions of the Governing Documents.

(b)          A copy of the current Rules and Regulations, if any, and all modifications, revisions and updates shall be given to each Owner.

(c)          If any provision of the Rules and Regulations conflicts with any provision of this Restated Declaration, the Articles, or the Bylaws, the Restated Declaration, Articles, or Bylaws shall control to the extent of the inconsistency.

3.5.3          The right to institute, defend, settle, or intervene in litigation, arbitration, mediation, or administrative proceedings in its own name as the real party in interest and without joining with it the Owners, in matters pertaining to:

(a)          Enforcement of the Governing Documents.

(b)          Damage to the Common Area.

(c)          Damage to any Units that the Association is obligated to maintain or repair.

(d)          Damage to the Units that arises out of, or is integrally related to, damage to the Common Area or Units that the Association is obligated to maintain or repair.

(e)          Enforcement of payment of assessments in accordance with the provisions of Section  herein.

(f)          Any other matter(s) in which the Association is a party, including, but not limited to, contract disputes.

8

Exhibit 1
Page 72

3.5.4    Subject to the limitations set forth in Section 3.13 of the Bylaws, the right to discipline a Member for violation of any of the provisions of the Governing Documents by (a) suspending the Member's membership rights, including the Member's voting rights and the rights and privileges to use the Common Area and facilities appurtenant to the Member's Unit, (b) imposing monetary fines, and (c) recording a notice of noncompliance in the Office of the County Recorder of San Diego County encumbering the Unit of the Owner.

3.5.5    The right for its agents and employees to enter any Unit when necessary in connection with any maintenance or construction work for which the Association is responsible. This entry shall be made only upon reasonable notice to the Owner (except in the case of an emergency) and with as little inconvenience to the Owner as is practicable. Any damage caused thereby shall be repaired by the Association at its own expense.

3.5.6    The power to grant permits, licenses and easements over, under and through the Common Area for roads, utilities, cable television, sewer facilities and other purposes in accordance with Section herein (a) to serve the Common Area or the Condominiums, or (b) where necessary or convenient to satisfy or achieve appropriate governmental purposes or requests.

3.5.7    The power to remove any vehicle within the Project parked in violation of this Restated Declaration or the Rules and Regulations in accordance with the provisions of California Vehicle Code section 22658.2 and any amendments thereto.

3.5.8    The power, without the approval of the membership, to bid and acquire any Unit at a foreclosure sale.

3.5.9    The power to separately meter and charge Owners for use of utilities by such means as may be determined in the sole discretion of the Board.

3.6    ***Duties of the Association*** . In addition to the duties of the Association, its agents and employees set forth elsewhere in the Governing Documents, the Association shall be responsible for the following:

SD 155245v3

Exhibit 1
Page 73

3.6.1            The Association, acting through the Board, shall operate, maintain, repair, and replace those components described in Section , or contract for the performance of that work, subject to the provisions of the Governing Documents.

3.6.2                 The Association shall use the maintenance fund described in Article  herein to, among other things, acquire and pay for goods and services for the Project, including, but not limited to:

    (a)            Water, sewer, refuse, electrical, telephone, gas, and other necessary utility service for the Common Area and, to the extent not separately metered and charged, for the Units.  If any utility service to a Unit is separately metered by either the utility provider or the Association and the Association is liable for payment to the utility provider, the costs thereof may be assessed against Owners as a utility assessment as otherwise provided herein.

    (b)            The insurance policies described herein.

    (c)            The services of any personnel that the Board determines are necessary or proper for the operation of the Common Area and the Association.

    (d)            Legal and accounting services necessary or proper in the operation of the Common Area and the Association or the enforcement of the Governing Documents.

## 4ARTICLE  - ASSESSMENTS AND COLLECTION PROCEDURES

4.1    *Covenant to Pay* .  Each Owner by acceptance of the deed to the Owner's Condominium is deemed to covenant and agree to pay to the Association regular, special, individual and utility assessments, and all other charges duly levied by the Association pursuant to the provisions of this Restated Declaration.  A regular, special, individual or utility assessment and any late charges, reasonable costs of collection, and interest, as assessed in accordance with the provisions of this Article, shall also be a personal debt of each Owner of the Condominium at the time the assessment or

Exhibit 1
Page 74

other sums are levied. Co-owners of a Unit shall be jointly and severally liable for all charges levied by the Association on that Unit. No Owner may waive or otherwise escape liability for these assessments by non-use of the Common Area or abandonment of the Owner's Condominium.

4.2    **Purpose of Assessments** . Except as provided herein, the Association shall levy regular, special, individual and utility assessments sufficient to perform its obligations. The assessments levied by the Association shall be used exclusively to promote the recreation and welfare of the Owners, and for the operation, replacement, improvement, and maintenance of the Project, and to discharge any other obligations of the Association under this Restated Declaration. All assessment payments shall be put into general operating and reserve funds to be used for the foregoing purposes.

4.3    **Regular Assessments** . Concurrently with preparation of the financial documents and budget as required in Section 3.13 of the Bylaws, the Board shall estimate the net charges to be paid during that next fiscal year, including a reasonable provision for contingencies, replacements and reserves, with adjustments made for any expected income and surplus from the prior year's fund. The resulting amount shall constitute the regular assessments for the budgeted year. Regular assessments shall be divided equally among all Units and allocated among, assessed against and charged to each Owner according to the ratio of the number of Units owned by the assessed Owner to the total number of Units subject to assessment. Each Unit shall bear an equal share of the total assessment. Failure of the Board to estimate the net charges within the time period stated herein shall not void any assessment imposed by the Board. Regular assessments for fractions of any month shall be prorated. Each Owner is obligated to pay assessments to the Association in equal monthly installments on or before the first day of each month unless the Board adopts an alternative method for payment.

4.4    **Special Assessments** . If the Board determines that the amount to be collected from regular assessments will be inadequate to defray the common expenses for the year due to the cost of any construction, unexpected repairs or replacements of capital improvements upon the Common Area, or any other reason, it shall make a special assessment for the additional amount needed, subject to any limitations imposed by law and the Governing Documents. Special assessments shall be divided equally among all Units in the same manner as regular assessments. Special assessments authorized solely by the Board shall be collected as prescribed by the Board; special assessments approved by the Members shall be collected in the manner approved by the Members.

4.5    **Limitations on Regular and Special Assessments** . Except in emergency situations, the Board may not, without the approval of Members constituting a quorum of the Owners and casting a majority of the votes at a meeting or election of the Association conducted in accordance with Corporations Code sections 7510 - 7527 and 7613, impose a

11

Exhibit 1
Page 75

regular assessment per Unit that is more than twenty percent (20%) greater than the regular assessment for the preceding fiscal year, or levy special assessments that in the aggregate exceed five percent (5%) of the budgeted gross expenses of the Association for that fiscal year. For purposes of this Section only, a "quorum" means more than fifty percent (50%) of the Owners of the Association. These limitations shall not apply to assessment increases that are necessary for emergency situations. An emergency situation is an extraordinary expense that is:

    4.5.1    Required by a court order.

    4.5.2    Necessary to repair or maintain the Project or any part of it for which the Association is responsible when a threat to personal safety in the Project is discovered.

    4.5.3    Necessary to repair or maintain the Project or any part of it for which the Association is responsible that could not have been reasonably foreseen by the Board in preparing and distributing the pro forma operating budget. Before the Board may impose or collect an assessment in this emergency situation, it shall pass a resolution containing written findings as to the necessity of the extraordinary expense and why the expense was not or could not have been reasonably foreseen in the budgeting process, and shall distribute the resolution to the Owners with the notice of assessment.

    4.6    *Owner Notice of Regular and Special Assessments* . The Association shall provide notice by first-class mail to the Owners of any increase in the regular assessments or the imposition of a special assessment not less than thirty (30) nor more than sixty (60) days prior to the increase in the regular assessment or special assessment becoming due.

    4.7    *Individual Assessments* . Subject to the limitations of the Governing Documents and in addition to regular and special assessments, the Board may levy individual assessments against Owners and Units whenever the Association (a) performs any service or accomplishes any item of repair or maintenance which is the duty of any Owner to accomplish, but which has not been accomplished by such Owner, or (b) incurs any costs which by law or as required by the Governing Documents must be reimbursed by an Owner. Such individual assessment shall include the cost thereof, together with any financing costs and administrative costs incurred by the Association. Prior to levying an individual assessment, the Board shall provide the Owner with notice and a hearing in accordance with Section 3.14 of the Bylaws. The notice and hearing regarding the levy of an individual assessment may be combined with the notice and hearing regarding the underlying violation. Duly levied individual assessments shall be subject to the provisions in the Governing

SD 155245v3

Exhibit 1
Page 76

Documents regarding costs, late charges and interest for delinquent payment, and may become a lien on the Unit, in the same manner as regular and special assessments.

4.8    **Utility Assessments** . In addition to any other assessment levied against a Unit, the Association may impose a utilities assessment for any utilities that are not separately metered and charged to the Condominiums by the utility company. If any such utility assessment is imposed by the Association, each Owner shall be obligated to pay to the Association, or its agent, a utilities assessment comprised of the costs for those utilities used by each Condominium as determined by the Board in its discretion. The amount of the utilities assessment levied by the Association against a Condominium shall be based upon each Condominium Owner's and/or tenant's actual use of the utility and may vary from month to month based upon such actual usage. The rate charged to each Condominium shall be based upon the utility company's rate for multifamily, residential dwellings or an equivalent designation established by the utility company. The utility assessment may include a nominal fee charged by a person or firm to read the sub-meter and administer the utility assessment.

Anything in the Declaration to the contrary notwithstanding, the utilities assessment shall be separate from, and not considered a part of either regular or special assessments, and shall not be subject to the limitations on the increases or decreases thereof contained in this Declaration or in section 1366 of the California Civil Code or any successor statute or law. Duly levied utility assessments shall be subject to Section  herein regarding costs, late charges and interest for delinquent payment, and may become a lien on the Condominium, in the same manner as regular and special assessments.

4.9    **Monetary Penalty Assessments** . The Board of Directors may levy, subject to the limitations of the Governing Documents, monetary penalties or fines against an Owner and his or her Unit. In the event the Board of Directors imposes a monetary penalty or fine, that fine shall be subject to costs, late charges and interest as described in Section  for delinquent payment, and may become a lien on the Unit, collectable by the Association through judicial foreclosure as allowed by Section  herein. In no event may the Association collect a monetary penalty or fine through nonjudicial foreclosure.

4.10    **Units Not Subject To Assessment** . Assessments which would normally become due on Units, but which Units are owned by the Association, shall be deemed to be common expenses collectible from all of the remaining Units in the same proportion that each Unit bears to the others less the number of Units owned by the Association.

4.11    **Costs, Late Charges and Interest** . Late charges may be levied by the Association against an Owner for the delinquent payment of regular, special, individual and utility assessments, fines and monetary penalties. An

13

Exhibit 1
Page 77

assessment, including any installment payment, is delinquent thirty (30) days after its due date. If an assessment is delinquent, the Association may recover all of the following from the Owner:

4.11.1    Reasonable costs incurred in collecting the delinquent assessment, including actual attorneys' fees.

4.11.2    A late charge not exceeding ten percent (10%) of the delinquent assessment, or the maximum amount allowed by law.

4.11.3    Interest on the foregoing sums, at an annual percentage rate of twelve percent (12%) commencing thirty (30) days after the assessment becomes due.

No late charge may be imposed more than once for the delinquency of the same payment. However, the imposition of a late charge on any delinquent payment shall not eliminate or supersede charges imposed on prior delinquent payments. The amounts delinquent, including the entire unpaid balance and any related costs described herein, may be collected by the Association as provided in Section hereinbelow.

4.12    *Priority of Payments* . The Board, in its sole discretion, may enact policies, not in violation of applicable law, including Civil Code sections 1367 and 1367.1, regarding how payments received from an Owner will be applied to any outstanding balances due the Association from that Owner.

4.13    *No Offsets* . All assessments shall be payable in the amounts specified by the Association, and no offsets against such amount shall be permitted for any reasons, including, without limitation, a claim that the Association is not properly exercising its duties of maintenance, operation or enforcement.

4.14    *Enforcement of Assessments and Late Charges* . A delinquent regular, special, individual or utility assessment, and any related late charges, reasonable costs of collection (including actual attorneys' fees), and interest assessed in accordance with Section herein, excluding monetary penalties, shall become a lien upon the Condominium when a Notice of Assessment Lien is duly recorded as provided in section 1367 or section 1367.1 of the California Civil Code or applicable statute. Unless otherwise provided by statute, the Notice of Assessment Lien shall describe the amount of the delinquent assessment or installment, the related charges authorized by this Declaration, the legal description of the Unit, the name of the purported Owner, and, if the lien is to be enforced by power of sale under nonjudicial foreclosure proceedings, the name and address of the trustee authorized by the Association to enforce the lien by sale. The Notice may be signed by any officer or director of the Association, or any employee or agent of the Association

14

Exhibit 1
Page 78

authorized to do so by the Board. The Notice shall be mailed in the manner set forth in Civil Code section 2924b, to all record owners of the Unit no later than ten (10) calendar days after recordation.

Unless otherwise allowed by statute, the Notice of Assessment Lien may not be recorded until after the Association has mailed, via certified mail, a written demand for payment to the delinquent Owner. The written demand shall comply with the requirements of Civil Code sections 1367, 1367.1 and any other applicable statute.

If not paid in full within thirty (30) days after recordation of the Notice of Assessment Lien, any lien described herein may be enforced in any manner permitted by law, including judicial foreclosure or nonjudicial foreclosure. Any nonjudicial foreclosure shall be conducted by the trustee named in the Notice or by a trustee substituted pursuant to section 2924(a) of the California Civil Code, in accordance with the provisions of sections 2924, 2924(b), and 2924(c) of the California Civil Code.

If all sums specified in the Notice of Assessment Lien are paid before the completion of any judicial or nonjudicial foreclosure, the Association shall (i) record a notice of satisfaction and release of lien, and (ii) upon receipt of a written request by the Owner, shall also record a notice of rescission of any recorded notice of default and demand for sale.

The Notice of Assessment Lien is not required to be amended by the Association or Trustee to reflect any partial payments made on the account of the delinquent Owner after its recordation, and any such partial payments received shall not be construed to invalidate the Notice of Assessment Lien and said Notice of Assessment Lien may be foreclosed upon as set forth herein even though the delinquent Owner has made one or more partial payments.

Notwithstanding any other provision herein, a monetary penalty or fine may not become a lien on a Unit enforceable by the sale of the Unit through nonjudicial foreclosure. Any Notice of Assessment Lien recorded to enforce a monetary penalty or fine must specifically state that such lien may not be enforceable by sale of the Unit through nonjudicial foreclosure.

4.15   **Priority of Assessment Lien** . As set forth hereinbelow, the assessment lien referred to in Section   shall be superior to all other liens, except (i) all taxes, bonds and governmental assessments which, by law, would be superior thereto, and (ii) the lien or charge of any First Mortgage of record. Notwithstanding any other provision to the contrary, the following provisions shall govern the priority and obligation for payment of the assessment lien:

SD 155245v3

Exhibit 1
Page 79

4.15.1      Only the judicial or nonjudicial foreclosure of the First Mortgage shall operate to transfer title free of the assessment lien or obligation for any assessment lien, and then only as to payments which became due prior to the date of sale, and excluding those assessment liens recorded prior to the recording of the First Mortgage.

4.15.2      Neither the transfer of a Condominium pursuant to a foreclosure of any Mortgage, nor an election by the Association to proceed against any new Owner for payment, shall serve to cancel the personal obligation of the prior Owner for payment of the delinquent assessments and charges which accrued during such Owner's period of ownership. The personal obligation of any Owner for payment of delinquent assessments and charges may only be satisfied, and therefore discharged, by payment of the entire amount of the delinquent assessments and charges, whether or not such Owner remains in possession of his or her Unit.

4.15.3      No sale or transfer of any Condominium shall relieve such Condominium or its new Owner from liability for any future assessments which accrue during such Owner's period of ownership.

4.16    *Statement of Delinquent Assessment* . The Association shall provide any Owner, upon written request, with a statement specifying the amounts of any delinquent assessments and related late charges, interest, and costs levied against the Owner's Condominium.

## ARTICLE 5 - USE RESTRICTIONS AND COVENANTS

5.1     *General* . The use and enjoyment of the Project by Owners and their tenants, guests, invitees or any other person deriving rights from such Owner, shall be subject to the covenants and restrictions contained in the Governing Documents. Each such person shall comply with the provisions thereof and be subject to any enforcement actions in the event of violations. Unless otherwise stated in the Governing Documents, the Association, through the Board of Directors, shall be primarily responsible for the enforcement of the Governing Documents.

5.2     *Common Area* . The following provisions govern the use and enjoyment of the Common Area:

16

Exhibit 1
Page 80

| | |
|---|---|
| 5.2.1 | The Association shall have an easement in, to, and throughout the Common Area and the improvements thereon to perform its duties and exercise its powers. |
| 5.2.2 | Except as provided in this Restated Declaration, there shall be no judicial partition of the Common Area, nor shall the Association or any person acquiring an interest in all or any part of the Project seek any judicial partition. |
| 5.2.3 | Subject to the provisions of this Restated Declaration, each Owner has non-exclusive rights of ingress, egress, and support through the Common Area. These rights shall be appurtenant to any deed of conveyance. However, these rights shall not interfere with, and shall be subordinate to, any exclusive right to use an area. |
| 5.2.4 | The Owners' rights of use and enjoyment of the Common Area shall be subject to the restrictions set forth in the Governing Documents, and the right of the Association, subject to the limitations of any laws or the Governing Documents, to: |

(a)     Adopt and enforce reasonable Rules and Regulations for the use of the Common Area and the Project.

(b)     Reasonably limit the number of Persons using the Common Area.

(c)     Charge a fee or deposit for use of any Common Area facilities.

(d)     Setting of fees and deposits for supplying and replacing keys or key codes to Common Areas, including charges calculated to limit distribution and deter loss of keys or codes.

(e)     Assign or otherwise control the use of any unassigned parking spaces within the Common Area.

(f)     Remove any vehicle within the Project parked in violation of this Declaration or the Rules and Regulations of the Board in accordance with the provisions of California Vehicle Code section 22658.2 and any amendments thereto.

SD 155245v3

Exhibit 1
Page 81

(g)     Suspend the voting rights of any Owner, and the rights of any Owner, and the Persons deriving rights from any Owner, to use and enjoy the Common Area for any period during which the Owner is delinquent in the payment of any assessment or as otherwise provided in the Governing Documents.

(h)     Cause the construction of additional improvements in the Common Area, or cause the alteration or removal of existing improvements on the Common Area.

(i)     Dedicate, grant, or join in the grant or conveyance of easements, licenses or rights-of-way in, on and over the Common Area to any public agency, authority or utility as may be determined by the Board to be in the best interests of the Association; provided that no such easement, license or right-of-way may be granted if it would unreasonably interfere with any exclusive easement, or with any Owner's use, occupancy, or enjoyment of his or her Unit.

(j)     Reasonably restrict access to roofs, maintenance facilities or areas, landscaped areas, and similar areas of the Project.

(k)     Approve any proposed alteration of or modification to the Common Area or any Unit.

5.2.5     The Board, with the approval of two-thirds (⅔) of the total voting power of the Association, may:

(a)     Dedicate, grant or join in the grant or conveyance of easements, licenses or rights-of-way in, on, and over the Common Area, other than those allowed by Section , above, (i) to third parties for purposes reasonably related to the operation of the Project, or (ii) to one or more Owners to exclusively use portions of the Common Area, subject to the Governing Documents.  No such easement, license or right-of-way may

18

Exhibit 1
Page 82

be granted if it would unreasonably interfere with any exclusive easement, or with any Owner's use, occupancy, or enjoyment of his or her Unit. Each Owner, in accepting his or her deed to the Unit, expressly consents to these easements.

(b)     Mortgage or encumber the Common Area or portions thereof.

5.2.6     Notwithstanding the easement rights or other rights contained herein, an Owner who has sold his or her Condominium to a contract purchaser or who has leased or rented the Condominium shall be deemed to have assigned his or her rights to use and enjoy the Common Area to the contract purchaser or tenant who resides in the Owner's Condominium, subject to reasonable regulation by the Board. If the Owner is deemed to have assigned such rights, the Owner and the Owner's family, guests, employees, and invitees shall not be entitled to use and enjoy the Common Area for so long as the assignment remains effective.

5.2.7     All internal and external telephone wiring designed to serve a single Unit, but located outside the boundaries of the Unit, is allocated exclusively to that Unit. The Owner of the Unit shall be entitled to reasonable access to the Common Area for the purpose of maintaining this wiring, subject to the consent of the Association and to any other conditions reasonably imposed by the Association. The Association's consent shall not be unreasonably withheld.

5.3     *General Restrictions on Use* . In exercising the right to occupy or use a Unit or the Common Area and its improvements, the Owner and the Owner's family, guests, employees, tenants, and invitees shall not do any of the following:

5.3.1     Attempt to subdivide or enlarge a Unit without obtaining the prior approval of the Association.

5.3.2     Modify, alter or otherwise change his or her Unit except as provided in Article 7 herein.

SD 155245v3

Exhibit 1
Page 83

5.3.3      Occupy or use a Unit, or permit all or any part of a Unit to be occupied or used for any purpose other than as a private single-family residence. The Board may establish guidelines in the Rules and Regulations to allow certain home occupations which (a) are consistent with the normal residential usage of the Project, (b) do not cause any external effects which are detrimental to neighboring Units or the Project, or (c) are compatible with the characteristics of residential use in the Project.

5.3.4      Lease or rent a Unit in derogation of the following:

(a)      All leases and rental agreements must be in writing.

(b)      All leases and rental agreements must be for the entire Unit and not merely parts thereof, unless the Owner remains in occupancy.

(c)      Except as otherwise provided by the Board, no lease or rental shall be for a period of less than thirty (30) days.

(d)      All leases and rental agreements shall be subject in all respects to the Governing Documents, and shall provide that failure to comply with the requirements of the Governing Documents shall constitute a default under the lease or rental agreement which may be cured by eviction of the tenant either by the Owner or the Association.

(e)      An Owner who leases or rents his or her Unit shall promptly notify the Association in writing of the names of all tenants and members of a tenant's family occupying such Unit.

(f)      All Owners leasing or renting their Units shall promptly notify the Association of the address and telephone number where such Owner can be reached.

(g)      Owners shall provide their tenants with copies of the Governing Documents, including the Rules and Regulations. Owners shall be responsible for the costs of reproducing the Governing Documents.

Exhibit 1
Page 84

(h)            Such other reasonable rules and regulations as may be promulgated from time to time by the Board.

5.3.5       Permit anything to obstruct the Common Area or store anything on the Common Area without the prior written consent of the Board, except as otherwise provided in the Governing Documents.

5.3.6       Perform any act or keep anything on or in any Unit or in the Common Area that will increase the rate of insurance on the Common Area without the Board's prior written consent. Further, no Owner shall permit anything to be done or kept in his or her Unit or in the Common Area that would result in the cancellation of insurance on any Unit or on any part of the Common Area or that would violate any law.

5.3.7       Disconnect, damage, tamper with or otherwise modify any protection system, including, but not limited to fire sprinklers, fire alarms and fuse boxes.

5.3.8       Store gasoline, kerosene, cleaning solvents, or other flammable liquids or substances, or any toxic or hazardous materials on the Common Area or in any Unit, provided, however, that amounts of these liquids, substances or materials which are reasonable for household use may be placed in appropriate containers and properly stored.

5.3.9       Discharge or cause the emission of any dust, sweepings, dirt, cinders, odors, gases, or other substances into the atmosphere other than normal residential chimney or outdoor grill emissions.

5.3.10      Erect or display any sign on or from any Unit except as allowed by sections 712 and 713 of the California Civil Code. No signs may be erected or displayed on the Common Area except (i) those signs allowed by this provision, and (ii) with the prior written approval of the Board.

5.3.11      Erect or display any radio or television antenna, satellite dish or other equipment or apparatus for transmitting or receiving transmissions. Notwithstanding the foregoing,

SD 155245v3

Exhibit 1
Page 85

an Owner may erect a video or television antenna, including a satellite dish, as allowed by any applicable statute or law, with Board approval. The Board may impose reasonable restrictions on its approval.

5.3.12    Keep pet(s) or other animal(s) in derogation of the following:

(a)    Owners may keep not more than two (2) usual and ordinary household pets (exclusive of caged birds) on the Project subject to the provisions of the Rules and Regulations.

(b)    Pets shall be permitted in the Common Area as specifically permitted by the Rules and Regulations.

(c)    No owners may raise or keep animals on the Project for commercial purposes.

(d)    The Association, its Board, officers, employees and agents shall have no liability to any Owner, his or her family members, guests, invitees, tenants and contract purchasers, or any other person on the Project, for any damage or injury to persons or property caused by any pet, absent any willful or wanton negligence on the part of the Association, or its Board, officers, employees and agents.

5.3.13    Engage in any illegal, noxious or offensive activity in any part of the Project, or do any act which unreasonably threatens the health, safety and welfare of other residents of the Project.

5.3.14    Engage in any type of harassment, illegal, noxious or offensive activity toward any Owners, residents, Association representatives, management representatives, Board members and/or vendors working in the Project.

5.3.15    Alter, attach, construct, or remove anything on or from the Common Area, except upon the written consent of the Board.

22

SD 155245v\

Exhibit 1
Page 86

| 5.3.16 | Keep or maintain any fixture, personal property or other object upon any porch, patio or balcony which interferes with the enjoyment of adjacent Units, porches, patios or balconies, or which may be in derogation of the Rules and Regulations. |
| --- | --- |
| 5.3.17 | Convert or use any garage for purposes other than parking of the number of vehicles such garage was designed to contain and storage of reasonable amounts of household goods that do not interfere with the ability to park the number of vehicles such garage was designed to accommodate or create a fire or safety hazard. |
| 5.3.18 | Park any automobile or other motor vehicle in the Project except wholly within a garage or in a space designated for the Owner by the Board or the Governing Documents. No junk or derelict vehicle or unregistered vehicle shall be kept upon any portion of the Project so as to be visible from the Common Area or another Unit. The Board, in its discretion, may adopt reasonable rules governing the operation, maintenance, storage and parking of any vehicle, including trucks, campers, trailers, boats or commercial vehicles in the Project, including the streets, garages, driveways, and Common Area. |

5.4     *Damage Liability* . Each Owner shall be liable to the Association for any damage to the Common Area or to Association owned property if the damage is sustained because of the negligence, willful misconduct, or unauthorized or improper installation or maintenance of any improvement by the Owner or the Owner's family, guests, tenants, contract purchasers, or invitees. In the case of joint ownership of a Condominium, the liability of the co-owners shall be joint and several, unless the co-owners and the Association have agreed in writing to an alternative allocation of liability.

5.5     *Vacating Unit; Costs* . As provided in Civil Code section 1364 or any successor statute, the Association shall have the authority to temporarily remove any Unit resident for such periods and at such times as may be necessary in connection with any maintenance or repair work performed by the Association. The costs of any temporary relocation during such maintenance or repair work shall be paid by the Unit owner affected. The Association shall give notice of the need to temporarily vacate a Unit to the record Owners and occupants not less than fifteen (15) days nor more than thirty (30) days prior to the date of the temporary relocation. The notice shall state the reason for the relocation, the date and time of the beginning of work, the anticipated date and time of termination of work and that the occupants will be responsible for all necessary accommodations during the relocation.

SD 155245v3

Exhibit 1
Page 87

## 6 ARTICLE - REPAIR AND MAINTENANCE

6.1    *General; Standards of Maintenance*    The Association and all Owners are required to fulfill the maintenance requirements imposed by the Governing Documents.  For purposes of this Article "maintenance" shall include without limitation painting, weatherproofing and cleaning to keep a clean, safe and sanitary condition necessary to preserve the attractive appearance of each Condominium and the Project and protect the values thereof, and to ensure that there is no threat to the health, safety or welfare of any resident.  The Board shall have the power to determine the standards of such maintenance.

6.2    *Division of Responsibility* .  Each Owner shall maintain and repair his or her Unit, including the windows and glass doors, and the interior of any Exclusive Use Common Area appurtenant to the Unit, and shall also maintain and repair the plumbing, electrical, and heating systems servicing the Unit and located within or underneath the outside perimeter of the exterior bearing walls of the Unit.  Except as otherwise provided in this Section 6.2, the Association shall be responsible for the maintenance, repair and replacement of the Common Area.  The cost of maintenance, repair, and replacement in any case shall be borne by the party responsible for such maintenance, repair and replacement.

6.3    *Owner Improvements* .  Notwithstanding the provisions of Section 6.2, each Owner shall be responsible for the maintenance, repair, and replacement of any improvements installed by the Owner, any resident in the Owners' Unit, or the Owners' predecessor in interest, within the Unit, the Exclusive Use Common Areas, or upon the Common Area.  The Owner is also responsible for damages to the Common Area caused by such installation, maintenance, or repair.  Installation of any improvement(s) within the Common Area is subject to the provisions of Article 7 herein.

6.4    *Access over Common Area* .  The Owner of the Unit shall be entitled to reasonable access over and through the Common Area, subject to the consent of the Association and to any other conditions reasonably imposed by the Association, for the purposes of performing any maintenance, repairs or replacement as required by the Governing Documents.  The Association's consent shall not be unreasonably withheld.

6.5    *Failure to Maintain* .  In the event an Owner fails to maintain the areas described herein pursuant to the standards set by the Board, the Board may notify the Owner of the work required and request that the same be done within a reasonable time from the giving of such notice.  In the event the Owner fails to carry out such maintenance within said time period, the Board may, following notice and a hearing, cause such work to be done and the cost thereof shall immediately be paid by such Owner to the Association and until paid shall bear interest at the rate of twelve percent (12%) per annum (but no greater than the maximum rate authorized by law).

Exhibit 1
Page 88

6.6      **Damage During Repairs** .  In the course of carrying out the maintenance and repair responsibilities of the Association, it may be necessary for agents or representatives of the Association to enter into a Unit to carry out the work. In this event, the Association's agents or representatives shall use care to cause as little damage as possible.  The Association shall, nonetheless, be responsible to repair any damage that may be caused to the Unit during such repair and maintenance.

6.7      **Termite Control** .  The responsibility for control of wood destroying pests or organisms shall be as follows:

6.7.1      Owners shall be responsible for the maintenance and repair of their personal property and their Unit as required to control the presence of or damage caused by wood-destroying pests or organisms.

6.7.2      The Association shall be responsible for the maintenance and repair of the Common Area as required to control the presence of or damage caused by wood destroying pests or organisms in accordance with the provisions of Civil Code section 1364.

6.7.3      The Association shall have the power to temporarily remove any Unit resident for such periods and at such times as may be necessary for prompt, effective treatment of such pests or organisms.  The costs of any temporary relocation during such maintenance or repair shall be paid by the Unit owner affected. The Association shall give notice of the need to temporarily vacate a Unit to the record Owners and occupants not less than fifteen (15) days nor more than thirty (30) days prior to the date of the temporary relocation.  The notice shall state the reason for the relocation, the date and time of the beginning of treatment, the anticipated date and time of termination of treatment and that the occupants will be responsible for all necessary accommodations during the relocation.

6.7.4      Neither the Association, the Board, officers, agents and employees shall have any liability, absent willful or wanton negligence, to any Owner, family member, guest, invitee or tenant for any damage caused by the treatment.

6.8      **Damage Caused by Owner or Item Under Control of Owner** .  Should any damage to the Common Area or any Unit result from the willful or negligent act or neglect of any Owner, or such Owner's tenants, guests, invitees, pets

25

Exhibit 1
Page 89

or other person or entity deriving any interest through such Owner, or from any item the maintenance, repair or replacement of which is an Owner responsibility, the cost of all repairs shall be borne solely by the culpable Owner.

The Association shall be responsible for performing the repair of any damage to the Common Area or items over which the Association has control at the culpable Owner's expense. The culpable Owner shall be responsible for performing the repair of any damage to his or her Unit for which such Owner has control. The Owner of any other Unit which sustained damage shall be responsible for performing the repair of any such damage, and may charge the cost thereof to the culpable Owner.

If the culpable Owner disputes or refuses to pay any repair costs incurred by the Association, the Association, after reasonable notice and hearing procedures as provided for the imposition of monetary fines or suspensions, may charge the cost of those repairs to such Owner as an individual or special assessment, with the full authority to lien on such amount in the event of non-payment. If the damage is such as may be covered by any insurance carried by the Association, the Board may, in its sole discretion, elect to submit the claim for the cost of repairs to its insurance carrier. Provided the submitted claim is covered by the Association's insurance, the culpable Owner shall be responsible for the cost of any deductible applicable to the covered claim. If the submitted claim is not covered by the Association's insurance, the Owner shall be responsible for the total cost of repair.

All repairs performed to correct any damage shall be sufficient to return the damaged property only to its condition prior to the damage, with upgrades as may be required to conform with any applicable building codes in effect at the time the damage is repaired.

6.9     *Limitation of Liability* . Except as otherwise provided in this Article 6, the Association shall not be liable to any Owner or his or her tenants, guests or others, for damage to or loss of any property, or the cost of repair or replacement of any damaged property or portions of such Owners' Unit or Exclusive Use Common Area, unless such damage is caused by the gross negligence of the Association, its Board, officers, agents or employees.

## 7ARTICLE - ARCHITECTURAL AND DESIGN CONTROL

7.1     *General* . Any change or improvement to the exterior of a Unit, or to the interior which affects the exterior of a Unit, any wall, any mechanical or utility systems (HVAC systems, gas, water or electrical pipes or wires, etc.), any garage, or the structural integrity of any building, shall be governed by this Article. Changes or improvements to the Common Area by the Association do not need to comply with the requirements of this Article. The powers and duties set

26

SD 155245v3

Exhibit 1
Page 90

forth in this Article shall be vested in, and exercised by, the Board. The Board may establish an architectural committee as provided herein to assist the Board in reviewing architectural submittals, and to provide recommendations to the Board with regard to approval or disapproval of any submittal. The foregoing notwithstanding, the Board shall be solely responsible for approving or rejecting any architectural submittal.

7.2    *General Changes Requiring Prior Approval*. Nothing may be erected, placed or planted on the exterior of any Unit or on the Common Area by any Owner without the prior written approval of the Board. Modifications to the interior of Units which involve alterations to the floor plan, removal or modification of a wall, or which may have the potential to affect the Common Area, including the walls, roofs and mechanical or utility systems, shall require prior approval. Additionally, prior written Board approval shall be required for any alteration, modification, painting or other change or addition to the exterior of any existing improvement or landscaping.

7.3    *Specific Changes*. Subject to other applicable restrictions contained in the Governing Documents, Owners may modify their Units subject to the following:

7.3.1    Modifications or alterations of the exterior of any Unit must have the prior written consent of the Board, including any modifications to facilitate handicapped access as provided by section 1360 of the California Civil Code. Any approval of such handicapped access modification may be conditioned on such modification's removal, by the Owner at his or her sole expense, once the handicapped access is no longer necessary for the Unit.

7.3.2    Alterations to the floor plan of a Unit, removal or modification of walls, or any portion thereof, may not be made within a Unit without the Prior written approval of the Board of Directors, which approval will not be unreasonably withheld, as long as appropriate plans and specifications are provided in writing at the time the request is made.

7.3.3    No Owner may install any shutter, screen, screen door, or other appurtenance in or on any window or door except those items which are in conformance with standards established by the Board.

7.3.4    No Owner may enclose his or her Unit's porch, patio, or balcony without the prior written consent of the Board.

27

Exhibit 1
Page 91

7.3.5 Except as provided by the Governing Documents, Owners shall not have the right to paint, decorate, remodel or alter any Exclusive Use Common Area or the Common Area without the prior written consent of the Board.

7.4 ***Procedure for Obtaining Approval of Architectural Changes*** .  The procedure for obtaining approval of any architectural change shall be as follows:

7.4.1 Plans and specifications showing the nature, kind, shape, color, size, height, materials to be used and location of any proposed improvements or alterations, as well as the proposed contractor and any other information as required by the Board, shall be prepared by the requesting Owner and submitted to the Association.

7.4.2 The architectural committee, if any, shall review the submission and provide a recommendation as to approval or disapproval of any such submission, including the reasons for any decision, to the Board and the requesting Owner within thirty (30) days of receipt of such submission.  The recommendation may be oral or in writing as the Board directs.

7.4.3 The Board shall review such recommendation within thirty (30) days of receipt of the architectural committee's recommendation, or within 60 days of receipt of the submission, whichever is earlier, and provide a written response to the requesting Owner, including reasons for such response.

7.4.4 In the event the Board fails to provide a written response to the requesting Owner within sixty (60) days of receipt of the request from the Owner, the Owner may notify the Board in writing that a response has not been received.  If the Board fails to respond within thirty (30) days of the receipt of the notice, approval will not be required and the related covenants shall be deemed to have been fully satisfied.

7.4.5 Once an Owner has obtained approval for an architectural submittal, work on such approved submittal shall promptly commence and shall be completed within a reasonable time.

SD 155245v3

Exhibit 1
Page 92

7.5     *Architectural Rules* .  The Board may, in its sole discretion, adopt, amend and repeal, as it deems necessary and by majority vote of the full Board, rules and regulations to be known as "Architectural Rules."  Said Architectural Rules shall interpret and implement the provisions of this Article by setting forth the standards for review by the Board and architectural committee and guidelines for architectural design, landscaping, color schemes, exterior finishes and materials and similar features which are recommended for use in the Project, provided, however, that said Architectural Rules shall not be in derogation of the standards required by this Restated Declaration.  The Architectural Rules may also address the information which is required to be presented in connection with an architectural submittal and the conditions for use of the Common Area in performing the work.

7.6     *Standard of Architectural Review* .  An architectural submittal made by an Owner shall be reviewed for conformity with the Architectural Rules.  Additional factors to be considered include, but are not limited to, the quality of proposed workmanship, the design and harmony of the improvement with existing structures, the location of the improvement in relation to surrounding structures, Owner and contractor insurance coverage, compliance with governmental permit requirements and contractor license status.

7.7     *Architectural Committee* .  The architectural committee, if any, shall consist of at least three (3) but not more than five (5) members, formed as follows:

7.7.1     The Board shall have the right to appoint all of the members of the committee.

7.7.2     Members appointed to the committee by the Board shall be Members of the Association.

7.7.3     Members shall be appointed for terms as prescribed by the Board, provided that no term may be less than one (1) year.  Notwithstanding the foregoing, all members of the committee may be removed by the Board at any time with or without cause.

7.7.4     The committee shall meet as often as it deems necessary to properly carry out the obligations imposed upon it, unless otherwise directed by the Board.

7.7.5     The vote or written consent of the majority of the committee shall be required for any recommendation.

SD 155245v3

Exhibit 1
Page 93

7.8    *Fee for Review* .  The Board shall have the right to establish a fee for the review and approval of plans and specifications which must be submitted to it pursuant to the provisions of this Article or the Bylaws, which shall be reasonably related to the duties performed.  Owners shall be responsible for their costs incurred for review of their plans.

7.9    *Compensation* .  The members of the Board and architectural committee shall receive no compensation for services rendered, other than reimbursement by the Association for expenses incurred by them in the performance of their duties hereunder.

7.10    *Liability* .  Neither the Board, the architectural committee nor any member thereof shall be liable to the Association or to any Owner for any damage, loss or prejudice suffered or claimed on account of:  (a) the approval or disapproval of any plans, drawings and specifications, whether or not defective, (b) the construction or performance of any work, whether or not pursuant to approved plans, drawings, and specifications, or (c) the execution and filing of a certificate, pursuant to Section 9.7, whether or not the facts therein are correct, provided, however, that such member has acted in good faith on the basis of such information as may be possessed by him or her.

7.11    *Enforcement* .  In addition to other enforcement remedies set forth in this Restated Declaration, the Board shall have enforcement rights with respect to any matters required to be submitted to and approved by it, and may enforce such architectural control by any proceeding at law or in equity in accordance with this Section.

7.11.1    No work for which approval is required shall be deemed to be approved simply because it has been completed without a complaint, notice of violation or commencement of a suit to enjoin such work.

7.11.2    The Board shall have the authority to order an abatement of any construction, alteration or other matter for which approval is required, to the extent that it has not been approved by the Board or if it does not conform to the plans and specifications submitted to the Board.

7.11.3    If the Owner fails to remedy any noticed noncompliance within thirty (30) days from the date of such notification, the Board shall set a date on which a hearing before the Board shall be held regarding the alleged noncompliance. The hearing date shall not be more than forty-five (45) days nor less than fifteen (15) days after the hearing notice is issued.

SD 155245v3

Exhibit 1
Page 94

7.11.4      At the hearing, the Owner, a representative(s) of the architectural committee and, in the Board's discretion, any other interested person may present information relevant to the question of the alleged noncompliance. After considering all such information, the Board shall determine whether there is a noncompliance.

7.11.5      If a noncompliance is determined to exist, the Board shall require the Owner to remedy or remove the same within such period or within any extension of such period as the Board, at its discretion, may grant.

7.11.6      If the Owner fails to take the corrective action prescribed by the Board after having a reasonable opportunity to do so, the Board at its option, may pursue all legal and equitable remedies available to remedy or remove the noncomplying improvement and the Owner shall reimburse the Association for all expenses incurred in connection therewith upon demand. If such expenses are not properly repaid by the Owner to the Association, the Board shall recover such expenses through the levy of an individual assessment against such Owner.

7.11.7      The approval by the Board of any plans, drawings or specifications for any work of improvement done or proposed, or for any other matter requiring the approval of the architectural committee under this Restated Declaration, or any waiver thereof, shall not be deemed to constitute a waiver of any right to withhold approval of any similar plan, drawing, specification or matter subsequently submitted for approval by the same or some other Owner. Different location for improvements, the size of the structure, proximity to other residences or the Common Area and other factors may be taken into consideration by the Board in reviewing a particular submittal.

7.11.8      If any legal proceeding is initiated to enforce any of the provisions hereof, the prevailing party shall be entitled to recover reasonable attorneys' fees in addition to the costs of such proceeding.

7.11.9      Notwithstanding any other provisions herein, the Board of Directors shall have the authority to obtain a restraining order or injunction at any time after discovery that work is proceeding without proper approval of the Board if the Board deems such action necessary to protect the Association's interests.

SD 155245v3

Exhibit 1
Page 95

7.12    **Non-Compliance with Laws** .  Neither the Association, the Board nor the architectural committee shall be responsible for any non-compliance with any governmental law, rule or regulation affecting any changes or improvements erected, constructed, installed, placed, altered or maintained in accordance with or pursuant to any plans and specifications approved by the Board or any defect in any conditions or requirements they may have imposed with respect thereto.

7.13    **Governmental Permits and Approvals** .  Prior to commencing any alteration or improvements approved by the Board, the Owner shall comply with all appropriate governmental laws and regulations.  The Association shall not be obligated to enforce the provisions of this Section.  Approval by the Board shall not be considered to satisfy the appropriate approvals that may be required by any governmental entity with appropriate jurisdiction, nor shall the approval of any governmental entity be considered to completely satisfy the requirement of Board approval.  An Owner's failure to obtain such governmental approval may subject such Owner to certain penalties imposed by the governmental entity, notwithstanding the approval of the Board, which penalties shall be the responsibility of such Owner.

## 1ARTICLE  - INSURANCE

1.1    **Fire and Casualty Insurance** .  The Association shall obtain and maintain a policy or policies of fire and casualty insurance with an extended coverage endorsement for the full insurable replacement value of the improvements in the Common Area.  The amount of any deductible shall be determined by the Board.  This insurance shall be maintained for the benefit of the Association, the Owners, and their Lenders, as their interests may appear as named insured, subject, however, to any loss payment requirements set forth in this Restated Declaration.  If required by any First Lender who notifies the Association of its requirement, and if economically feasible and available, such policies shall contain an agreed amount endorsement, an inflation guard endorsement, and a construction code endorsement.

1.2    **General Liability Insurance** .  The Association shall obtain and maintain a policy or policies insuring the Association, its officers, directors, agents and employees, the Owners, and the Owners' relatives, invitees, guests, employees, and their agents against any liability for bodily injury, death, and property damage arising from the activities of the Association and its Members, with respect to the Common Area.  Limits of liability under the insurance shall not be less than Three Million Dollars covering all claims for death, personal injury, and property damage arising out of a single occurrence.

Exhibit 1
Page 96

1.3   **Directors and Officers Liability Insurance** . The Association shall obtain and maintain one or more policies of insurance which include coverage for individual liability of officers and directors of the Association for negligent acts or omissions of those persons acting in their capacity as officers and directors. Limits of liability under this insurance shall be determined by the Board at its sole discretion.

1.4   **Fidelity Coverage** . The Association shall purchase and maintain fidelity coverage for any person or entity handling funds of the Association, whether or not such persons or entities are compensated for their services. If an agent handles Association funds, such agent shall be covered by the Association's coverage, unless such agent provides similar coverage. The Association's coverage may be in the form of a separate bond, a separate policy (e.g., crime policy), or may be added by endorsement to the general policies carried by the Association. The coverage may be in an amount that is at least equal to the estimated maximum of funds, including reserve funds, in the custody of the Association or its managing agent at any given time during the term of each bond or policy. However, in no event may the aggregate amount of these bonds be less than a sum equal to three (3) months' aggregate assessments on all units plus reserve funds. The bond or policy must contain a provision that it may not be cancelled or substantially modified without at least ten (10) days' prior written notice to the Association.

1.5   **Other Association Insurance** . The Association shall purchase and maintain workers' compensation insurance to the extent necessary to comply with any applicable laws. The Association also may purchase and maintain a blanket policy of demolition insurance in an amount that is sufficient to cover any demolition that occurs following the total or partial destruction of the Project and a decision not to rebuild. The Association may purchase such other insurance the Board considers necessary or advisable, including earthquake insurance coverage.

1.6   **Review of Insurance; Notice of Cancellation or Modification** . The limits and coverage of insurance carried by the Association shall be reviewed at least annually by the Board and increased or decreased in its discretion. Such policies shall include a provision for at least ten (10) days' prior written notice to the Association, and, if available, to each First Lender which is listed as a scheduled holder of a First Mortgage in the insurance policy, of any cancellation or substantial modification by any party.

1.7   **Qualifications of Insurance Carriers** . The Association shall use generally acceptable insurance carriers from which to purchase and maintain the coverage required herein.

1.8   **Failure to Acquire Insurance** . The Association, and its directors and officers, shall have no liability to any Owner or Lender if, after a good faith effort, it is unable to obtain any insurance required hereunder, because the insurance is no longer available or, if available, can be obtained only at a cost that the Board in its sole discretion

33

Exhibit 1
Page 97

determines is unreasonable under the circumstances, or the Members fail to approve any assessment increase needed to fund the insurance premiums. In such event, the Board immediately shall notify each Member and any Lender entitled to notice that the specific insurance will not be obtained or renewed.

The Association, and its directors and officers, shall also have no liability to any Owner or Lender if it does not obtain any of the insurance referenced hereunder which is not required but may be obtained at the discretion of the Association. The Board may, in good faith in its sole discretion, determine that obtaining any of the discretionary insurance is unreasonable or unnecessary under the circumstances. In making a determination as to whether to acquire any such discretionary insurance, the Board may base its decision upon, among other things, a vote of the Owners.

1.9    **Trustee for Policies** . The Association, acting through its Board, is appointed and shall be deemed trustee of the interests of all named insureds under all insurance policies purchased and maintained by the Association. All insurance proceeds under any of those policies shall be paid to the Board as trustee. The Board shall use the proceeds for the repair or replacement of the property for which the insurance was carried or for the purposes described in Article 9 herein. The Board also is authorized to negotiate loss settlements with the appropriate insurance carriers, to compromise and settle any claim or enforce any claim by any lawful action, and to execute loss claim forms and release forms in connection with such settlements.

1.10    **Insurance Premiums** . Insurance premiums for any insurance coverage obtained by the Association shall be included in the regular or special assessments. That portion of the assessments necessary for the required insurance premiums shall be used solely for the payment of the premiums when due.

1.11    **Insurance Policy Deductibles** . The Board of Directors shall have the power, in its sole discretion, to determine the amount of any deductible applicable to any insurance policy carried by the Association. In the event of a loss for which Association insurance coverage is used, the responsibility for payment of any deductible shall be as follows:

1.11.1    If the damage or loss occurs to an item of personal property or other item for which an Owner is responsible, the Owner shall be responsible for the cost of any deductible.

1.11.2    If the damage or loss occurs to an item owned by the Association or for which the Association is responsible, the Association shall be responsible for the cost of any deductible.

Exhibit 1
Page 98

1.11.3  If the damage or loss occurs to any Unit and the Common Area, or to more than one Unit, the responsibility for the payment of any deductible shall be apportioned among the affected parties on the basis of the ratio of each party's cost of repair to the total costs of repair.

1.11.4  The foregoing notwithstanding, if the damage or loss is caused by the negligence or misconduct of any Owner, or resident, guest, tenant or invitee of an Owner, such Owner shall be liable for the cost of the deductible.

1.12 ***Insurance Disclosures*** . The Association shall disclose such information regarding insurance coverage as and when required by any applicable statute or law. Failure to disclose such information shall not impose any liability upon the Association or Board other than that provided for in such statute or law.

1.13 ***Individual Property Insurance*** . Except as provided in this Section, no Owner can separately insure his or her Unit or any part of it, against loss by fire or other casualty covered by the Association's blanket insurance carried under Section 8.1. If any Owner violates this provision, any diminution in insurance proceeds otherwise payable pursuant to the provisions of Section 8.1 that results from the existence of such other insurance will be chargeable to the Owner who acquired such other insurance, and the Owner will be liable to the Association to the extent of any diminution. An Owner may insure his or her personal property against loss. In addition, any improvements made by an Owner may be separately insured by the Owner, but the insurance is to be limited to the type and nature of coverage commonly known as "tenant's improvements." All such insurance that is individually carried must contain a waiver of subrogation rights by the carrier as to other Owners, the Association, and any institutional first Lender of such Unit.

1.14 ***Individual Liability Insurance*** . An Owner may carry whatever personal liability and property damage liability insurance with respect to his or her Unit that he or she desires. However, any such policy shall include a waiver of subrogation clause acceptable by the Board and to any first Lender.

1.15 ***Damage to or Loss of Owner Property; Insurance; Limitation of Liability*** . An Owner is responsible for obtaining and maintaining such insurance, at his or her sole expense, to protect against any damage to, or loss of property, and the cost of repair or replacement of damaged items, including, but not limited to, any personal property, decorations, floor and wall coverings, appliances, fixtures or other items therein, or any exterior items such as damage to an Exclusive Use Common Area, which is caused by any Common Area component or any component maintained by the Association. The Association shall not be liable to any Owner or his or her tenants, guests or others, for damage to or loss of any such property, or the cost of repair or replacement of any damaged property or portions of such Owners' Unit

35

Exhibit 1
Page 99

or Exclusive Use Common Area, unless such damage is caused by the gross negligence of the Association, its Board, officers, agents or employees.

## 2ARTICLE - DAMAGE OR DESTRUCTION

2.1    **Duty to Restore**.  Any portion of the Project that is damaged or destroyed must be repaired or replaced promptly by the Association unless:

2.1.1                The Project is terminated.

2.1.2                Repair or replacement would be illegal under a state statute or municipal ordinance.

2.1.3                Eighty percent (80%) of Owners, including each Owner of a Unit or Exclusive Use Common Area that will not be rebuilt, vote not to rebuild.

2.2    **Cost of Repair**.  Any cost of repair or replacement in excess of any insurance proceeds and reserves shall be a common expense, levied against Condominiums in the same proportion as regular assessments are levied.

2.3    **Repair Plans**.  The Project must be repaired and restored in accordance with either (a) the original plans and specifications, updated as required to reflect applicable building codes, or (b) other plans and specifications which have been approved in writing by the Board, a majority of Owners, and at least fifty-one percent (51%) of Lenders holding Mortgages on Units subject to the repair.

2.4    **Replacement of Less Than Entire Project**.

2.4.1                Any insurance proceeds attributable to the damaged Common Area shall be used to restore the damaged area to a condition compatible with the remainder of the Project.

Exhibit 1
Page 100

2.4.2          Except to the extent that other persons or entities will be distributees:

    (a)          Any insurance proceeds attributable to a Unit and Exclusive Use Common Area that are not rebuilt must be distributed to the Owner of that Unit and the Owner of the Unit to which the Exclusive Use Common Area is appurtenant, or to lien holders, as their interests may appear.

    (b)          The remainder of any proceeds must be distributed to each Unit Owner or lien holder, as their interests may appear, in proportion to the interests of all the Units.

    (c)          If the Owners vote not to rebuild a Unit, the common interest portions of the Unit shall be reallocated among all other Units, and the Association, acting solely through the Board, shall prepare, execute and record an amendment to this Restated Declaration reflecting the reallocations.

2.5    ***Insurance Proceeds***.  As provided in Section 8.9, the Association shall hold any insurance proceeds in trust for the Association, Owners and lien holders as their interests may appear.  Subject to the provisions of this Restated Declaration, the proceeds shall be disbursed first for the repair or restoration of the damaged property.  The Association, Owners and lien holders are not entitled to receive payment of any portion of the proceeds unless there is a surplus after the Project has been completely repaired or restored, or unless the Project is terminated.

2.6    ***Disbursements to Owners and Lenders***.  Any insurance proceeds distributed to Owners and Lenders shall be distributed proportionately according to the fair market values of the Units at the time of the destruction as determined by an independent appraisal.  That appraisal shall be performed by an independent appraiser who shall be selected by the Board and who shall be a member of, and apply the standards of, a nationally recognized appraiser organization.

2.7    ***Certificates By Board***.  Any insurance trustee, if not the Association, may rely on the following certifications in writing made by the Board:

2.7.1          Whether or not damaged or destroyed property is to be repaired or restored.

37

Exhibit 1
Page 101

2.7.2            The amount or amounts to be paid for repairs or restoration and the names and addresses of the parties to whom such amounts are to be paid.

2.8    **Certificates by Attorneys or Title Insurance Companies**.  If payments are to be made to Owners or Lenders, then the Board and the trustee, if any, shall obtain and may rely on a title insurance company's or attorney's title certificate or a title insurance policy based on a search of the Official Records of the County Recorder, stating the names of the Owners and the mortgagees.

## 3ARTICLE - EMINENT DOMAIN

3.1    **Representation by Association**.  The Association shall represent the Owners in the event of any threatened condemnation, condemnation proceedings or in negotiations, settlements and agreements with the condemning authority for acquisition of the Common Area(s), or any part thereof.  In furtherance of this purpose, each Owner, by acceptance of a deed to his or her Condominium, irrevocably appoints the Association as their attorney-in-fact to represent the Owners in any such condemnation proceeding(s).

3.2    **Common Area Taking**.  In the event of a taking or acquisition of part or all of the Common Area(s) by a condemning authority, the award or proceeds of settlement, less any fees or costs incurred in collection thereof, shall be payable to the Association, or any trustee appointed by the Association, for the use and benefit of the Owners and their Lenders as their interests may appear according to the relative values of the Condominiums affected by the condemnation where Condominiums are not valued separately by the condemning authority or by the court.

3.3    **Condominium Unit Taking**.  In the event of an award for the taking of any Condominium in the Project by eminent domain, the respective Owner(s) and Lenders of such Condominium shall be entitled to receive the award for such taking, less any fees and costs incurred in collecting such amount and only up to the fair market value of the Condominium, and after acceptance thereof he or she and the Lender shall be divested of all interest in the Project if such Owner shall vacate his Condominium as a result of such taking.  The remaining Owners shall decide by majority vote whether to rebuild or repair the Project, or take other action.  The remaining portion of the Project shall be resurveyed, if necessary, and this Restated Declaration shall be amended to reflect such taking and to readjust proportionately the percentages of undivided interest of the remaining Owners in the Project based on the number of Units remaining in the Project.

SO 155245v3

Exhibit 1
Page 102

3.4 **Substantial Taking** . If there is a substantial taking of the Project (more than fifty percent), the Owners may terminate the legal status of the Project and, if necessary, bring a partition action under California Civil Code section 1359 or any successor statute, on the election to terminate by fifty-one percent (51%) of the total voting power of the Association. The proceeds from the partition sale, less any costs or fees incurred in collection thereof, shall be distributed to the Owners and their respective Lenders in proportion to the fair market values of the Condominiums.

## 4ARTICLE - RIGHTS OF LENDERS

4.1 **General** . No breach of any of the covenants, conditions and restrictions herein contained, nor the enforcement of any lien provisions herein, shall render invalid the lien of any First Mortgage on any Unit made in good faith and for value, but all of said covenants, conditions and restrictions shall be binding upon and effective against any Owner whose title is derived through foreclosure or trustee's sale, or otherwise.

4.2 **No Right of First Refusal** . This Restated Declaration neither contains nor shall be amended to contain any provision creating a "right of first refusal" to the Association before a Unit can be sold. Should any such rights nevertheless be created in the future, such rights shall not impair the rights of any first Lender to: (a) foreclose or take title to a Unit pursuant to the remedies provided in the mortgage, (b) accept a deed (or assignment) in lieu of foreclosure in the event of a default by a mortgagor, or (c) sell or lease a Unit acquired by the Lender.

4.3 **Unpaid Dues or Charges** . Where the Lender of a First Mortgage of record or other purchaser of a Unit obtains title to the Unit pursuant to the remedies in the Mortgage or as a result of foreclosure, such acquirer of title, his successors and assigns, shall not be liable for the share of the common expenses or assessments made by the Association chargeable to such Unit which became due prior to the acquisition of title to such Unit by such acquirer. Such unpaid share of common expenses or assessments shall be deemed to be common expenses collectible from all of the Units including such acquirer, his successors and assigns.

4.4 **Payment of Taxes and Insurance** . First Lenders may, jointly or singly, pay taxes or other charges which are in default and which may or have become a charge against the Common Area property and may pay overdue premiums on hazard insurance policies, or secure new hazard insurance coverage on the lapse of a policy, for such Common Area property. First Lenders making such payments shall be owed immediate reimbursement from the Association.

SD 155245v3

Exhibit 1
Page 103

4.5    *Priority of Proceed or Award Distribution* . Any other provision herein contained to the contrary notwithstanding, no provision of the Governing Documents shall give an Owner, or any other party, priority over any rights of the first Lender pursuant to its Mortgage in the case of a distribution to such Owner of insurance proceeds or condemnation awards for losses to or a taking of the Common Area.

4.6    *Inspection of Documents, Books and Records* . The Association shall make available to Lenders, current copies of the Governing Documents and the accounting books, records and financial statements of the Association. "Available" means available for inspection, upon request, during normal business hours or under other reasonable circumstances.

4.7    *Non-Curable Breach* . Any Lender who acquires title to a Unit by foreclosure or by deed in lieu of foreclosure or assignment-in-lieu of foreclosure shall not be obligated to cure any breach of this Restated Declaration that is non-curable or of a type that is not practical or feasible to cure.

4.8    *Loan to Facilitate* . Any First Mortgage given to secure a loan to facilitate the resale of a Unit after acquisition by foreclosure or by a deed-in-lieu of foreclosure or by an assignment-in-lieu of foreclosure shall be deemed to be a loan made in good faith and for value and entitled to all of the rights and protections of this Article.

4.9    *Lenders Furnishing Information* . Any Lender shall be entitled and authorized to furnish information to the Board concerning the status of any Mortgage.

## 5ARTICLE - ENFORCEMENT

5.1    *Right to Enforce; Remedies* . The Association or any Owner shall have the right to enforce, by any proceeding at law or in equity, all restrictions, conditions, covenants, reservations, liens and charges now or hereafter imposed by the Governing Documents. Each Owner of a Condominium shall have a right of action against the Association or any Owner for failure to comply with the provisions of the Governing Documents. The remedies provided for herein are to be considered cumulative and the use of one remedy shall not preclude the use of any other.

40

Exhibit 1
Page 104

5.2    **Nuisance** . The result of every act or omission, whereby any provision, condition, restriction, covenants, easement, or reservation contained in the Governing Documents is violated in whole or in part, is declared to be and constitute a nuisance, and every remedy allowed by law or equity against a nuisance, either public or private, shall be applicable against every such result and may be exercised by any Owner and the Association. Each remedy provided herein shall be cumulative and not exclusive.

5.3    **Failure to Enforce** . Failure by the Association or any Owner to enforce any provisions of the Governing Documents shall in no event be deemed a waiver of the right to do so thereafter.

5.4    **Violation of Law** . Any violation of any state, municipal or local law, ordinance or regulation pertaining to the ownership, occupation or use of any Condominium within the Project is declared to be a violation of the Governing Documents and subject to any or all of the enforcement procedures herein set forth.

5.5    **Compliance with Statute** . All activities to enforce the provisions of the governing documents shall be conducted in accordance with all applicable laws, statutes and ordinances. This Section shall apply to both the Association and to all Owners.

## 6ARTICLE - AMENDMENTS

6.1    **Owner Approval of Amendments** . Subject to Section 13.2 below, this Restated Declaration may be amended by the vote or written consent of Owners representing not less than two-thirds (⅔) of the voting power of the Association; provided, however, that the percentage of the voting power necessary to amend a specific clause or provision of this Restated Declaration shall not be less than the percentage of affirmative votes prescribed for action to be taken under that clause or provision.

An amendment becomes effective after (a) the approval of the required percentage of Owners has been given, (b) that fact has been certified in the form of a written document executed and acknowledged by an officer designated by the Association for that purpose or, if no such designation is made, by the President of the Association and (c) the document has been recorded in San Diego County.

6.2    **Amendment of Restated Declaration or Bylaws by Board Vote.** The Board of Directors shall have the power to amend this Restated Declaration or the Bylaws, as the case may be, but only as this Section permits. By a

41

Exhibit 1
Page 105

majority vote of the full Board, the Board shall have the power to prepare and, if necessary, to record an amendment for the following purposes:

6.2.1    To correct any printing or grammatical error or omission in the Restated Declaration or Bylaws without any vote of the Members.

6.2.2    To make any change in this Restated Declaration or Bylaws required by a change in any applicable law, which obligates the Association, the Board or the Owners to conform their conduct with the terms of the law.

6.2.3    To make any change in the Restated Declaration or Bylaws needed to comply with any requirements of an Institutional Lender.

6.2.4    If the Board approves an amendment using the procedure in this subparagraph 13.2.2 or 13.2.3, the amendment shall not be recorded or filed until he following procedure is implemented. The Board shall first send notice of such action to the Owners, which notice shall include the text of the proposed amendment and an opinion from legal counsel that the proposed change in the Governing Documents is either required by law or by an Institutional Lender. An amendment shall be considered ratified, unless within thirty (30) days after the date such notice is sent to the Owners, the Owners entitled to cast twenty percent (20%) of the votes in the Association, sign a written petition to reconsider the Board's action and file it with the Board. If such a petition is filed, the Board shall call a special meeting of the Members to reconsider the Board's action. At the meeting, unless a majority of the total voting power of the Association rejects the proposed amendment, the amendment shall be considered ratified, whether or not a quorum is present at the special meeting.

This section shall not restrict the powers of the Owners to amend this Restated Declaration or the Bylaws by any other method, but is intended to authorize a simple process for amendment where the property rights of Owners are not materially or adversely affected.

6.3    *Statute of Limitations to Challenge Amendments* . No action to challenge the terms or validity of any amendment to this Restated Declaration or to the Bylaws may be made more than one (1) year after the recording date in

SD 155245v3

Exhibit 1
Page 106

the case of an amendment to this Restated Declaration, or more than one (1) year after the recording date in the case of an amendment to this Restated Declaration, or more than one (1) year after the official tally of the vote in the case of an amendment to the Bylaws.

## 1ARTICLE - GENERAL PROVISIONS

1.1     **Term** . The provisions of this Restated Declaration shall continue in effect for a term of fifty (50) years from the date of execution.  Thereafter, it shall be automatically extended for successive periods of ten (10) years, until the membership of the Association decides to terminate it.

1.2     **Nonwaiver of Remedies** . Each remedy provided for in this Restated Declaration is separate, distinct, and nonexclusive.  Failure to exercise a particular remedy shall not be construed as a waiver of the remedy.

1.3     **Severability; Invalidity** . The provisions of this Restated Declaration shall be deemed independent and severable, and the invalidity or partial invalidity or unenforceability of any one (1) provision shall not affect the validity or enforceability of any other provision.  If for any reason this Restated Declaration is declared completely invalid in its entirety, the Original Declaration shall be deemed to have survived and thereafter become effective without any further action.

1.4     **Binding** . This Restated Declaration, as well as any amendment thereto and any valid action or directive made pursuant to it, shall be binding on the Owners and their heirs, grantees, tenants, successors, and assigns.

1.5     **Interpretation** . The provisions of this Restated Declaration shall be liberally construed and interpreted to effectuate its purpose of creating a uniform plan for the development and operation of a condominium project.  Failure to enforce any provision of this Restated Declaration shall not constitute a waiver of the right to enforce that provision or any other provision of this Restated Declaration.

1.6     **Limitation of Liability** . The liability of any Owner for performance of any of the provisions of this Restated Declaration shall terminate upon sale, transfer, assignment, or other divestment of the Owner's entire interest in his or her Unit but only with respect to obligations arising from and after the date of the divestment.

1.7     **Fair Housing** . Neither the Association nor any Owner shall, either directly or indirectly, forbid the conveyance, encumbrance, renting, leasing, or occupancy of any  Owner's Unit to any person on the basis of race, color,

SD 155245v.1

Exhibit 1
Page 107

sex, sexual orientation, religion, ancestry, national origin, age, marital status, physical handicap or any other classification prohibited by Law.

1.8    ***Number and Headings*** . As used in this Restated Declaration, the singular shall include the plural, unless the context requires the contrary. The headings are not a part of this Restated Declaration, and shall not affect the interpretation of any provision.

1.9    ***Attorneys' Fees*** . In the event an attorney is engaged by the Board to enforce the Governing Documents, the Association shall be entitled to recover from the adverse party to the controversy its actual attorneys' fees and costs so incurred. In the event litigation is commenced to enforce the Governing Documents, the prevailing party shall be entitled to its attorneys' fees and costs. Said costs and attorneys' fees shall constitute a lien on the Unit which is enforceable pursuant to Article 4 herein. This Section shall also apply to actual attorneys' fees incurred to collect any post-judgment costs.

1.10    ***Variances*** . The Board may, by unanimous vote of the full Board, authorize variances from compliance with any of the architectural or use provisions of this Restated Declaration as follows:

1.10.1    Variances may be granted, without limitation, to restrictions upon use contained in Article , restrictions on repair and maintenance in Article , and architectural restrictions in Article , when circumstances such as location, engineering, economy, hardship, aesthetic or environmental considerations warrant.

1.10.2    Variances shall be in writing and shall become effective upon final approval by the Board.

1.10.3    When a variance is granted, no violation of the Restated Declaration shall be deemed to have occurred with respect to the matter for which the variance was granted. The granting of a variance shall not operate to waive any of the terms and provisions of this Restated Declaration for any purpose except as to the particular property and particular provision covered by the variance, nor shall it affect in any way the Owner's obligation to comply with all governmental laws and regulations affecting the use of the premises, including, but not limited to, zoning ordinances or requirements imposed by the City of Del Mar or any other governmental authority.

44

SD 155245v3

Exhibit 1
Page 108

1.10.4        The Association may charge a reasonable fee to cover any costs associated with the variance approval process, or for issuance of a variance.

1.10.5        The Board may enact additional rules and regulations regarding the variance approval process, the circumstances under which a variance may be granted, and the execution of indemnity or other agreements by the Owner as a condition to issuance of a variance.

1.11    ***Governing Document Priorities***  In the event of a conflict between the Governing Documents, or any provision thereof, the following documents shall take precedence in the order given: (1) the Articles, (2) the Condominium Plan, (3) this Restated Declaration, (4) the Bylaws, and (5) the Rules and Regulations.

1.12    ***Conflict with Statutes***  Provided any federal, state or local statute, law or ordinance ("Law") is inconsistent with any provision or provisions of the Governing Documents, and compliance with that Law is mandatory, neither the Association, the Board nor any member thereof shall have any liability for complying with the Law or for failing to comply with provisions of the Governing Documents if compliance would violate such Law.

SD 155245v3

Exhibit 1
Page 109

**IN WITNESS WHEREOF**, the undersigned has executed this 2003 Amended and Restated Declaration of Restrictions this _____ day of _____, 2003.

DEL MAR WOODS,
a California nonprofit mutual benefit corporation


By: _____
President


By: _____
Secretary



STATE OF CALIFORNIA    )
                       )
COUNTY OF SAN DIEGO    )

On _____, before me, _____ Notary Public, personally appeared _____ and

[ ] personally known to me
            - OR -
[ ] proved to me on the basis of satisfactory evidence

SD 155245v3

Exhibit 1
Page 110

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

_____

Notary Public

**EXHIBIT 2**

Exhibit 1
Page 112



## ARCHITECTURAL REVIEW COMMITTEE

# POLICY, PROCEDURE & SPECIFICATION MANUAL



## DEL MAR WOODS HOMEOWNERS ASSOCIATION
### November 2010

Exhibit 1
Page 113

## DEL MAR WOODS HOMEOWNERS ASSOCIATION
## ARC POLICY, SPECIFICATION AND PROCEDURE MANUAL

**SUBJECT:** Architectural Review Committee (ARC)

**PURPOSE:** The purpose of this policy is to highlight and reiterate the scope of review by the ARC of owner submitted Architectural Improvement Request Applications as established under the CC&R Article VII.

**POLICY: 7.1  General.** Any change or improvement to the exterior of a Unit, or to the interior which affects the exterior of a Unit, any wall, any mechanical or utility systems (HVAC systems, gas, water or electrical pipes or wires, etc.), any garage, or the structural integrity of any building, shall be governed by this Article. Changes or improvements to the Common Area by the Association do not need to comply with the requirements of this Article.  The Board may establish an architectural committee as provided herein to assist the Board in reviewing architectural submittals, and to provide recommendations to the Board with regard to approval or disapproval of any submittal. The foregoing notwithstanding, the Board shall be solely responsible for approving or rejecting any architectural submittal.

**7.2  General Changes Requiring Prior Approval.** Nothing may be erected, placed or planted on the exterior of any Unit or on the Common Area by any Owner without the prior written approval of the Board. Modifications to the interior of Units which involve alterations to the floor plan, removal or modification of a wall, or which may have the potential to affect the Common Area, including the walls, roofs and mechanical or utility systems, shall require prior approval. Additionally, prior written Board approval shall be required for any alteration, modification, painting or other change or addition to the exterior of any existing improvement or landscaping.

**7.3 Specific Changes.** Subject to other applicable restrictions contained in the Governing Documents, Owners may modify their Units subject to the following:

**7.3.1** Modifications or alterations of the exterior of any Unit must have the prior written consent of the Board, including any modifications to facilitate handicapped access as provided by section 1360 of the California Civil Code. Any approval of such handicapped access modification may be conditioned on such modification's removal, by the Owner at his or her sole expense, once the handicapped access is no longer necessary for the Unit.

**7.3.2** Alterations to the floor plan of a Unit, removal or modification of walls, or any portion thereof, may not be made within a Unit without the Prior written approval of the Board of Directors, which approval will not be unreasonably withheld, as long as appropriate plans and specifications are provided in writing at the time the request is made.  A structural engineer and a city permit will be required to move walls.

Exhibit 1
Page 114

7.3.3  No Owner may install any shutter, screen, screen door, or other appurtenance in or on any window or door except those items which are in conformance with standards established by the Board.

7.3.4  No Owner may enclose his or her Unit's porch, patio, or balcony without the prior written consent of the Board.  SD 155245v3

7.3.5  Except as provided by the Governing Documents, Owners shall not have the right to paint, decorate, remodel or alter any Exclusive Use Common Area or the Common Area without the prior written consent of the Board.

**7.4  Procedure for Obtaining Approval of Architectural Changes.**  The procedure for obtaining approval of any architectural change shall be as follows:

7.4.1  Plans and specifications showing the nature, kind, shape, color, size, height, materials to be used and location of any proposed improvements or alterations, as well as the proposed contractor and any other information as required by the Board, shall be prepared by the requesting Owner and submitted to the Association.

7.4.2  The architectural committee, if any, shall review the submission and provide a recommendation as to approval or disapproval of any such submission, including the reasons for any decision, to the Board and the requesting Owner within thirty (30) days of receipt of such submission. The recommendation may be oral or in writing as the Board directs.

7.4.3  The Board shall review such recommendation within thirty (30) days of receipt of the architectural committee's recommendation, or within 60 days of receipt of the submission, whichever is earlier, and provide a written response to the requesting Owner, including reasons for such response.

7.4.4  In the event the Board fails to provide a written response to the requesting Owner within sixty (60) days of receipt of the request from the Owner, the Owner may notify the Board in writing that a response has not been received. If the Board fails to respond within thirty (30) days of the receipt of the notice, approval will not be required and the related covenants shall be deemed to have been fully satisfied.

7.4.5  Once an Owner has obtained approval for an architectural submittal, work on such approved submittal shall promptly commence and shall be completed within a reasonable time.

Refer to CC&R's Article 7.1-7.13 for complete architectural guidelines

Exhibit 1
Page 115

# DEL MAR WOODS HOMEOWNERS ASSOCIATION
## ARCHITECTURAL REVIEW COMMITTEE

### INSTRUCTIONS

**I. PREPARATION OF APPLICATION:**

  **A.** WORK IS NOT TO BE STARTED PRIOR TO RECEIPT OF WRITTEN
  APPROVAL FROM THE ARCHITECTURAL REVIEW COMMITTEE (ARC).

  **Note:** Substantial penalty may be applied if work is started prior to approval receipt
  Minimum $100.00- Maximum $1,000.00 plus the possible removal of the work
  started.

  **B.** Read all information under "GENERAL INFORMATION"

  **C.** Complete "Architectural Committee Request for Approval Form, attach detailed
  plans and specifications as needed to meet the requirements under "GENERAL
  INFORMATION", sign and date the ARC form.

  **Note:** Signing ARC form gives ARC or its duly authorized representatives permission to
  enter the project area at any time during the construction period to perform
  CC&R authorized inspections.

  **D.** Preliminary Approval
  1. Any homeowner who plans any change or any improvements shall first apply for plan
  approval of the proposed improvement.
  2. The submitted preliminary plans must include full dimensions, exact location,
  materials to be used, external finishes, and similar features.
  3. The preliminary plans and improvements shall be reviewed by the ARC and their
  approval or denial presented to the owner and the Board within 30 days from the
  date of receipt of the ARC form.  For the application to be accepted it MUST be
  complete and totally filled out with all desired information including full dimensions
  and location as stated before.
  4. If plan approval is granted by the ARC, the improvements must start within a
  reasonable amount of time. The preliminary approval is necessary before any
  improvement construction can begin.
  5. The Board/ARC or authorized representative have the right to inspect the work during
  construction.
  6. Upon completion of the improvements, construction, reconstruction, etc. the Owner
  shall give a written notice requesting a Final Construction Approval to the ARC. After
  the plan approval period, any application for final construction approval must consist
  of the final improvements being in accordance with the provision of the Plan
  Approval. The ARC 30 days to act on the complete final approval.

Exhibit 1
Page 116

7. If the ARC finds that the Owner is not in substantial compliance of the approved plans, it shall inform the Owner in writing within 30 days. The Owner has 90 days to correct the deficiency and reapply for Final Construction Approval.

8. The ARC has the right to hire any Engineer or Consultant, the opinion of which the Board deems necessary in connection with their review of the plans submitted by the Owner, and the Owner shall be liable for the payment of such engineers and/or consultants.

## II. OWNER RESPONSIBILITY:

A. Prepare and submit completed application to the ARC by mail to address on application.

B. Prepare a complete drawing of your proposed improvement(s), complete with dimensions, exact locations, materials, colors, etc.

C. After completing the Preliminary Application based on informal discussions with the ARC, your preliminary application may be submitted to the ARC for their approval. The ARC has 30 days from date of preliminary submittal to respond. The application must be complete and entirely filled out to be considered. The ARC has 30 days from date of submittal to respond.

D. Preliminary approval by the ARC is valid for a period of 180 days from the date of issuance. During this 180 day preliminary approval period you can propose modification or changes to comply with the provisions of the ARC regarding their recommendations of the preliminary application. A Final Application with the necessary changes must then be submitted by the end of this 180 day period.

E. Once preliminary approval is secured by the ARC, it is the Owner responsibility to comply with all City, County, and State codes, rules, statues, etc. All necessary permits and approvals by any governmental agency must be secured prior to commencement of construction or reconstruction.

F. The Board and/or ARC, or their authorized representatives, have the right to inspect the work to alert you to any defects or needed corrections. This can be done during construction and/or upon completion.

G. Upon completion of the work, the owner shall give a written notice to the Board that the project has been completed according to the approvals and specifications authorized.

H. Should the Board become aware that the Owner is not in substantial compliance of the approved plans, it shall inform the Owner in writing within a 30-day period.

Exhibit 1
Page 117

## DEL MAR WOODS HOMEOWNERS ASSOCIATION
## ARC POLICY, SPECIFICATION AND PROCEDURE MANUAL

**POLICY NUMBER:** 01                    **APPROVAL DATE:** March 2010

**SUBJECT:** Screen Door

**PURPOSE:** For Homeowners that just want to use a regular screen door.

**GENERAL REQUIREMENTS AND RECOMMENDATIONS:**
The following are general requirements or recommendations:

1. Owners must receive, in writing, ARC approval before starting the project. Approval is
   obtained using the **Architectural Committee Request for Approval Form.** The form is
   available from the Association Manager or online at www.delmarwoods.org

2. All costs associated with the project including all future maintenance and repair of the
   screen door is the ***owner's responsibility***.

3. Color must be dark bronze, dark brown, sand or beige. For longer life—"hard anodizes"
   finish is recommended.

**SPECIFIC GENERIC SPECIFICATIONS:**
**A, Framed Screen Doors:**
      1. Frames must be of high strength extruded aluminum, aluminum alloy or wood.
      2. Screen must be of a non-corrosive material.
      3. Optional items:
            a. Heavy duty push bars and protective grill on lower half of door.
            b. Heavy duty scratch resistant kick plate.

**B. "Phantom" Screens** or "Side Roll-Up" Screens are approved provided material is non-
corrosive and the color is per specification.

Exhibit 1
Page 118

## DEL MAR WOODS HOMEOWNERS ASSOCIATION
## ARC POLICY, SPECIFICATION AND PROCEDURE MANUAL

**POLICY NUMBER:**  02                              **APPROVAL DATE:** March 2010

**SUBJECT:** Security Screen Door

**PURPOSE:** For homeowner that would like to use a security screen door.

**GENERAL REQUIREMENTS:**
The following are general requirements or recommendations:

1. Owners must receive, in writing, ARC approval before starting the project. Approval is
   obtained using the **Architectural Committee Request for Approval Form.** The form is
   available from the Association Manager or online at www.delmarwoods.org

2. All costs associated with the project including all future maintenance and repair of the screen
   door is the **owner's responsibility**.

3. Color must be dark bronze, dark brown, sand or beige.  For longer life—"hard anodized"
   finish is recommended.

4. Contractor must demonstrate how frame of security screen door will be attached to the
   building.

5. Typical models of approved security screen doors can be found at Home Depot
   (www.homedepot.com), Lowe's (www.lowes.com) or Dixieline Lumber.



Lowe's: – Columbia Bronze Bayside Metal Screen Door;
            model #: **20331082**  *(pictured at left)*

            Columbia Bronze Tahoe Metal Screen Door;
            model #: 20335592

Home Depot: – Timberline Press Treated Screen Door;
                model: WTIM36PT

                Pressure Treated Summit Wood Door;
                model: WSUM36PT

                Woodcraft:
                model: WCRA36

Exhibit 1
Page 119

# DEL MAR WOODS HOMEOWNERS ASSOCIATION
## ARC POLICY, SPECIFICATION AND PROCEDURE MANUAL

**POLICY NUMBER:** 03                              **APPROVAL DATE:** March 2010

**SUBJECT:** Flooring Replacement - Sound Control

**PURPOSE:** The purpose of this specification is to establish a Flooring Replacement-Sound Control specification that will reduce, as much as possible, the sound transfer from the upper floors to the units below.

**BACKGROUND:** The units on the east side of Stratford Court are either two story or three story stacked units. Each floor is separated with a 10" beam and on top of the beam are two sheets of 5/8-inch plywood. On top of the plywood homeowners have placed carpeting, tile, wood, linoleum, and other types of flooring. These floor coverings, if not installed with sound control in mind, will increase the sound transmission. In addition, if tile and wood flooring are not installed properly with an anti-fracture or crack isolation membrane, they might crack along grout lines of connection. The units west of Stratford Court do not need to submit a request. These units are typical town home style and therefore sound control is not an issue.

**GOAL:** To reduce and/or eliminate as much sound transmission as possible between stacked units.

**GENERAL REQUIREMENTS AND RECOMMENDATIONS:**
The following are general requirements or recommendations:

1. Owners must submit an **Architectural Committee Request for Approval Form**, noting the replacement or installation of the flooring will be in accordance with this Specification, Number 03. The form is available from the Association Manager or online at www.delmarwoods.org

2. HOA Manager or ARC Member, per ARC procedure, is responsible for inspections. For 2nd or 3rd floor unit owners, the Board of Directors has established a tile inspection fee of $125.

3. All cost associated with the project, including *inspector fees*, and all future maintenance and repair, is the **owner's responsibility.**

4. Under no circumstances are owners or their agents allowed to remove the original sound-proofing that was installed by the developer. However, it can be replaced with new sound-proofing.

Exhibit 1
Page 120

Flooring Replacement-Sound Control, cont.

**SPECIFIC SPECIFICATIONS:**

**A. CARPETING:** *Carpeting is acceptable in any and all areas.* Carpeting shall be installed using a standard felt or foam pad. "Glue down" carpeting is not approved.

**B. RESILIENT FLOOR COVERING:** *Resilient Floor Coverings are acceptable.* Resilient flooring materials are made in various shapes and sizes including both tile and roll form. Common types of resilient flooring include vinyl composition tile, vinyl tile, sheet linoleum, and runner tile sheet. These types of flooring shall be installed in accordance with the specific product manufacture's installation procedure and with manufacturer's recommendation sound proofing underlayment.

**C. WOOD AND SIMULATED WOOD:** Floor coverings like wood and simulated wood shall be installed in accordance with the specific product manufacturer's installation procedure.

For upper units on the east side of Stratford Court, homeowners must obtain written permission from owner of unit below and submit with request. In addition,
1. Wood flooring must be installed as per manufacturer's specifications.
2. Sound proofing must be installed as per manufacturer's specifications.
3. ARC request must outline exactly what type of sound proofing will be used and how it will be installed.
4. Any sound transference complaints must be worked out amongst the two unit owners.

**D. TILE:** Tile shall be installed in accordance with the "Tile Council of America" (TCA) installation procedures over an underlayment of one of the sound control products listed below. The sound control underlayment shall be installed in accordance with the manufacturer's installation procedure.

**CAUTION: a 3/8 inch gap shall be allowed between the tile and the perimeter wall and any and all other penetration of flooring. Gap shall be filled with acoustically rated sealant. Tile and/or mortar must not touch walls, sills, conduit or pipes, as this will impair sound control.**

**Inspection:**
In process inspections shall be made by the HOA Manager or ARC Member to determine that underlayment material and installation are in accordance with this specification. And tile is installed in accordance with this specification and the 3/8-inch gap is allowed and filled with acoustically rated sealant.

Exhibit 1
Page 121

**APPROVED SOUND CONTROL PRODUCTS:**

1. Product:        NobleSeal SIS (Sound Isolation Sheet) (Also Crack Isolation)
   Manufacturer:   The Noble Company (www.noblecompany.com)
                   P.O. Box 350, Grand Haven, MI 04941-0350
                   800 878-5788, Fax 231 799-8850
   Performance:    IIC   Impact Insulation Class      62
                   STC  Sound Transmission Class  59

**APPROVED SOUND CONTROL PRODUCTS, cont.:**

2. Product:        AFM-SCU (Anti-Fracture Membrane Sound Control Underlayment)
   Manufacturer:   Protecto Warp Company
                   2255 South Delaware, Denver, CO 80223
                   800 759-9727, Fax 303 777-9273
                   www.protectowrap.com
   Performance:    IIC   Impact Insulation Class      67
                   STC  Sound Transmission Class  55
   Available at:   Sunshine Supply Company, Inc.

                   **Note:** Proteto Wrap primer must be put on cement first, before membrane
                   is put down AFM P.W. 6000 covers kitchen and bathroom.

**Note:**

1. For units on the east side of Stratford Court, homeowners must also get written approval of downstairs owner before submitting request.

2. If the unit owner installs tile to manufacturer's specifications, installs sound proofing to specifications noted above and retrieves signed written approval from the downstairs unit owner, the owner or any future owner of lower unit must work out any sound transference issues directly with the upper unit owner.

Exhibit 1
Page 122

# DEL MAR WOODS HOMEOWNERS ASSOCIATION
## ARC POLICY, SPECIFICATION AND PROCEDURE MANUAL

**POLICY NUMBER:** 04                                      **APPROVAL DATE:** March 2010

**SUBJECT:** Front Door Replacement or Refinish

**PURPOSE:** The purpose of this specification is to establish a Front Door Replacement and Refinish specification that reflects the intent of the Homeowners Association and permits Manager approval to all applications for Front Door Replacement or Refinish meeting this specification.

### GENERAL REQUIREMENTS AND RECOMMENDATIONS:

1. Owners must submit an **Architectural Committee Request for Approval Form** noting the replacement or refinish of the front door will be in accordance with this Specification, Number 04. The form is available from the Association Manager or online at www.delmarwoods.org

2. All costs associated with the project including all future maintenance and repair is the *owner's responsibility.*

3. Color of the front door must be one of the five (5) approved colors.
   Dunn Edwards Permasheen: 1) Green - ICI 981 Hawthorne Green, 2) Plum - ICI 21 Shaker Village, 3) Burgundy - ICI 88 Wild Cranberry , 4) Blue – ICI 1486 Signature Blue, OR 5) Stain Mahogany

### SPECIFIC GENERIC SPECIFICATIONS:

**A. Doors:**

Doors shall be exterior solid core smooth surface doors with wood veneer on both sides and stained or painted with one of the five (5) approved colors or one with a natural stone color. Fiberglass doors are also allowed.

Door may have glass and/or stained glass in door frame. Amount of glass should not exceed 80% of the total door space. HOA is not responsible for broken glass under any circumstances.

Front doors and locking mechanisms are the responsibility of the unit owner.

**B. Hardware:**

Choice of hardware is not specified, but is left up to the unit owner.

Exhibit 1
Page 123

## DEL MAR WOODS HOMEOWNERS ASSOCIATION
## ARC POLICY, SPECIFICATION AND PROCEDURE MANUAL

**POLICY NUMBER:** 05                               **APPROVAL DATE:** March 2010

**SUBJECT:** Sink Disposal

**PURPOSE:** Several costly plumbing repairs have been attributed to the collection of poorly ground garbage in the complex plumbing. This situation is caused by worn out, defective or ineffective kitchen sink disposals. Without corrective action costly repairs will continue. Therefore, the purpose of this specification is to establish a Sink Disposal specification that will help eliminate this type of maintenance cost and reflects the intent of the HOA and permits Manager approval to all applications for Sink Disposals meeting this specification.

### GENERAL REQUIREMENTS:

1. Owners must submit an **Architectural Committee Request for Approval Form** noting the replacement of a Sink Disposal in accordance with this Specification, Number 05. The form is available from the Association Manager or online at www.delmarwoods.org

2. All costs associated with the project including all future maintenance and repair is the **owner's responsibility.**

### SPECIFIC GENERIC SPECIFICATIONS:
1. Motor:                              Three Quarter or One Horse Power Only
2. Sound Reduction:                    Very Quiet
3. Grind Chamber & Elements:           Stainless Steel
4. Grinding Capacity:                  Extra Large

### RECOMMENDATIONS:
1. Horse Power:                        One
2. Reversing Action:                   Automatic
3. Warranty:                           Seven or Five Years
4. Service:                            In house for life of warranty
5. Brands:                             In Sink Erator  www.insinkerator.com
                                       and KitchenAid  www.kitchenaid.com

Exhibit 1
Page 124

# DEL MAR WOODS HOMEOWNERS ASSOCIATION
## ARC POLICY, SPECIFICATION AND PROCEDURE MANUAL

**POLICY NUMBER:** 06                    **APPROVAL DATE:** March 2010

**SUBJECT:** Window and Sliding Glass Doors Replacement Program

**PURPOSE:** These specifications have been set forth in order to maintain Del Mar Woods Architectural continuity, provide for the optimum wear with respect to moisture resistance and structural frame durability.

**GENERAL REQUIREMENTS:**

1. Owners must submit an **Architectural Committee Request for Approval Form** noting the replacement of Windows and/or Sliding Glass Doors in accordance with this Specification, Number 06. The form is available from the Association Manager or online at www.delmarwoods.org
2. All costs associated with the project including all future maintenance and repair is the **owner's responsibility.**
3. An inspection by the HOA manager or a member of the ARC must be made after each installation.

**SPECIFIC GENERIC SPECIFICATIONS:**

1. **SIZE:** All windows and sliding glass doors must be of the same dimension.

2. **FRAMES**    A. Color    Bronze, Brown, Sand or Beige
                    B. Type    Aluminum, Wood, Fiberglass or Vinyl
                               Corrosion Resistant Coating Systems
                               Aluminum - Anodized
                               Steel Frame - Powder Coated, Kynar Coated (i.e. Fleetwood Mfg.)
                                            Vinyl Coated (i.e. Milgard)

3. **SEALING PROCEDURES**
    A. Window/or doors must be caulked/sealed.
    B. All windows/doors must have weather stripping, Jiffy-Seal moisture seal around the entire replacement fixture.

4. **SIDING**
    A. Replacement siding is tongue and grove butt joint, grade B or better, kiln dried western Red Cedar with 15% moisture content or less, rough one side.
    B. Wood trim around the window 2x2, clear Douglas Fir, The trim should have a good grade of polyurethane caulking.
    C. Finished siding must have same appearance as original.

5. **PAINT**
    A. All wood should be primed with oil-based primer
    B. Apply two coats of top-coat paint. Apply one coat of sealer to back side to prevent cupping.

Exhibit 1
Page 125

## DEL MAR WOODS HOMEOWNERS ASSOCIATION
## ARC POLICY, SPECIFICATION AND PROCEDURE MANUAL

**POLICY NUMBER:** 07                          **APPROVAL DATE:** March 2010

**SUBJECT:** Garage Door Replacement

**PURPOSE:** To replace the old wood garage doors with a lighter, more modern roll-up garage door.

**GENERAL REQUIREMENTS:**

1. Owners must submit an **Architectural Committee Request for Approval Form** noting the replacement of a Garage Door in accordance with this Specification, Number 07. The form is available from the Association Manager or online at www.delmarwoods.org

2. All costs associated with the project including all future maintenance and repair is the *owner's responsibility.*

**GENERIC SPECIFICATIONS/ FEATURES:**

1. COLOR: Sandstone or similar
2. MATERIAL: Aluminum
2. STYLE: Window style garage doors may be used if owner's of adjoining garages agree to also replace garage door with the same style. For units west of Stratford Court, consent of immediate neighbor would be required. For units east of Stratford Court, consent of the other three owners in garage would be required.

**AVAILABLE FROM:**     Pacific Garage Doors
                        www.pacificgaragedoors.com
                        Contact: Dan Larose  760-793-2088

Exhibit 1
Page 126

# DEL MAR WOODS HOMEOWNERS ASSOCIATION
## ARC POLICY, SPECIFICATION AND PROCEDURE MANUAL

**POLICY NUMBER:** 08                          **APPROVAL DATE:** December 2008

**SUBJECT:** Exterior Light Fixture Replacement

**PURPOSE:** To replace the old wood hanging fixtures at front entrances of west side, and old wall mounted fixtures at entry walkways and balconies.

**GENERAL REQUIREMENTS:**

1. If other than noted 'pre-approved' fixture, owner must submit an **Architectural Committee Request for Approval Form** noting the replacement of an exterior light fixture in accordance with this Specification, Number 08. The form is available from the Association Manager or online at www.delmarwoods.org

2. All costs associated with the project including all future maintenance and repair is the *owner's responsibility.*

**GENERIC SPECIFICATIONS/ FEATURES:**
1. COLOR: Matte Bronze
2. MATERIAL: Solid Brass
3. STYLE: to match new surrounding lighting
3. Title 24 Approved

**H.O.A. PRE-APPROVED SOLID BRASS LIGHT FIXTURES:**
*details also available at www.delmarwoods.org*

COLOR: MATTE BRONZE/ PLAIN FROSTED GLASS



| FLUSH MOUNT WALL FIXTURE | | | PENDANT MOUNT FIXTURE | | |
|---|---|---|---|---|---|
| Model # | width | height | Model # | width | height |
| **SPJ29-02A** | 6" | 12-1/2" | **SPJ29-04A** | 8-1/2" | 18" |
| *(DMW price: $170.00)* | | | *(DMW price: $277.00)* | | |
| *Also available* | | | *Also available* | | |
| SPJ29-02B | 8-1/2" | 18" | SPJ29-04B | 11" | 21-1/2" |

**AVAILABLE FROM:**    SPJ LIGHTING
                      www.spjlighting.com
                      Contact: Chris Gonzales 800-469-3637

Exhibit 1
Page 127

2003 AMENDED AND RESTATED


BYLAWS OF



DEL MAR WOODS
*A Residential Condominium Association*

Exhibit 1
Page 128

## TABLE OF CONTENTS

ARTICLE 1 - NAME; LOCATION AND APPLICABILITY . . . . . . . . . . . . . . . . . . . . 1
    1.1   *Name; Nonprofit Mutual Benefit Corporation* . . . . . . . . . . . . . . . 1
    1.2   *Principal Office* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.3   *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.4   *Documents Being Replaced; Approvals* . . . . . . . . . . . . . . . . . 1
    1.5   *Definitions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.6   *Membership Rights* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARTICLE 2 - MEETINGS OF MEMBERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.1   *Place of Meetings; Conduct* . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.2   *Annual Meetings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.3   *Special Meetings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.4   *Notice of Meetings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.5   *Waiver of Notice* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.6   *Voting Rights* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.7   *Quorum.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    2.8   *Adjournment for Lack of Quorum* . . . . . . . . . . . . . . . . . . . . . 4
    2.9   *Adjustment of Voting Power and Quorum* . . . . . . . . . . . . . . . 4
   2.10  *Voting by Proxy* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   2.11  *Form and Content of Proxies* . . . . . . . . . . . . . . . . . . . . . . . . 5
   2.12  *Voting by Written Ballot* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARTICLE 3 - BOARD OF DIRECTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.1   *Number; Qualification* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.2   *Nomination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.3   *Qualifications of Candidates for Election* . . . . . . . . . . . . . . . 6
    3.4   *Election* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.5   *Term* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    3.6   *Removal* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.7   *Resignation of Directors.* . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    3.8   *Return of Association Materials.* . . . . . . . . . . . . . . . . . . . . . . 7
    3.9   *Filling Vacancies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   3.10  *Compensation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   3.11  *Powers and Duties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   3.12  *Financial Documentation; Preparation, Reporting and
           Review Responsibilities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   3.13  *Disciplinary Action Against An Owner* . . . . . . . . . . . . . . . . . 11
   3.14  *Expending Reserve Funds* . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE 4 - MEETINGS OF DIRECTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    4.1   *Regular Meetings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    4.2   *Special Meetings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

AMENDED BYLAWS-DEL MAR WOODS

Exhibit 1
Page 129

4.3    *Meeting Notice* ................................................. 12
4.4    *Organizational Meetings* ..................................... 13
4.5    *Emergency Meetings* .......................................... 13
4.6    *Executive Sessions* ........................................... 13
4.7    *Quorum* ...................................................... 13
4.8    *Adjournment* ................................................. 13
4.9    *Owner Attendance at Board Meetings; Notice* ................... 13
4.10  *Action Without a Meeting* .................................... 14
4.11  *Board Deliberation Regarding Member Discipline* .............. 14
4.12  *Meeting Minutes; Availability to Owners* ..................... 14

ARTICLE 5 - OFFICERS ................................................. 14
5.1    *Enumeration of Officers* ..................................... 14
5.2    *Appointment and Term* ........................................ 14
5.3    *Duties* ...................................................... 14
5.4    *Resignation and Removal* ..................................... 16
5.5    *Return of Association Materials* ............................. 16
5.6    *Compensation* ................................................ 16
5.7    *Delegation* .................................................. 16

ARTICLE 6 - BOOKS AND RECORDS; INSPECTION RIGHTS ..................... 17
6.1    *Required Books and Records* .................................. 17
6.2    *Member Inspection of Accounting Records and Minutes* ......... 17
6.3    *Member Inspection of Membership Register* .................... 17
6.4    *Denial of Inspection Request* ................................ 17
6.5    *Director Inspection of All Association Records* .............. 17
6.6    *Removal of Records* .......................................... 17

ARTICLE 7 - NONLIABILITY AND INDEMNIFICATION ........................ 18
7.1    *Limitation on Liability of Association's Directors and Officers* ... 18
7.2    *Indemnification of Association* .............................. 18
7.3    *Indemnification by Association of Directors, Officers, Employees and Other Agents* ............................................. 19
7.4    *Approval of Indemnity by Association* ........................ 19
7.5    *Advancement of Expenses* ..................................... 19
7.6    *Insurance* ................................................... 19

ARTICLE 8 - AMENDMENTS .............................................. 20

Exhibit 1
Page 130

## 2003 AMENDED AND RESTATED

## BYLAWS OF

## DEL MAR WOODS

## ARTICLE 1 - NAME; LOCATION AND APPLICABILITY

1.1    **Name; Nonprofit Mutual Benefit Corporation**. The name of the corporation is Del Mar Woods ("*Association*"). The Association has been formed pursuant to the California Nonprofit Mutual Benefit Corporation Law (Corporations Code sections 7110-8970) as a nonprofit mutual benefit corporation.

1.2    **Principal Office**. The principal office of the Association is located in Del Mar, California. The Board shall have the full power and authority to change the principal office of the Association from one location to another in the County of San Diego, California. Any such change shall be adopted by a resolution of the Board and noted in the meeting minutes.

1.3    **Application**. These Restated Bylaws are applicable to the Association and all Owners, residents, tenants, employees, and other persons who use the facilities of the residential condominium development known as Del Mar Woods ("Project"), consisting of 126 Units, located in the City of Del Mar, County of San Diego, State of California, as more particularly described as follows:

> Lots 1 through 5, inclusive, in the City of Del Mar, County of San Diego, State of California, according to Map thereof No. 7285 filed in the Office of the County Recorder of San Diego County, California on May 17, 1972.

1.4    **Documents Being Replaced; Approvals**. These Restated Bylaws amend and restate, in their entirety, the Bylaws of Del Mar Woods adopted October 24, 1972, and as subsequently amended ("Original Bylaws"). In accordance with Article VII of the Original Bylaws, these Restated Bylaws have received the approval of the required number of Members for their adoption.

1.5    **Definitions**. Unless otherwise specified in these Restated Bylaws, the definitions set forth in Article 1 of the Restated Declaration of Restrictions for Del Mar Woods recorded on _____ 20__ as File/Page No. _____ of Official Records of the County Recorder of San Diego County, apply to these Restated Bylaws.

Exhibit 1
Page 131

1.6    **Membership Rights**.  The qualifications for membership are set forth in Article 3 of the Restated Declaration and are hereby incorporated by reference.

## ARTICLE 2 - MEETINGS OF MEMBERS

2.1    **Place of Meetings; Conduct**.  All meetings of the Members shall be held at a place designated by the Board.  This meeting place shall be within the Project or as close to it as reasonably possible.  If no meeting place is designated, the meetings shall be held at the principal office of the Association.  Meetings of Members shall be conducted in accordance with a recognized system of parliamentary procedure or such parliamentary procedures as the Board may adopt by resolution.

2.2    **Annual Meetings**.  The annual meeting of the Members shall be held on a date and time established by the Board, so long as the annual meeting is held within the month of May, provided that adjournments of such meetings for lack of quorum or otherwise may be held as soon thereafter as practical.

2.3    **Special Meetings**.  Special meetings of the Members may be called for any lawful purpose by a majority of a quorum of the Board, the President of the Association, or by a written request signed by Members representing at least five percent (5%) of the total voting power of the Association.  If the special meeting is requested by the Members, it shall be held not less than thirty-five (35) nor more than ninety (90) days after receipt of the request by an officer of the Association.  Only that business stated in the notice of meeting given pursuant to Section 2.4 of these Restated Bylaws shall be transacted at the special meeting.

2.4    **Notice of Meetings**.  The Secretary of the Association shall give written notice of any Members' meeting to each Member of record in accordance with the following:

      2.4.1    Except as otherwise provided in this Article, the notice shall be given at least ten (10) but not more than ninety (90) days before the meeting, by first class mail or by personal delivery.

      2.4.2    The notice shall be addressed to the Member at the address appearing on the books of the Association, or the address supplied by the Member to the Association for this purpose.

      2.4.3    The notice shall state the place, date, and time of the meeting.  If directors are to be elected at the meeting, the notice or proxy accompanying the notice shall include the names of all those who are nominees at the time the notice is given.  The notice or proxy accompanying the notice shall also state those matters that the

Exhibit 1
Page 132

Board, at the time the notice is given, intends to present for action by the Members.

2.4.4    In the case of a special meeting which is called by Members, pursuant to Section 2.3 of these Restated Bylaws, the notice shall be given within twenty (20) days after receipt of the request for the meeting. If that twenty (20) day requirement is not satisfied, the Members who called the meeting may give the notice.

2.4.5    An affidavit of the mailing or other means of giving any notice of any Members' meeting may be executed by the Secretary, and if so executed, shall be filed with the corporate records or made a part of the minutes of the meeting. Such affidavit shall constitute prima facie evidence of the giving of notice.

2.5    *Waiver of Notice.* Attendance by a person at a meeting shall constitute a waiver of notice of that meeting, except when the person objects at the beginning of the meeting to the transaction of any business due to the inadequacy or illegality of the notice. Attendance at a meeting is not a waiver of any right to object to the consideration of matters not included in the notice of the meeting which are required to be described therein if that objection is expressly made at the meeting.

2.6    *Voting Rights.* Members shall have the power to exercise their voting rights as set forth in Article 3 of the Restated Declaration, subject to the following provisions:

2.6.1    Fractional votes shall not be allowed. When there is more than one (1) record Owner of a Unit (co-owners), all of the co-owners shall be Members, but only one (1) of them shall be entitled to cast the single vote attributable to the Unit. Co-owners may designate in writing one (1) of the co-owners to vote. If no such designation is made or if it is revoked, the co-owners shall decide among themselves, by majority vote, how that Unit's vote is to be cast. Unless the Board receives a written objection in advance from a co-owner, it shall be conclusively presumed that the voting co-owner is acting with the consent of his or her co-owners. No vote shall be cast for the Unit on a particular matter if a majority of the co-owners present in person or by proxy cannot agree on a vote.

2.6.2    Any provision of the Governing Documents that requires the approval of a specified percentage of the voting power of the Association shall require the approval of the specified percentage of the voting power of the membership. If no percentage of the voting power is specified in the Governing Documents or by California law, the approval of a majority of a quorum shall be required.

Exhibit 1
Page 133

2.6.3    The Board may fix, in advance, a record date or dates for the purpose of determining the Owners who are entitled to exercise voting rights:

(a)    The record date for eligibility to vote shall not be fixed more than sixty (60) days before the date of the meeting. If no record date is fixed, all Members who are otherwise eligible to vote as of the day of the meeting may vote.

(b)    The record date for eligibility to vote by written ballots shall not be fixed more than sixty (60) days before the day on which the first written ballot is mailed or solicited. If no record date is fixed, all Members who are otherwise eligible to vote as of the day of mailing or soliciting the written ballot shall be eligible to vote.

2.6.4    A Member's voting rights may be suspended by the Board in accordance with the provisions of Section 3.13 hereinbelow.

2.7    *Quorum.* At any meeting, the presence either in person or by proxy of Members entitled to cast votes equal to at least fifty-one percent (51%) of the total voting power of the Association shall constitute a quorum for any action except as otherwise provided in the Governing Documents or by law. The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment notwithstanding the withdrawal of enough Members to leave less than a quorum, if the action taken, other than adjournment, is approved by at least a majority of Members required to constitute a quorum.

2.8    *Adjournment for Lack of Quorum.* If a quorum is not present at a duly called meeting, a majority of those Members present in person or by proxy may adjourn the meeting to a time not less than five (5) days nor more than thirty (30) days from the meeting date, but no other business may be transacted. Provided that the date, time and place of the adjourned meeting is announced at the original meeting, the adjourned meeting may be held without additional written notice. If no such announcement is made, or if the selected date is changed after adjournment, notice of the time and place shall be given to Members in the manner provided in Section 2.4 of these Restated Bylaws.

2.9    *Adjustment of Voting Power and Quorum.* For purposes of establishing a quorum and determining the total voting power of the Association, if a Member's voting rights are suspended as provided in the Governing Documents, the total voting power of the Association shall be reduced for the period of time for which the suspension is in effect by an amount equal to the number of Units for which membership voting rights have been suspended.

AMENDED BYLAWS-DEL MAR WOODS

Exhibit 1
Page 134

2.10    **Voting by Proxy**.  At all meetings of Members, each Member may vote in person or by proxy.  All proxies shall be in writing and filed with the Secretary of the Association.  Every proxy shall be revocable and shall automatically cease upon conveyance of its maker's membership, or upon receipt of written notice by the Secretary of the maker's death or judicially declared incapacity.  The maker of a proxy may revoke it by delivering a written revocation to the Association, by executing a subsequent proxy and presenting it to the meeting, or by attending any meeting and voting in person.

2.11    **Form and Content of Proxies**.  A proxy distributed to Members shall set forth all items to be voted upon which are known at the time the proxy is prepared.  Any form of proxy distributed by any person or entity to more than one Member shall afford the opportunity to specify a choice between approval and disapproval of each matter or group of matters to be acted on.  The proxy shall provide that, when the Member specifies a choice, the vote shall be cast in accordance with that choice.

2.12    **Voting by Written Ballot**.  Any action that may be taken at a meeting of the Members, except for the election of directors, may be taken without a meeting provided the following ballot requirements are satisfied:

2.12.1    The Association shall distribute a written ballot to every Member entitled to vote on the matter as provided in Section 2.6.3.  The ballot shall be solicited in the same manner as provided in Section 2.4 of these Restated Bylaws for the giving of notice of meetings of Members.

2.12.2    The ballot shall (1) set forth all items to be voted upon; (2) provide an opportunity to specify approval or disapproval of any proposal, including confirmation that, if the Member specifies a choice, the vote shall be cast in accordance with that Member's choice; (3) provide a reasonable time within which to return the ballot; (4) indicate the number of responses needed to meet the quorum requirement; and (5) state the percentage of approvals necessary to pass the measure submitted.

2.12.3    The proposed action shall be considered approved if:

(a)    The number of votes cast by ballot within the specified time period equals or exceeds the quorum required to be present at a meeting authorizing the action, and

(b)    The number of approvals equals or exceeds the number of votes that would be required for approval at a meeting at which the total number of votes cast was the same as the number of ballots received in response to the ballot solicitation.

Exhibit 1
Page 135

2.12.4    No written ballot may be revoked.

2.12.5    Any deadline stated for return of the ballots may be extended for successive reasonable periods with the approval of a majority of the Board. Notice of any extension must be sent to the Members within thirty (30) days of the previously noticed deadline date.

## ARTICLE 3 - BOARD OF DIRECTORS

3.1    *Number; Qualification*. The affairs of this Association shall be managed and its duties and obligations performed by an elected Board of Directors, consisting of seven (7) persons. Members of the Board must be Members of the Association who qualify as candidates for election as provided herein.

3.2    *Nomination*. The Board of Directors shall establish reasonable nomination procedures for election to the Board. In addition to any other procedures, any Member who is present in person or by proxy may make a nomination from the floor at the annual meeting of Members at which the director is to be elected.

3.3    *Qualifications of Candidates for Election*. Candidates for election must be Members in good standing. Good standing shall mean that all assessments must be current and the candidate's membership must not be subject to any suspension of membership rights arising out of any violations of the Association's Governing Documents.

3.4    *Election*. At each annual meeting of the Association, the Members shall fill, by election, all positions on the Board held by directors whose terms are then expiring and all vacant positions, if any. However, if an annual meeting is not held or does not include an election, the election may be held at a special meeting of Members called for that purpose. Voting for directors shall be by secret written ballot. At an election, the Member or the Member's proxyholder may give a single candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes the Member is entitled to exercise under the provisions of these Restated Bylaws, or the Member may distribute the Member's cumulated votes among any two or more candidates as the Member desires. The persons receiving the highest number of votes shall be elected.

3.5    *Term*. The terms of office of all members of the Board shall be staggered three year terms, with two terms expiring in year 2002, three terms expiring in year 2003, two terms expiring in year 2004, and continuing on in a like manner. There shall be no limit to the number of consecutive terms to which a director may be reelected. Each director shall hold office until the election of his or her successor or until the director's death, resignation or removal.

6

AMENDED BYLAWS-DEL MAR WOODS

Exhibit 1
Page 136

3.6     *Removal*.  Directors may be removed as follows:

    3.6.1     The Board may declare vacant the office of a director on the occurrence of any of the following events:

        (a)     The director is declared of unsound mind by a final order of court.

        (b)     The director is convicted of a felony.

        (c)     The director has failed to attend three (3) consecutive regular meetings of the Board.

        (d)     The director fails or ceases to meet any required qualifications that were in effect at the beginning of that director's current term of office.

    3.6.2     One (1) or more directors may be removed prior to the expiration of their terms, without cause, at an annual or special meeting of the Members. Any such removal without cause shall be approved by the vote of Members representing a majority of the required quorum for the meeting and a majority of the Members voting at the meeting. Notwithstanding the foregoing, unless the entire Board is removed from office by the vote of the Members, an individual director shall not be removed prior to the expiration of his or her term of office except in compliance with Corporations Code section 7222 or any successor statute.

3.7     *Resignation of Directors.*  Any director may resign at any time by giving written notice to the Board, the President, or the Secretary, or by giving verbal notice at a Board meeting such that the resignation is recorded in the minutes of the meeting. Such resignation shall take effect on the date of receipt of such notice, or at any time later specified therein, and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

3.8     *Return of Association Materials*.  Upon resignation, removal or expiration of the directors' term, directors shall return to the Association those Association materials in their possession.

3.9     *Filling Vacancies*.  The remaining directors shall fill any vacancy on the Board caused by the death, removal or resignation of a director unless the vacancy is created by the removal of a director by the Members. The Members shall vote to fill any vacancy on the Board created by the removal of a director by the Members. A successor director shall serve for the unexpired term of the director he or she replaces. If the Board accepts the resignation of a director which is scheduled to take effect at a future date, the

AMENDED BYLAWS-DEL MAR WOODS

Exhibit 1
Page 137

Board may appoint a successor to take office when the resignation becomes effective, and the resigning director may participate in the appointment of a successor.

3.10    *Compensation*. No director shall receive any compensation for any service he or she may render to the Association; provided, however, that a director may be reimbursed for actual out-of-pocket expenses incurred by the director in the performance of his or her duties.

3.11    *Powers and Duties*. The Board shall exercise for the Association all powers and duties vested in or delegated to the Board or the Association by the Governing Documents and the California Corporations Code governing nonprofit mutual benefit corporations. Said powers and duties shall be subject to the limitations of the Governing Documents, and shall include, but not be limited to, the following:

    3.11.1    Formulating Rules and Regulations for the use and operation of the Units, Exclusive Use Common Areas, Common Area, common facilities and facilities owned or controlled by the Association pursuant to Section 3.5.2 of the Restated Declaration.

    3.11.2    Enforcing the applicable provisions of the Governing Documents and any other instruments governing the ownership, management, and control of the Project.

    3.11.3    Initiating and executing disciplinary proceedings against Members for violations of provisions of the Governing Documents in accordance with procedures set forth in Section 3.13 herein.

    3.11.4    Paying taxes and assessments that are, or could become, a lien on all or a portion of the Common Area.

    3.11.5    Fixing and establishing the fiscal year for the Association, including the power to modify the fiscal year.

    3.11.6    Contracting for casualty, liability, and other insurance on behalf of the Association.

    3.11.7    Contracting for goods and services for the Common Area and operation of the Association, and borrowing money, incurring indebtedness and executing promissory notes or other evidences of debt for the Association.

    3.11.8    Creating committees pursuant to resolution adopted by a majority of the Board; provided that if a committee will exercise any power or authority of the Board, it shall consist of two (2) or more directors, and as many other persons as the Board may designate, to serve at the pleasure of the Board. No directors need serve on

Exhibit 1
Page 138

any committee which does not exercise any power or authority of the Board (e.g., social committees).

3.11.9    Delegating its authority, duties, and responsibilities to its officers, employees, committees, or agents, including a professional management agent. The term of any agreement with a manager shall not exceed one (1) year, renewable by agreement of the parties for successive one (1) year periods, and shall provide for termination by either party for cause with no more than thirty (30) days' written notice, or without cause and without payment of a termination fee or penalty with no more than ninety (90) days' written notice.

3.11.10    Authorizing the withdrawal of moneys from the Association's reserve accounts, upon the signatures of two (2) directors or one (1) director and one (1) officer who is not a director.

3.11.11    Entering any Unit to perform necessary construction, maintenance, or emergency repair work for the benefit of the Common Area or the Association.

3.11.12    Filling vacancies on the Board, except for a vacancy created by the removal of a director by Members.

3.11.13    Extending the time for return of ballots when an action is taken without a meeting pursuant to Section 2.12.5 herein, by majority approval of the Board.

3.12    *Financial Documentation; Preparation, Reporting and Review Responsibilities*. With regard to the preparation, reporting and review of the Association's financial documentation, the Board shall have the following responsibilities:

3.12.1    Preparing a pro forma operating budget for each fiscal year, and distributing a copy thereof to each Owner not less than forty-five (45) and not more than sixty (60) days prior to the beginning of the fiscal year. The budget shall comply with California Civil Code section 1365 or any successor statute.

3.12.2    Preparing and distributing to each Owner an annual report, within one hundred twenty (120) days after the close of each fiscal year, consisting of the following:

(a)    A balance sheet as of the end of the fiscal year.

(b)    An operating (income) statement for the fiscal year.

Exhibit 1
Page 139

(c)     A statement of changes in financial position for the fiscal year.

(d)     For any fiscal year in which the gross income to the Association exceeds $75,000, a copy of the review of the annual report prepared in accordance with generally accepted accounting principles by a licensee of the California State Board of Accountancy.  If this report is not prepared by an independent accountant, it shall be accompanied by the certificate of an authorized officer of the Association that the statement was prepared without independent audit or review from the books and records of the Association.

3.12.3     Preparing and distributing to the Owners, within sixty (60) days before the beginning of each fiscal year, the written notice regarding assessments and foreclosure described in California Civil Code section 1365.1(b).

3.12.4     Causing to be conducted, at least once every three (3) years, a study of the reserve account requirements of the Project.  The Board shall review this study annually and shall consider and implement necessary adjustments to the Board's analysis of the reserve account requirements as a result of that review.

As used herein, the term "reserve account requirements" means the estimated funds which the Board has determined are required to be available at a specified point in time to repair, replace, or restore those major components which the Association is obligated to maintain.

3.12.5     Reviewing the following:

(a)     A current reconciliation of the operating and reserve accounts of the Association on at least a quarterly basis.

(b)     The actual reserve revenues and expenses for the current year compared to the budget for the current year on at least a quarterly basis.

(c)     An income and expense statement for the operating and reserve accounts of the Association on at least a quarterly basis.

(d)     The most current account statements prepared by the financial institution where the Association has its operating and reserve accounts.

AMENDED BYLAWS-DEL MAR WOODS

Exhibit 1
Page 140

3.13    **_Disciplinary Action Against An Owner_**.  In connection with the general power of enforcement, the Association may discipline an Owner for violation of any of the provisions of the Governing Documents by one or more of the following: (1) suspending the Member's membership rights, including the Member's voting rights, (2) imposing monetary fines, and (3) recording of a notice of noncompliance encumbering the Unit of the Owner, subject to the following limitations:

3.13.1    The accused Owner shall be given at least ten (10) days' prior written notice of the intention of the Board to meet and consider imposition of a suspension, monetary fine, notice of noncompliance or any combination of these, with respect to any alleged violation.

3.13.2    At the Board meeting, the accused Owner shall be given an opportunity to be heard, orally or in writing.

3.13.3    Notwithstanding the foregoing, under circumstances involving conduct that constitutes (a) an immediate and unreasonable infringement of, or threat to, the safety or quiet enjoyment of neighboring Owners; (b) a traffic or fire hazard; (c) a threat of material damage to, or destruction of, the Common Area, the Board or its agents may undertake immediate corrective action and conduct a hearing as soon thereafter as reasonably possible, if either (1) requested by the offending Owner within five (5) days following the Association's actions, or (2) on its own initiative.

3.13.4    The amount of any monetary penalties shall be established from time to time by the Board, and a schedule thereof shall be distributed to the Members by personal delivery or first class mail. Distribution of additional schedules is not required unless there are any changes to an existing schedule.

3.13.5    If the Board imposes discipline on a Member, the Board shall provide notification of the disciplinary action by either personal delivery or first-class mail to the Member within fifteen (15) days following the action.

3.13.6    An Owner's membership privileges may be suspended (a) for up to thirty (30) days for any violation of the Governing Documents; and (b) during any period of time that the Owner is delinquent in the payment of assessments.   Suspension of membership privileges shall include suspension of the right of a Member to vote at meetings of the Association and the right to use any Common Area facilities.

Exhibit 1
Page 141

3.13.7   Any notice of noncompliance shall identify the subject Unit, describe the nonconforming use, and specify the provision of the Governing Documents that is being violated. Upon the elimination of any nonconforming use, the Association shall execute and record an estoppel certificate, which shall reference any previously recorded notice of noncompliance, rescind said notice and confirm that the Unit is in compliance with all applicable Governing Documents provisions referenced in the notice of noncompliance.

3.13.8   Except as provided in Article 4 of the Restated Declaration relating to foreclosure for failure to pay assessments, or as a result of the judgment of a court or a decision arising out of arbitration, the Association shall in no way abridge the right of any Owner to the full use and enjoyment of his or her Unit.

3.14   **Expending Reserve Funds**. The Board may not expend funds designated as reserve funds for any purpose other than the repair, restoration, replacement or maintenance of, or litigation involving the repair, restoration, replacement or maintenance of, major components which the Association is obligated to repair, restore, replace, or maintain and for which the reserve fund was established except as allowed by (i) section 1365.5(c) of the Civil Code, (ii) any other applicable statute or law, or (iii) any successor statute or law.

## ARTICLE 4 - MEETINGS OF DIRECTORS

4.1   **Regular Meetings**. Regular meetings of the Board of Directors shall be held at least ten (10) times each year at a time and place within the Project fixed by resolution of the Board. The meeting place shall ordinarily be within the Project unless, in the judgment of the Board, a larger meeting room is required than exists within the Project. Any larger meeting room selected by the Board shall be as close as possible to the Project. Notice of the time and place of the meeting shall be communicated to the directors as provided in Section 4.3; provided, however, that no notice need be given if the time and place of the meeting has been previously fixed by the Board.

4.2   **Special Meetings**. Special meetings of the Board shall be held when called by written notice signed by the President of the Association or by any two (2) directors other than the President. The notice shall specify the time and place of the meeting and the nature of any special business to be considered.

4.3   **Meeting Notice**. Notice of any regular or special meeting shall be communicated to all directors not less than or four (4) days prior to the meeting; provided, however, that notice need not be given to any director who has signed a waiver of notice or a written consent to holding of the meeting. Notice may be delivered by first class mail, personally, by telephone, including a voice messaging system, telegraph, facsimile, electronic mail or other electronic means.

AMENDED BYLAWS-DEL MAR WOODS

Exhibit 1
Page 142

4.4    *Organizational Meetings*. Immediately after the annual meeting, described in Section 2.2, herein, or as soon thereafter as reasonably practicable, the Board shall meet to elect the officers of the Association and conduct any other business of the Association as the Board, in its discretion, shall determine is necessary.

4.5    *Emergency Meetings*. An emergency meeting of the Board may be called by the President, or by any two Board members if there are circumstances that could not have been reasonably foreseen which require immediate attention and possible action by the Board, and which of necessity make it impracticable to provide notice as required herein.

4.6    *Executive Sessions*. The Board may, with the approval of a majority of a quorum of the Board, adjourn a meeting and reconvene in executive session to meet with its legal counsel, or discuss and vote upon (a) litigation in which the Association is or may become involved, (b) matters that relate to the formation of contracts with third parties, (c) personnel matters, (d) Member disciplinary matters, (e) orders of business of a similar nature, and (f) to meet with a Member upon the Member's request regarding the Member's payment of assessments in compliance with Civil Code section 1367.1. The nature of any and all business to be considered in executive session shall first be announced in open session. In the event the executive session does not follow an open session, the Board may conduct an executive session if the nature of any and all business considered in such executive session is announced at the next regularly scheduled Board meeting. Nothing herein contained shall be construed to obligate the Board to first call an open meeting before meeting in executive session. An executive session which does not follow an open meeting may be called and noticed in the same manner as a special meeting. Any matter discussed in executive session shall be generally noted in the minutes of the next meeting of the Board of Directors which is not an executive session.

4.7    *Quorum*. A majority of the Board shall constitute a quorum and if a quorum is present, the decision of a majority of the directors present, excluding abstentions, shall be the act of the Board.

4.8    *Adjournment*. A majority of the directors present, whether or not a quorum is present, may adjourn any meeting to another time and place. If the meeting is adjourned for more than twenty-four (24) hours, notice of the adjournment shall be given, prior to the time of the adjourned meeting, to the directors who were not present at the time of the adjournment.

4.9    *Owner Attendance at Board Meetings; Notice*. Any Member of the Association may attend meetings of the Board except when the Board adjourns to executive session as provided in Section 4.6 herein. Members who are not on the Board may speak at any meeting, except executive sessions, subject to reasonable limitations established by the Board of Directors. Notice of the time and place of a Board meeting, except for an emergency meetings and executive sessions, shall be communicated to Members not less than four (4) days prior to the meeting. Notice may be given by posting

the notice in a prominent place or places within the Common Area, by mail, by delivery to all Units in the Project, or by newsletter or similar means of communication.

4.10   *Action Without a Meeting*.  Any action required or permitted to be taken by the Board may be taken without a meeting, if all members of the Board, individually or collectively, consent in writing to that action.  Such action by written consent shall have the same force and effect as a unanimous vote of the Board.  Such written consent or consents shall be filed with the minutes of the proceedings of the Board.  An explanation of the action taken shall be communicated to the Members by any means the Board deems appropriate.

4.11   *Board Deliberation Regarding Member Discipline*.  In any matter relating to the disciplining of a Member, the Board shall meet in executive session if requested by that Member, or upon the Board's own decision.  The Member subject to discipline shall be allowed to address the Board during that portion of the executive session.

4.12   *Meeting Minutes; Availability to Owners*.  The Board shall keep accurate written minutes of its meetings, and shall retain them in the permanent records of the Association.  The minutes, minutes proposed for adoption that are marked to indicate draft status, or a summary of the minutes, of any Board meeting, other than executive session, shall be available to Members within thirty (30) days of the meeting.  The minutes, proposed minutes, or summary minutes shall be distributed to any Member upon request and upon reimbursement for the costs in making that distribution.  Members shall be notified in writing at the time that the budget is distributed, or at the time of any general mailing to the entire membership, of their right to have copies of the minutes of meetings of the Board, and how and where those minutes may be obtained.

## ARTICLE 5 - OFFICERS

5.1   *Enumeration of Officers*.  The officers of this Association shall be a President, a Vice-President, a Secretary, and a Treasurer.  The Board may appoint such additional officers as it may, in its sole discretion, determine necessary or desirable.  Any number of offices may be held by the same person except for the offices of (a) President and Treasurer, and (b) President and Secretary.

5.2   *Appointment and Term*.  The officers shall be elected annually by the Board.  Any vacancies shall be filled by the Board.  Each officer shall hold his or her office at the pleasure of the Board.

5.3   *Duties*.  Unless otherwise delegated by the Board, the duties of each officer shall be as follows:

Exhibit 1
Page 144

5.3.1   The President shall:

    (a)   Preside over all meetings of the Members and of the Board.

    (b)   Sign as President all deeds, contracts, and other written instruments that have been approved by the Board, unless the Board, by duly adopted resolution, authorizes the signature of a lesser officer.

    (c)   Call meetings of the Board whenever he or she deems it necessary, in accordance with any rules and notice requirements imposed by the Board and the Governing Documents.

    (d)   Have, subject to the approval of the Board, general supervision, direction, and control of the affairs of the Association.

    (e)   Discharge any other duties required of him or her by the Board.

5.3.2   The Vice-President shall:

    (a)   Act in the place and in the stead of the President in the event of his or her absence, inability, or refusal to act.

    (b)   Exercise and discharge any other duties required of him or her by the Board. In connection with any such additional duties, the Vice-President shall be responsible to the President.

5.3.3   The Secretary shall:

    (a)   Keep a record of all meetings and proceedings of the Board and of the Members.

    (b)   Keep the seal of the Association, if any, and affix it on all papers requiring the seal.

    (c)   Serve all required notices of meetings of the Board and the Members.

    (d)   Keep current records showing the names and addresses of all Members.

Exhibit 1
Page 145

(e)    Sign as Secretary all deeds, contracts, and other written instruments that have been approved by the Board, if the instruments that have been approved by the Board and signed by the President require a second Association signature and the Board has not passed a resolution authorizing another officer to sign in the place and stead of the Secretary.

5.3.4    The Treasurer shall:

(a)    Receive and deposit all of the funds of the Association in any bank or banks selected by the Board.

(b)    Be responsible for and supervise the maintenance of books and records to account for Association funds and other Association assets.

(c)    Disburse and withdraw Association funds in the manner specified by the Board.

(d)    Prepare and distribute the financial statements for the Association required by the Restated Declaration.

5.4    **Resignation and Removal**. The Board may remove any officer from office either with or without cause. An officer may resign at any time by giving written notice to the Board, the President or the Secretary. The resignation shall take effect at the date of receipt of the notice or at any later time specified in the notice. Unless otherwise specified in the notice, acceptance of the resignation by the Board shall not be necessary to make it effective.

5.5    **Return of Association Materials**. Upon resignation, removal or expiration of the officers' term, officers shall return to the Association those Association materials in their possession.

5.6    **Compensation**. An officer shall not receive any compensation for any service he or she may render to the Association; provided, however, that any officer may be reimbursed for actual out-of-pocket expenses incurred by the officer in the performance of his or her duties.

5.7    **Delegation**. With Board approval, an officer may delegate his or her powers and duties to any committee, employee or agent of the Association, including, but not limited to, a community association manager.

Exhibit 1
Page 146

## ARTICLE 6 - BOOKS AND RECORDS; INSPECTION RIGHTS

6.1    *Required Books and Records.*  The Association shall maintain at its principal office:

      6.1.1    Copies of the Governing Documents as last amended.

      6.1.2    Adequate and correct books and records of account.

      6.1.3    Written minutes of the proceedings of its Members, of its Board, and of committees of its Board.

      6.1.4    A membership register containing each Member's name, mailing address and voting rights.

6.2    *Member Inspection of Accounting Records and Minutes.*  In accordance with Corporations Code section 8333, the accounting books and records and minutes of proceedings of the Members, the Board and its committees, with the exception of minutes of executive meetings, shall be open to inspection upon the written demand on the Association by any Member at any reasonable time, for a purpose reasonably related to such Person's interests as a Member.  Members may not inspect the minutes of executive meetings.

6.3    *Member Inspection of Membership Register.*  Subject to Section 6.4 and applicable law, Members may obtain copies of the membership register within 10 days upon a written demand to the Association and payment of a reasonable charge.  The demand shall state the purpose for which the list is requested.

6.4    *Denial of Inspection Request.*  In accordance with section 8338 of the Corporations Code, the membership register is a corporate asset.  The Association may deny a Member access to the membership register, including copies thereof, where the Association reasonably believes that the information will be used for a purpose not reasonably related to the Member's interest as a Member, or where the Association provides a reasonable alternative method of achieving the purpose identified in the written demand from the Member in accordance with section 8330(c) of the Corporations Code.

6.5    *Director Inspection of All Association Records.*  Subject to any limitations imposed by law, every director shall have the right to inspect all Association records and the physical properties owned or controlled by the Association at any reasonable time as provided by section 8334 of the Corporations Code.

6.6    *Removal of Records.*  No Member or director may remove the Association's copies of the Governing Documents, books and records of account, minutes, the membership register, or other records or documents from the Association's office or designated depository without the prior consent of the Board.

Exhibit 1
Page 147

## ARTICLE 7 - NONLIABILITY AND INDEMNIFICATION

7.1    *Limitation on Liability of Association's Directors and Officers.*    No
directors or officers of the Association (collectively and individually referred to as the
"Released Party") shall be responsible to any Owner, any member of an Owner's family,
any of the Owner's tenants, guests, servants, employees, licensees, invitees, or any other
person for:

    7.1.1    Any error or omission in the discharge of their duties and
responsibilities or for their failure to provide any service required by
the Governing Documents, provided that such Released Party has,
upon the basis of such information as may be possessed by the
Released Party, acted in good faith, in a manner that such person
believes to be in the best interests of the Association and with such
care, including reasonable inquiry, as an ordinarily prudent person
in a like position would use under similar circumstances. Without
limiting the generality of the foregoing, this standard of care and
limitation of liability shall extend to such matters as the
establishment of the Association's annual financial budget, the
funding of Association capital replacement and reserve accounts,
repair and maintenance of Common Areas and enforcement of the
Governing Documents.

    7.1.2    Any loss or damage suffered by reason of theft or otherwise of any
article, vehicle or other item of personal property which may be
stored by such Owner or other person within any Unit or Exclusive
Use Common Area or for any injury to or death of any person or
loss or damage to the property of any person caused by fire,
explosion, the elements or any other Owner or person within the
Project, or by any other cause, unless the same is attributable to
his or her own willful or wanton act or gross negligence. It is the
intent of this Section to provide volunteer directors and officers with
protection from liability to the full extent permitted by California Civil
Code section 1365.7, or comparable superseding statute, and to
the extent this provision is inconsistent with said section, the Civil
Code shall prevail.

7.2    *Indemnification of Association.*    Each Owner shall be liable to the
Association for any damage to the Common Areas caused by the negligence or willful
misconduct of the Owner or his or her family, guests, invitees or lessees. Each Owner
shall indemnify, hold harmless, and pay any costs of defense of each other Owner from
claims for personal injury or property damage occurring within any Unit owned by the
indemnitor, provided that this protection shall not extend to any indemnitee whose gross
negligence or willful misconduct caused or contributed to the injury or damage.    This
Section is not intended to be for the benefit of any insurer and shall not affect nor limit the

AMENDED BYLAWS-DEL MAR WOODS

Exhibit 1
Page 148

duty of any insurer to pay any claim which would be payable by said insurer but for this Section.

7.3    *Indemnification by Association of Directors, Officers, Employees and Other Agents*.  To the fullest extent permitted by law, the Association shall indemnify its directors, officers, employees, and other agents described in Corporations Code section 7237, including persons formerly occupying any such positions, against all expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by them in connection with any "proceeding" as that term is used in Corporations Code section 7237 and including an action by or in the right of the Association, by reason of the fact that such person is or was a person described by that section.  "Expenses," as used in this Section, shall have the same meaning as in Corporations Code section 7237(a).

7.4    *Approval of Indemnity by Association*.  On written request to the Board by any person seeking indemnification hereunder, the Board shall promptly determine in accordance with Corporations Code section 7237(e), whether the applicable standard of conduct set forth in Corporations Code section 7237(b) or section 7237(c) has been met, and if it has, the Board shall authorize indemnification.  If the Board cannot authorize indemnification because the number of Directors who are parties to the proceeding with respect to which indemnification is sought prevents the formation of a quorum of Directors who are not parties to the proceeding, the Board shall promptly call a meeting of Members. At that meeting, the Members shall determine under Corporations Code section 7237(e) whether the applicable standard of conduct set forth in Corporations Code section 7237(b) or section 7237(c) has been met, and if it has, the Members present at the meeting in person or by proxy shall authorize indemnification.

7.5    *Advancement of Expenses*.  To the fullest extent permitted by law and except as is otherwise determined by the Board in a specific instance, expenses incurred by a director, officer, employee or agent seeking indemnification under Sections 7.2 and 7.3 of this Article in defending any proceeding covered by those Sections shall be advanced by the Association before final disposition of the proceeding, on receipt by the Association of an undertaking by or on behalf of that person that the advance will be repaid unless it is ultimately determined that the person is entitled to be indemnified by the Association for those expenses.

7.6    *Insurance*.  The Association shall have the power to purchase and maintain insurance on behalf of its directors, officers, employees or other agents against other liability asserted against or incurred by any director, officer, employee or agent in such capacity or arising out of the director's, officer's, employee's or agent's status as such.

Exhibit 1
Page 149

## ARTICLE 8 - AMENDMENTS

These Restated Bylaws may be amended by the vote or written consent of fifty-one percent (51%) of the voting power of the Association. Notwithstanding the foregoing, the percentage of a quorum or of the voting power of the Association necessary to amend a specific clause or provision in these Bylaws shall not be less than the prescribed percentage of affirmative votes required for action to be taken under that clause or provision.

Notwithstanding the other provisions of this Article 8, the Board may, by a majority vote of the full Board, adopt amendments to these Restated Bylaws without Member approval when such Board action complies with Section 13.2 of the Restated Declaration of Restrictions.

Exhibit 1
Page 150

# CERTIFICATE OF SECRETARY

## OF

### DEL MAR WOODS
a California Nonprofit
Mutual Benefit Corporation

I, the undersigned, do hereby certify that I am the duly elected Secretary of Del Mar Woods, a California corporation. The foregoing 2003 Amended and Restated Bylaws of said Association constitute the fully amended and restated Bylaws as approved by the membership of the Association.

DATED: _August 28_____, 20**03**

_____
Secretary

Exhibit 1
Page 151

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Stephen C. Grebing 178046<br>WINGERT GREBING BRUBAKER & JUSKIE LLP<br>1230 Columbia Street, Suite 400<br>San Diego, CA 92101-3370<br>TELEPHONE NO.: (619) 232-8151   FAX NO. *(Optional)*: (619) 232-4665<br>E-MAIL ADDRESS: sgrebing@wingertlaw.com<br>ATTORNEY FOR *(Name)*: Plaintiffs | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**10/26/2022** at 09:27:26 AM<br><br>Clerk of the Superior Court<br>By Brenda Ramirez, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF COUNTY OF SAN DIEGO
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: CENTRAL DIVISION

CASE NAME: Gregory Haidet, et al. v. Del Mar Woods Homeowners Association, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 37-2022-00043098-CU-BC-CTL |
|---|---|---|---|---|
| [X] Unlimited<br>(Amount demanded exceeds $25,000) | [ ] Limited<br>(Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE: Judge Eddie C Sturgeon<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[X] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[X] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is   [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify)*:  4
5. This case [ ] is   [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 10/24/2022

Stephen C. Grebing
_____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. November 1, 2007]

[CEB] Essential
ceb.com   Forms

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

Haidet v. Del Mar Woods

Exhibit 1<br>Page 152

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition

Exhibit 1
Page 153

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

STREET ADDRESS:        330 W Broadway

MAILING ADDRESS:      330 W Broadway

CITY AND ZIP CODE:     San Diego, CA 92101-3827

DIVISION:                    Central

TELEPHONE NUMBER:  (619) 450-7067

PLAINTIFF(S) / PETITIONER(S):        Gregory Haidet et.al.

DEFENDANT(S) / RESPONDENT(S):  Del Mar Woods Homeowners Association et.al.

HAIDET VS DEL MAR WOODS HOMEOWNERS ASSOCIATION [IMAGED]

| NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL) | CASE NUMBER: 37-2022-00043096-CU-BC-CTL |
|---|---|

## CASE ASSIGNED FOR ALL PURPOSES TO:

Judge:  Eddie C Sturgeon                                    Department: C-67

## COMPLAINT/PETITION FILED: 10/26/2022

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 09/08/2023 | 10:30 am | C-67 | Eddie C Sturgeon |

**Due to the COVID-19 pandemic, all Case Management Conferences (CMCs) are being conducted virtually unless there is a court order stating otherwise.** Prior to the hearing date, visit the "virtual hearings" page for the most current instructions on how to appear for the applicable case-type/department on the court's website at www.sdcourt.ca.gov.

A Case Management Statement (JC Form #CM-110) must be completed by counsel for all parties and by all self-represented litigants and timely filed with the court at least 15 days prior to the initial CMC.  (San Diego Superior Court (SDSC) Local Rules, rule 2.1.9; Cal Rules of Court, rule 3.725).

All counsel of record and self-represented litigants must appear at the CMC, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of Alternative Dispute Resolution (ADR) options.

It is the duty of each plaintiff (and cross-complainant) to serve a copy of this Notice of Case Assignment and Case Management Conference (SDSC Form #CIV-721) with the complaint (and cross-complaint), the Alternative Dispute Resolution (ADR) Information Form (SDSC Form # CIV-730), a Stipulation to Use Alternative Dispute Resolution (ADR) (SDSC Form # CIV-359), and other documents on all parties to the action as set out in SDSC Local Rules, rule 2.1.5.

**TIME FOR SERVICE AND RESPONSE:** The following rules apply to civil cases except for collections cases under California Rules of Court, rule 3.740(a), unlawful detainer actions, proceedings under the Family Code, and other proceedings for which different service requirements are prescribed by law (Cal. Rules of Court, rule 3.110; SDSC Local Rules, rule 2.1.5):

  • **Service:** The complaint must be served on all named defendants, and proof of service filed with the court within 60 days after filing the complaint.  An amended complaint adding a defendant must be served on the added defendant and proof of service filed within 30 days after filing of the amended complaint.  A cross-complaint against a party who has appeared in the action must be accompanied by proof of service on that party at the time it is filed.  If it adds a new party, the cross-complaint must be served on all parties and proof of service on the new party must be filed within 30 days of the filing of the cross-complaint.
  • **Defendant's appearance:** Unless a special appearance is made, each defendant served must generally appear (as defined in Code of Civ. Proc. § 1014) within 30 days of service of the complaint/cross-complaint.
  • **Extensions:** The parties may stipulate without leave of court to one 15-day extension beyond the 30-day time period prescribed for the response after service of the initial complaint (SDSC Local Rules, rule 2.1.6).  If a party fails to serve and file pleadings as required under this rule, and has not obtained an order extending time to serve its pleadings, the court may issue an order to show cause why sanctions shall not be imposed.

**JURY FEES:** In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

**COURT REPORTERS:** Official Court Reporters are not normally available in civil matters, but may be requested in certain situations no later than 10 days before the hearing date.  See SDSC Local Rules, rule 1.2.3 and Policy Regarding Normal Availability and Unavailability of Official Court Reporters (SDSC Form #ADM-317) for further information.

**ALTERNATIVE DISPUTE RESOLUTION (ADR):** The court discourages any unnecessary delay in civil actions; therefore, continuances are discouraged and timely resolution of all actions, including submitting to any form of ADR is encouraged.  The court encourages and expects the parties to consider using ADR options prior to the CMC.  The use of ADR will be discussed at the CMC. Prior to the CMC, parties stipulating to the ADR process may file the Stipulation to Use Alternative Dispute Resolution (SDSC Form #CIV-359).

## NOTICE OF E-FILING REQUIREMENTS
## AND IMAGED DOCUMENTS

Effective April 15, 2021, e-filing is required for attorneys in represented cases in all limited and unlimited civil cases, pursuant to the San Diego Superior Court General Order: In Re Procedures Regarding Electronically Imaged Court Records, Electronic Filing and Access to Electronic Court Records in Civil and Probate Cases. Additionally, you are encouraged to review CIV-409 for a listing of documents that are not eligible for e-filing. E-filing is also encouraged, but not mandated, for self-represented litigants, unless otherwise ordered by the court. All e-filers are required to comply with the e-filing requirements set forth in Electronic Filing Requirements (Civil) (SDSC Form #CIV-409) and Cal. Rules of Court, rules 2.250-2.261.

All Civil cases are assigned to departments that are part of the court's "Imaging Program." This means that original documents filed with the court will be imaged, held for 30 days, and then destroyed, with the exception of those original documents the court is statutorily required to maintain. The electronic copy of the filed document(s) will be the official court record, pursuant to Government Code § 68150. Thus, original documents should not be attached to pleadings filed with the San Diego Superior Court, unless it is a document for which the law requires an original be filed. Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant, or petitioner to serve a copy of this Notice of Case Assignment and Case Management Conference (Civil) (SDSC Form #CIV-721) with the complaint, cross-complaint, or petition on all parties to the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words "IMAGED FILE" in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and may be found on the court's website at www.sdcourt.ca.gov.

Exhibit 1
Page 155