UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEL MAR WOODS, a California non-profit common interest development corporation,<br><br>                         Plaintiff,<br><br>v.<br><br>PHILADELPHIA INDEMNITY INSURANCE COMPANY, a Pennsylvania corporation,<br><br>                         Defendant. | Case No.:  24-cv-0779-WQH-SBC<br><br>**ORDER** |

HAYES, Judge:

The matters before the Court are (1) the Motion for Partial Summary Judgment or Adjudication of Issues (ECF No. 17) filed by Defendant Philadelphia Indemnity Insurance Company ("PIIC") and (2) the Motion for Partial Summary Judgment Regarding [PIIC's] Duty to Defend (ECF No. 18) filed by Plaintiff Del Mar Woods ("Plaintiff").

## I.    PROCEDURAL BACKGROUND

On May 1, 2024, Plaintiff initiated this action by filing a Complaint against PIIC, asserting claims for breach of contract and tortious breach of the implied covenant of good faith and fair dealing arising from PIIC's alleged "unreasonable breaches of its duties to defend, pay defense costs for, and indemnify Plaintiff" in an underlying lawsuit. (ECF No.

1, Compl. ¶ 5.) Plaintiff seeks economic, non-economic, exemplary, and punitive damages; pre-judgment interest; all penalties and interest allowed for by contract and applicable law; attorneys' fees and costs; and other such relief as the Court deems just and proper. *Id.* at 7.

On June 13, 2024, PIIC filed an Answer to the Complaint. (ECF No. 8.)

On January 7, 2025, the parties filed a Joint Motion for Order to Extend Deadlines Pending Ruling on Cross-Motions for Summary Judgment, informing the Court that they had "agreed to file Cross-Motions For Summary Judgment regarding [PIIC's] duty to defend the subject underlying case." (ECF No. 15 at 1.) The same day, the parties filed a joint Stipulation of Facts and Evidence Admissible for Cross-Motions for Summary Judgment. (ECF No. 15-1.)

On January 31, 2025, the parties filed their respective motions for partial summary judgment regarding PIIC's duty to defend Plaintiff in the underlying lawsuit. (ECF Nos. 17 & 18.) On February 12, 2025, PIIC filed a Response in opposition to Plaintiff's Motion. (ECF No. 19.) On February 13, 2025, Plaintiff filed a Response in opposition to PIIC's Motion. (ECF No. 20.) On February 20, 2025, PIIC filed a Reply in support of its Motion. (ECF No. 21.) On February 24, 2025, Plaintiff filed a Reply in support of its Motion. (ECF No. 22.)

On May 21, 2025, the Court heard oral argument on the present Motions.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## II.    FACTS[1]

Plaintiff is a non-profit homeowners association that governs Del Mar Woods Community, a residential community located in San Diego County. (Compl. ¶ 1.)

### A.    The Underlying *Haidet* Action

Plaintiff seeks coverage from PIIC in connection with an underlying lawsuit, *Haidet v. Del Mar Woods*, that was filed against Plaintiff on October 26, 2022, in the Superior Cout of the State of California, County of San Diego, Case No. 37-2022-0043096 (the "Underlying Action" or the "*Haidet* Action"). (*See generally* ECF No. 18-3 at 49–59.) The plaintiffs in the Underlying Action, Gregory and Kathleen Haidet (collectively, "the Haidets"), owned a unit within Plaintiff's Del Mar Woods Community. *See id.* at 51 ¶ 8. The Haidets asserted claims against Plaintiff for breach of contract, breach of fiduciary

---

[1] Plaintiff filed Objections to Evidence Submitted in Support of [PIIC's] Separate Statement of Undisputed Facts/Motion for Partial Summary Judgment. (ECF No. 20-2.) However, Plaintiff objects not to the evidence itself, but to PIIC's characterization of the evidence. (*See, e.g., id.* at 2 (objecting to PIIC's Undisputed Material Fact No. 22, which states that the Demand Letter "provided a history of Haidet's written demands for relief from [Plaintiff]," because "[t]he demand letter is simply statements of the Haidets' counsel and does not provide any evidence on the issue before the Court on whether a written demand for non-monetary relief was made prior to March 25, 2022").) Indeed, the evidence Plaintiff purports to object to—the Demand Letter and the Haidets' Complaint in the Underlying Action—were both referenced and included as exhibits in the parties' Joint Stipulation of Facts and Evidence Admissible for Cross-Motions for Summary Judgment. (ECF No. 15-1 at 3–4.) The Court need not consider "objections to the characterization of or purported misstatement of the evidence represented." *See Ward v. Crow Vote LLC*, 634 F. Supp. 3d 800, 808 (C.D. Cal. 2022) (noting that where "several of the parties' objections concern[ed] the phrasing or interpretation of a certain fact," the court "[did] not construe th[o]se specific disputes regarding the parties' characterizations of the underlying evidence to be adequate evidentiary objections"); *see also Sernoffsky v. Novak*, ___ F. Supp. 3d ___, No. 23-cv-0039-MMA-VET, 2025 WL 918307, at *4 (S.D. Cal. Mar. 26, 2025) (explaining that "[a]t summary judgment, courts rely on the underlying evidence, not the statements contained within a separate statement of undisputed material facts … and so challenges should be directed at the evidence supporting those statements instead[.]" (internal citations omitted)). The Court accordingly considers the Demand Letter and the Haidets' Complaint as competent summary judgment evidence. However, as discussed in more detail below, the Court does not adopt PIIC's characterization of the evidence in its Separate Statement of Undisputed Facts (ECF No. 17-1) or consider any hearsay statements for "the truth of the matter asserted." *See infra* at 26–28.

duty, and declaratory relief arising from their upstairs neighbor, David Yu's ("Yu"),[2] improper installation of hardwood flooring in the unit located directly above the Haidets' unit. *Id.* at 53 ¶¶ 19–20; *see also id.* at 55–58. The Haidets alleged that the installment of the flooring with an "incorrect sound barrier" violated various "governing documents" and covenants and restrictions ("CC&Rs") implemented by Plaintiff and subjected the Haidets to "the transmission of sound and noise," which "interrupted their use and enjoyment of" their unit. *Id.* at 50 ¶¶ 20–21. The Haidets alleged that, despite their demands for Plaintiff to enforce the CC&Rs and governing documents, Plaintiff "refused to take further action" after issuing two notices of violation to Yu. *Id.* at 54 ¶ 27.

**B.    The Haidets' Communication with Plaintiff Prior to Filing the Underlying Action**

On January 20, 2022, Gregory Haidet sent an email to Carol German ("German"), one of Plaintiff's board members. In relevant part, Haidet's email stated:

> Kathy and I are considering soundproofing our condo as we now have two you [sic] men renting above us. The noise is almost unbearable as I doubt the hardwood floors throughout were properly installed. We have contacted to [sic] owner to discuss to no avail. So, we have several quotes to reconstruct and "soundproof" the ceiling. Is this something the HOA Board will need to approve? If so, what will the board need in terms of information?

*Id.* at 62. German responded with an email stating, in relevant part, "I just don't think it is possible in those buildings to make the floors above silent." *Id.* at 61. Later that day, Gregory Haidet replied, in relevant part: "We agree the sound is always an issue so we will plan to take care of it ourselves." *Id.*

On February 20, 2022, Gregory Haidet sent another email to one of Plaintiff's board members (the "February 20 Email"). Haidet's February 20 Email stated:

---

[2] The Haidets' Complaint alleges that Yu was "the owner in possession and control" of the upstairs unit until October 11, 2022, when Matilde Cabrera, as trustee of the Matilde Cabrera Family Trust ("Cabrera"), "became the legal owner" of the upstairs unit. *Id.* at 51–52 ¶¶ 9-10. The Haidets also assert claims against Yu and Cabrera in the Underlying Action. *See id.* at 54–56.

> Linda - as you know the police were at 250 DCC last night due to the extreme noise at 250 DCC - a clear R&Regs violation. Many of the owners here are very upset. A second event occurred at 3:35 am this morning - loud foot noise, a unidentifiable pounding noise and loud voices. They woke us up again, as they do every morning they are here, but with earlier and louder noise. We would like the owner/David Yu to be contacted by the property manager and instruct him to terminate the tenant's lease given the multiple violations. We have a record of many more noise issues created by these tenants. This has gone on far too long and is affecting our mental and physical wellbeing. We also expect the HOA board to enforce our rights as an owner under the CC&R's and R&Regs and promptly resolve the 250 DCC hardwood flooring issue, installed without HOA or our approval, as a separate issue.

*Id.* at 65–66. German responded to Haidet's February 20 Email, in relevant part: "It sounds like they have two issues here- partying and noise due to hardwoods…. Floors are a bit trickier. Floor coverings can be required, but not before a few things happen, including attempts of neighbors to work out a solution with the owners and a board hearing." *Id.* at 65. Haidet replied:

> Thanks Carol - your comments are helpful. There are two issues - the constant early morning and evening daily footfall noise then the loud music and screaming. We have quot;noisequot; [sic] records for about the past 30 days, we started keepimg [sic] them after we realized these issues were not going away without us pushing back. I am not clear on how to proceed. We had Jennifer Nunes come into our condo to experience the floor/footfall noise first hand [sic] - she stated she then sent a violation notice to David Yu. What else can we do? We are exasperated at this point.

*Id.* at 64.

On February 21, 2022, another of Plaintiff's board members sent an email to the Haidets stating that "the board will take the strongest actions possible against the homeowner." *Id.*

On February 22, 2022, Plaintiff's community manager, Jennifer Nunes ("Nunes"), sent an email to Plaintiff's board members and the Haidets that stated, in relevant part:

> The flooring issue is not an owner to owner issue. This is an unauthorized architectural modification, which is HOA. A few weeks ago we discussed that I put a call into your general counsel about the flooring – this is the same unit.

One violation has already been sent to the owner. I will send another today for the unapproved modification and the noise. Seeing as you have these two violations for this unit, I am recommending the [board] call the owners to the next meeting for a hearing to discuss both issues. I will send the [board] a separate note regarding. Thank you Greg and Kathy for your continued patience. I know this unit has been an ongoing issue but I have not forgotten about the struggles you are enduring. It is being addressed.

*Id.* at 63.

On March 7, 2022, Kathleen Haidet sent the following email to Nunes (the "March 7 Email"):

Hi Jennifer, Greg and I have been poring over the Internal Dispute Resolution Procedures in the recent Annual Disclosure Mailing and we need some clarification from you.

Was the ADR Request for Resolution sent to David Yu on our behalf? Did he respond within 30 days of receipt? Is this what the hearing with the Board is about on March 15? This is very time-sensitive to us as we are still being woken up and disturbed by footfall. Also, as we have made our unit available for rent beginning April 15 and need resolution.

We appreciate the attention you have paid to this matter. Do you have a few minutes to speak with us by phone for an update? We are available at your convenience. Thanks!

*Id.* at 68.

On June 8, 2022, counsel for the Haidets sent a letter to Plaintiff's Board of Directors with the subject line "Demand to Enforce CC&Rs and Rules/Regulations" (the "Demand Letter"). *Id.* at 70–73. In relevant part, the Demand Letter states: "[I]t is our understanding the Haidets submitted a formal demand to the Board to issue a directive to the Yus to remove the flooring so the nuisance could be abated…. On February 20, 2022, the Haidets demanded the Board take action to enforce the CC&Rs and Rules and Regulations." *Id.* at 71. The Demand Letter also states: "***The Haidets demands*** [sic] ***the Board undertake immediate action to enforce the CC&Rs and Rules and Regulations against the Yus.***" *Id.* at 72.

**C.    PIIC's Refusal to Defend Plaintiff in the Underlying Action**

PIIC issued a claims-made Community Association Advantage Policy, No. PCAP033390-0122 (the "Policy"), to Plaintiff with an effective policy period from March 25, 2022, through March 25, 2023 (the "Policy Period"). *Id.* at 10.

On June 9, 2022, one day after receiving the Demand Letter, Plaintiff tendered the Haidet claim to PIIC. *See generally id.* at 75–80.

On July 5, 2022, PIIC disclaimed coverage for the Haidet claim on the basis that the claim was first made before the Policy incepted. *See id.* at 82. Specifically, PIIC's letter disclaiming coverage noted that "it appears that the [Haidet] claim was first made to [Plaintiff's] Board of Directors … in January 2022." *Id.*

On November 3, 2022, Plaintiff's insurance broker notified PIIC adjuster Sharon Mozzi ("Mozzi") that the Haidet Complaint had been filed in the Underlying Action and requested that PIIC "reopen the claim and review [it] for coverage." *Id.* at 88.

On December 7, 2022, Mozzi notified Plaintiff's attorney via email that PIIC was "stand[ing] by [its] initial coverage disclaimer." *Id.* at 90.

On February 12, 2024, PIIC reaffirmed its denial of coverage, stating that "[t]here is multiple ongoing correspondence regarding this issue which predates [Plaintiff's] policy inception date of March 25, 2022." *Id.* at 142.

**D.    Relevant Provisions of the Insurance Policy PIIC Issued to Plaintiff**

The Policy provides:

**NOTICE: THIS IS A CLAIMS-MADE POLICY. THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR DISCOVERY PERIOD** …

…

**1.    Insuring Agreement**: The Insurer shall pay on behalf of the **Insureds** all **Loss** which they shall become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, against the **Insureds** for a **Wrongful Act** which takes place before or during the **Policy Period**.

*Id.* at 11.

The Policy defines "Claim" as follows:

> **23.3**  **"Claim"** means:
> **(a)** a written demand for monetary or non-monetary relief against an **Insured**;
> …
> A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

*Id.* at 17.

The Policy further provides:

> **9.2**  All **Claims** arising from the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and subject to a single limit of liability. Such **Claim** shall be deemed first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

*Id.* at 14.

The Policy defines "Wrongful Act" to include "any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty … committed or attempted by the Insured Persons in their capacities as such or by the Insured Organization." *Id.* at 20. The Policy defines "Interrelated Wrongful Acts" to mean "Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes." *Id.* at 19.

The Policy also contains a "Related Claim" exclusion, which provides:

> **4.**  **Claim Exclusions:** This Policy does not apply to any **Claim** made against any **Insured**
> …
> **4.5**  based upon, arising from, or in any way related to:
> **(a)** any demand, suit, or other proceeding against any **Insured** which has been made, which existed, or was pending prior to the applicable Prior Litigation Date set forth in Item V of the Declarations; or
> **(b)** the same or substantially the same facts, circumstances or allegations involved in such demand, suit, or other proceeding ….

1    *Id.* at 11–12.

2        **E.    The Present Cross-Motions for Partial Summary Judgment**

3        In the present cross-motions, PIIC and Plaintiff each seek partial summary judgment

4    regarding PIIC's "duty to defend" Plaintiff in the Underlying *Haidet* Action. PIIC contends

5    that it is entitled to judgment as a matter of law "on the duty to defend issue asserted in"

6    the Complaint's first cause of action for breach of contract. (ECF No. 17 at 2.) Specifically,

7    PIIC seeks "Partial Summary Judgment in its favor on the Complaint that it owed no duty

8    to defend [Plaintiff] against the Underlying Action." *Id.* at 18. Plaintiff seeks partial

9    summary judgment on its breach of contract cause action, contending that the Court should

10   "find[ ] that the claim was first made on June 8, 2022 and that PIIC owed [Plaintiff] a

11   defense to that claim." (ECF No. 18-1 at 9.)

12   **III.   LEGAL STANDARD**

13       "A party may move for summary judgment, identifying each claim or defense—or

14   the part of each claim or defense—on which summary judgment is sought. The court shall

15   grant summary judgment if the movant shows that there is no genuine dispute as to any

16   material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

17   56(a). "A material fact is one that is relevant to an element of a claim or defense, and whose

18   existence might affect the outcome of the case." *See United States v. Grayson*, 879 F.2d

19   620, 622 (9th Cir. 1989) (citation omitted). The materiality of a fact is determined by the

20   substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477

21   U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

22       The moving party has the initial burden of demonstrating that summary judgment is

23   proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving

24   for summary judgment bears the burden of proof at trial, the moving party "must come

25   forward with evidence which would entitle it to a directed verdict if the evidence went

26   uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). Where

27   the party moving for summary judgment does not bear the burden of proof at trial, "the

28   burden on the moving party may be discharged by 'showing'—that is, pointing out to the

district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542–43 (9th Cir. 1989) ("[O]n an issue where the plaintiff has the burden of proof, the defendant may move for summary judgment by pointing to the absence of facts to support the plaintiff's claim. The defendant is not required to produce evidence showing the absence of a genuine issue of material fact with respect to an issue where the plaintiff has the burden of proof.  Nor does Rule 56(c) require that the moving party support its motion with affidavits or other similar materials *negating* the nonmoving party's claim." (citations and internal quotation marks omitted)).

If the moving party meets the initial burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 322, 324. The nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient[.]"). The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (quotations omitted). The nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial,' and summary judgment is appropriate." *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

"[W]hen parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted). "In fulfilling its duty to

review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

## IV. DISCUSSION

### A. Whether PIIC Owed a Duty to Defend

#### 1. Legal Principles

Federal courts sitting in diversity jurisdiction apply state law to interpret an insurance policy. *See Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008). Under California law,[3] "[a]bsent a factual dispute, the interpretation of an insurance contract and its application to undisputed facts are questions of law." *Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.*, 163 Cal. App. 4th 1387, 1391 (Ct. App. 2008). "The ordinary rules of contract interpretation apply equally to contracts of insurance." *Am. Alt. Ins. Corp. v. Superior Ct.*, 135 Cal. App. 4th 1239, 1245 (Ct. App. 2006). "The mutual intention of the contracting parties at the time the contract was formed governs." *Id.* "In construing the language of an insurance policy, a court should give the words used their plain and ordinary meaning, unless the policy clearly indicates to the contrary." *Giddings v. Indus. Indem. Co.*, 112 Cal. App. 3d 213, 218 (Ct. App. 1980). Courts "read a contract as a whole in order to 'give effect to every part, if reasonably practicable, each clause helping to interpret the other.'" *Van Ness v. Blue Cross of Cal.*, 87 Cal. App. 4th 364, 372 (Ct. App. 2001) (quoting Cal. Civ. Code § 1641). "Where contract language is clear and explicit and does not lead to an absurd result, [the court] ascertain[s] [the parties'] intent from the written provisions and go[es] no further." *Id.*; *see Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992) (providing that if a policy's language is "clear and explicit, it governs"). "[I]nsurance coverage is interpreted broadly so as to afford

---

[3] The parties agree California law applies. (*See generally* ECF No. 17 (applying California law); *see also* ECF No. 18-1 at 5 (stating that "California substantive law regarding the duty to defend such as the one involved in this action controls").)

24-cv-0779-WQH-SBC

the greatest possible protection to the insured." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003).

Where an insurance contract imposes a duty to defend on an insurer, the insurer "owes a broad duty to defend its insured against claims that create a potential for indemnity." *Montrose Chem. Corp. v. Superior Ct.*, 6 Cal. 4th 287, 295 (1993). "[T]he duty to defend is so broad that it only requires 'a bare "potential" or "possibility" of coverage as the trigger of a defense duty.'" *Nat'l Union Fire Ins. Co. v. Seagate Techs., Inc.*, 466 F. App'x 653, 655 (9th Cir. 2012) (quoting *Montrose*, 6 Cal. 4th at 300). "[T]he duty to defend arises when the facts alleged in the underlying complaint give rise to a potentially covered claim regardless of the technical legal cause of action pleaded by the third party." *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 510 (Ct. App. 2001). The duty to defend exists where, "under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability." *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (2005).

"The burden is on an insured to establish that the occurrence forming the basis of its claim is within the basic scope of insurance coverage.... [O]nce an insured has made this showing, the burden is on the insurer to prove the claim is specifically excluded." *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998) (internal citations omitted). Thus, to prevail on a motion for summary judgment concerning the duty to defend, "the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." *Montrose*, 6 Cal. 4th at 300. "Where there is doubt as to whether the duty to defend exists, the doubt should be resolved in favor of the insured and against the insurer." *Hudson Ins. Co. v. Colony Ins. Co.*, 624 F.3d 1264, 1267 (9th Cir. 2010).

## 2. Contentions

PIIC contends that it owed no duty to defend Plaintiff in the Underlying Action because the "Claim" was first made before the Policy incepted. (*See* ECF No. 17 at 13.)

Specifically, PIIC contends that this Claim was "first made against [Plaintiff] upon its receipt of the [Haidets'] first pre-inception demand in or about February of 2022," which preceded the Policy's inception on March 25, 2022. *Id.* at 13. PIIC contends that the Haidets' pre-Policy-inception written communications, the Demand Letter, and the Underlying Action all constitute the same "Claim" under the Policy because they "alleged the same act, omission, neglect, or breach of duty, i.e., that [Plaintiff] was not enforcing their CC&Rs against their upstairs neighbors regarding their hardwood floors, which were causing unbearable noise in the Haidet[s'] unit." *Id.* at 13–14. PIIC contends that its "declination of coverage was based on (1) approximately eleven emails and (2) an extensive June 8, 2022 pre-suit demand letter between the Haidets and HOA" because "[t]hese communications provide the fuller context of the single sentence by Haidet in his email dated February 20, 2022, which demanded the HOA take action to remedy the improper hardwood flooring in the Yu[s'] upstairs unit." (ECF No. 21 at 3.)

PIIC also contends that coverage is barred under the Policy's "Related Claim" exclusion because the Underlying Action is "based upon, arising from, or in any way related to" and alleges "the same or substantially the same facts, circumstances, or allegations" as the Haidets' correspondence with Plaintiff, which occurred before the inception of the Policy. (ECF No. 17 at 16–17.) PIIC further contends that it need not make any showing of prejudice in order for the Court to hold that it owes no duty to defend because California's "notice-prejudice rule"—which "requires an insurer to prove that the insured's late notice of a claim has substantially prejudiced its ability to investigate and negotiate payment for the insured's claim," *Pitzer Coll. v. Indian Harbor Ins. Co.*, 447 P.3d 669, 674 (Cal. 2019)—does not apply to "claims-made" policies such as the Policy issued here. *See id.* at 15–16.

Plaintiff contends that PIIC owed a duty to defend it in the Underlying Action because the Claim was first made on June 8, 2022, when counsel for the Haidets sent the Demand Letter to Plaintiff's Board. (*See* ECF No. 18-1 at 9.) Plaintiff contends that the Haidets' February 20 Email does not constitute a "demand" resulting in a "Claim" under

the Policy because the email "does not make a definitive request for specific relief or any course of action by the Board." *Id.* at 3. (ECF No. 20 at 3.) Plaintiff contends that if the Haidets' statement in the February 20 Email constitutes a "demand" or "claim," then "every HOA will be required to report every complaint from one homeowner against another homeowner to its insurance company." *Id.* at 6. Plaintiff contends that PIIC improperly requests that the Court consider the "context" of multiple emails, contending that the Policy does not define a "Claim" as a "writing taken in context or viewed in hindsight." *Id.* at 2. Plaintiff also contends that PIIC improperly relies on emails from its Board members to the Haidets, as communications from Plaintiff's own Board members "cannot constitute a written demand *to* [Plaintiff]." *Id.* at 3. Plaintiff further contends that PIIC cannot rely on the statements in the Demand Letter or the allegations in the Haidets' Complaint to determine when a "demand" was made under the Policy, because these documents are merely the Haidets' counsel's characterization of prior communications. Plaintiff contends that the Policy's "Related Claim" exclusion also does not exclude it from coverage because the exclusion requires there to have been "a definitive written demand, on a specific date, made to [Plaintiff] for specific relief," prior to the inception of the Policy. (ECF No. 22 at 5–6.)

### 3. Whether a "Demand" Was Made Prior to the Policy's Inception

#### a. Plaintiff Bears the Burden of Establishing When a Demand Was Made

As a preliminary matter, PIIC contends that Plaintiff's Motion applies the incorrect standard when discussing which party bears the burden to establish when a "claim" was first made under the Policy. Plaintiff contends in its Motion that "exclusions and limitations on coverage in an insurance policy are 'strictly construed against the insurer and liberally interpreted in favor of the insured.'" (ECF No. 18-1 at 5.) PIIC contends, however, that "[w]hether or not the Haidet[s'] claim was first made during [PIIC's] policy period is a requirement of the insuring agreement," rather than an exclusion. (ECF No. 19 at 15.) PIIC contends that, as a result, Plaintiff, as the insured, bears "the burden of establishing that

[its] claim comes within the 'scope of basic coverage.'" *Id.* (quoting *Prichard v. Liberty Mut. Ins. Co.*, 84 Cal. App. 4th 890, 910 (Ct. App. 2000)).

The Court agrees that a determination of whether the "claim" was "first made" during the Policy Period affects whether the claim "is within the basic scope of insurance coverage." *See Aydin Corp.*, 18 Cal. 4th at 1188. Accordingly, Plaintiff, as the insured, bears the burden of establishing that the claim was first made during the Policy Period.

### b.    Whether the February 20 Email Was a "Demand"

Here, the parties agree that PIIC's duty to defend turns on whether the Haidets' "claim" against Plaintiff was first made prior to the Policy's inception on March 25, 2022. The Policy defines a "Claim" to mean, inter alia, "a written demand for monetary or non-monetary relief against an Insured." (ECF No. 18-3 at 17.) The Policy further states that a "Claim" is "deemed first made on the date an Insured receives a written demand, complaint, indictment, notice of charges, or order of formal investigation." *Id.* The parties agree that the Haidets sent Plaintiff the Demand Letter and filed their Complaint initiating the Underlying Action during the Policy Period. Thus, the sole issue is whether, prior to sending the Demand Letter and filing the Complaint, the Haidets made a "demand" for "non-monetary relief" against Plaintiff before the Policy incepted.[4]

The Policy does not define a "demand" or "non-monetary relief." The parties agree that the definition of "demand" set out in *Westrec Marina Mgmt., Inc. v. Arrowood Indem. Co.* ("*Westrec*") should apply here. *See* 163 Cal. App. 4th at 1387; *see also Griswold v. Liberty Mut. Grp., Inc.*, No. ED CV19-00662 JAK (SPx), 2020 WL 13311567, at *11 (C.D. Cal. Oct. 6, 2020) ("Federal district courts have relied on the definition of 'demand' in *Westrec Marina*."). *Westrec* involved an insurance policy that defined a "claim" to include "a written demand for civil damages or other relief" but did not define "demand." 163 Cal.

---

[4] PIIC does not contend that the Haidets made a demand for "monetary relief" prior to the Policy's inception. Accordingly, the sole issue is whether the Haidets' pre-inception communications with Plaintiff constitute a "demand" for "non-monetary relief."

App. 4th at 1392. The California Court of Appeal held that "[t]he ordinary meaning of a 'demand' as used in this context is a request for something under an assertion of right or an insistence on some course of action." *Id.* The court explained that "[a] mere request for an explanation, expression of dissatisfaction, or lodging of a grievance that falls short of such an insistence is not a demand." *Id.*

Relying on *Westrec*'s definition of "demand," PIIC contends that the following statement in the Haidets' February 20 Email constitutes a "demand" for non-monetary relief: "We also expect the HOA board to enforce our rights as an owner under the CC&R's and R&Regs and promptly resolve the 250 DCC hardwood flooring issue, installed without HOA or our approval, as a separate issue." (ECF No. 18-3 at 65–66.) PIIC contends that this statement meets "both prongs of *Westrec*'s test" for a "demand" because it contains (1) "a request for something under an assertion of right"—the Haidets' request that Plaintiff "enforce [their] rights under the CC&Rs"—and (2) an "insistence on some course of action"—the Haidets' request that Plaintiff "take specific action against their upstairs neighbors to resolve the hardwood floor issue." (ECF No. 21 at 2–5.)

Plaintiff contends that the Haidets' statement in the February 20 Email did not constitute a "demand" because it was "nothing more than a general complaint to [Plaintiff's] property manager … from an understandably exasperated homeowner" and "does not contain any request for specific relief" or "state what 'rights' the homeowner is referring to." (ECF No. 18-1 at 7.) To support this argument, Plaintiff contends that the facts in the case at bar are distinct from those that led the court to find a "demand" in *Westrec*.

The Court agrees with Plaintiff that *Westrec* is factually distinguishable from the present case. In *Westrec*, the court found that the insured's receipt of a letter from the attorney of a former employee notifying the insured that the employee had "received Right to Sue letters from the [Department of Fair Employment and Housing]" constituted "a settlement demand seeking monetary compensation for the alleged wrongdoing." 163 Cal. App. 4th at 1390, 1393. In particular, the attorney's letter to the insured stated that the

former employee "had been subjected to employment discrimination and wrongful termination and that she had received a right-to-sue notice," in addition to stating that the insured "might prefer 'to resolve or mediate this matter' and 'to promptly rectify the harm' rather than suffer the expense of litigation." *Id.* at 1392. The court explained that the attorney's letter was a "demand" because "its meaning was clear that, absent some form of negotiated compensation, [the former employee] would commence a lawsuit against [the insured]," and such a "request for compensation while threatening litigation was a 'demand,' as that word is ordinarily understood." *Id.* at 1392–93. In contrast, here, the February 20 Email was not written by an attorney, identifies no potential claims against Plaintiff, and contains no indication that the Haidets would commence a lawsuit against Plaintiff if Plaintiff failed to take action. Moreover, the flooring issue is not the main subject of the February 20 Email, and it is instead referenced only in the final line of the email as a "separate issue." (ECF No. 18-3 at 66.)

PIIC does not attempt to analogize the facts of the present case to those in *Westrec*. Instead, as discussed above, PIIC merely relies on *Westrec*'s general definition of a "demand." PIIC also contends that Plaintiff incorrectly interprets *Westrec* as standing for the proposition that a "demand" "requires that there be a threat of litigation or notice of intent to sue." (ECF No. 21 at 5.) PIIC contends that *Westrec* discussed "intent to sue" merely to address the unique facts in that case. In the alternative, PIIC contends that if a threat of litigation is required for a communication to constitute a demand, the Haidets' emails "certainly notified [Plaintiff's] Board that future litigation was likely should the demands not be satisfied" because the email used terms like "expect" and "promptly resolve," which is "a clear demand with threat of consequences if the board failed to act." *Id.* at 6.

Contrary to PIIC's argument, the words "expect" and "promptly resolve" fall short of demonstrating that litigation could result if Plaintiff did not comply with the Haidets' stated expectation. "[A] strong statement of one's position is irrelevant to whether a demand for non-monetary relief has been made." *St. Paul Mercury Ins. Co. v. RMG Cap.*

24-cv-0779-WQH-SBC

*Corp.*, No. SACV 12-450-JST (MLGx), 2012 WL 2069677, at *5 (C.D. Cal. June 7, 2012) (explaining that "if whether a demand has been made depends upon the subjective zeal with which a third party communicates its position, the definition of 'Claim' would be, at best, a moving target").[5] Indeed, in *Westrec*, the California Court of Appeal found that a demand had been made not due to the forcefulness of the letter's language, but because the letter referenced the employee's receipt of a right-to-sue notice, proposed resolving or mediating the matter to avoid litigation, and explicitly mentioned the claims that would be brought against the insured (employment discrimination and wrongful termination) absent prior resolution. *See* 163 Cal. App. 4th at 1390–92. The one-sentence statement in the Haidets' February 20 Email contains no such similar elements or references that render it analogous to the "demand" in *Westrec* that "clearly expressed [the former employee's] intent to sue [the insured] for employment discrimination if an appropriate settlement could not be reached." *Id.* at 1392.

PIIC contends that *Westrec* does not require that a "demand" include "a threat of litigation or notice of intent to sue." (ECF No. 21 at 5.) However, PIIC does not provide any examples of cases where courts have found "demands" were made absent such a threat or notice. In fact, federal courts applying *Westrec* have been reluctant to find that a "demand" was made where the communication in question lacks some sort of ultimatum. In *St. Paul Mercury Insurance Co.*, for example, the Central District of California held that a letter that essentially asked a bank to "confirm" whether it "agreed with [the other party's] interpretation of the Construction Loan" at issue was not a demand for non-monetary relief.

---

[5] Moreover, even if the precise language used in the purported "demand" was pertinent to the analysis, the Court would find that the Haidets' use of the phrase "we expect" falls short of constituting an "insistence on some course of action" under *Westrec*, 163 Cal. App. 4th at 1392. An "expectation" is not equivalent to "insistence." At most, the phrase "we expect" signifies that the Haidets were merely expressing dissatisfaction or lodging a grievance with Plaintiff. *See id.* As the California Court of Appeal explained in *Westrec*, "[a] mere request for an explanation, expression of dissatisfaction, or lodging of a grievance that falls short of such an insistence is not a demand." *Id.* Thus, to the extent the specific language used affects the analysis, the language of the February 20 Email indicates that it did not rise to the level of a "demand" against Plaintiff.

2012 WL 2069677, at *4. The court reached this conclusion in part because, despite being written by a lawyer and "strongly referenc[ing] a belief that the contract had been breached," the letter "did not contain any such 'or else' ultimatum" and "expressed no entitlement to, or threat to seek, court-ordered relief of any kind." *Id.* at *4–5.

In *Griswold*, a father sent a letter informing a dentist of the "constant pain and myofascial muscle cramping" that the father's minor son had experienced since being under the dentist's care, as well as the specialists his son had seen to treat these issues. 2020 WL 13311567, at *3. In the letter, the father acknowledged that he was writing to the dentist for an "unorthodox" reason before asking: "Would you be willing to refund the monies we paid while under your care [and] meet the verifiable medical expenses related to fixing the damage which we have incurred since?" *Id.* The Central District of California held that the father's letter was not a "claim" against the dentist in part because it "was not written by an attorney," it "[did] not assert a specific right or entitlement or identify a specific process that could lead to relief," and it did not "insist on a payment of compensation by the [dentist]." *Id.* at *11. Although "the presence of a forthcoming dispute could be inferred," the court held that the letter was "appropriately construed as a cordial, polite request and offer to have some discussions about a potential resolution," as there was "no express demand, reference to litigation, or deadline." *Id.*

Similarly, here, the Haidets' February 20 Email contained no explicit reference to litigation. Furthermore, despite communicating that the Haidets expected Plaintiff to "promptly resolve" the flooring issue, the February 20 Email did not set a deadline by which this resolution should occur. The same facts that led the court to determine that the father's letter was not a "demand" in *Griswold* are applicable to the February 20 Email— it was not written by an attorney, it fails to identify a "specific process that could lead to relief," and it does not insist on compensation or a specific form of non-monetary relief. As in *Griswold*, while it could be inferred that Plaintiff's failure to meet the Haidets' expectation could lead to a "forthcoming dispute," the February 20 Email failed to communicate any sort of ultimatum indicating that it constituted a "demand."

Although not cited by either party in the briefing, the Court notes that *Phoenix Insurance Co. v. Sukut Construction Co.* is more analogous than *Westrec* to the facts of the present case, in that the court found that a "claim" had been made even in the absence of any explicit threats of future litigation. *See* 136 Cal. App. 3d 673 (Ct. App. 1982). In *Phoenix Insurance Co.*, the insured was an attorney who had executed a mechanics lien for a client. *Id.* at 675. When the client learned that the mechanics lien "might inadequately protect him," he met with the attorney and asked him "to work without pay to correct the problem with the lien." *Id.* Explaining that a "claim" is "a demand for something as a right, or as due," the Court of Appeal held that the client's demand that the attorney work for free to correct the issue constituted a claim against the insured because "further *actions*, not explanations were sought by the client," and it was not "a request for new services," but rather "a demand that [the attorney] correct and complete work for which payment had already been made." *Id.* at 677–78.

However, the Court finds that *Phoenix Insurance Co.* is also distinguishable from the case at bar. The client's conversation with the attorney in *Phoenix Insurance Co.* clearly communicated that the client believed the attorney had committed some error and that the client was demanding that the attorney take a specific action to rectify that error—"correct[ing] the problem with the lien." *Id.* at 675. In contrast, it was not clear from the Haidets' February 20 Email that a failure to act upon the Haidets' request would subject Plaintiff to a "claim" that would expose Plaintiff to legal action. While the February 20 Email states that the Haidets expect Plaintiff to "enforce [the Haidets'] rights as an owner under the CC&R's and R&Regs and promptly resolve the 250 DCC hardwood flooring issue," the email does not identify a specific type of action that Plaintiff should take. The Haidets' expectation that Plaintiff will "enforce [their] rights … under the CC&R's and R&Regs" is too vague to constitute "an insistence on some course of action." *Westrec*, 163 Cal. App. 4th at 1392.

PIIC's contention that the February 20 Email was a "demand" fares no better when compared to federal district court cases that have relied on *Westrec* and *Phoenix Insurance*

24-cv-0779-WQH-SBC

*Co.* to conclude that certain communications constituted "demands" or "claims." For example, *Presidio Wealth Management, LLC v. Columbia Casualty Co.* involved an investment company and its client who alleged that the investment company used his money, without his knowledge, to buy Auction Rate Preferred Securities ("ARPS") that were illiquid, "preventing [the client] from purchasing property and otherwise accessing their funds when they wished." No. 13-cv-04604-WHO, 2014 WL 1341696, at *2 (N.D. Cal. Apr. 3, 2014). The court held that certain emails from the client to the investment company each constituted a "demand" where the emails stated, among other things: "[The investment company] must make me whole by buying me out, forcing redemption of the ARPS or deliver on an acceptable sale"; "Please let me know how and when I can expect liquidity"; "I am at the point now that I must demand for you to make me whole"; and "I ask that [the investment company] redeem me and do what is right." *Id.* at *7. The court reasoned that, under *Westrec*, these emails each constituted "request[s] for something under an assertion of right" and "an insistence on some course of action." *Id.* (quoting *Westrec*, 163 Cal. App. 4th at 1392). The court further held that these emails constituted demands for "non-monetary relief" because the client "ultimately … wanted liquidity," and, like the attorney's client in *Phoenix Insurance Co.*, he "insisted that [the investment company] 'cure the problems' created by [its] wrongful conduct." *Id.* at *8.

Similarly, in *State Farm Fire & Casualty Co. v. Drake Real Estate Group*, the court held that an email from a property company to a real estate group that had handled several renovations amounted to a "demand" where the email "state[d] that there are 'significant issues and claims at each property,' inform[ed] [the real estate group] that [the property company] ha[d] lost money, and insist[ed] on a course of action" by stating: "I am obligated to ask one more time if you will admit responsibility and if you will bear the costs to correct the issues." *See* No. 2:22-cv-08776-JLS-MRW, 2024 WL 5428872, at *4 (C.D. Cal. Mar. 20, 2024), *aff'd*, No. 24-2752, 2025 WL 720896 (9th Cir. Mar. 6, 2025). The court held that the property company "was clearly asserting a right to have the construction work at

the rental units corrected on the basis that [it] had accrued lost income and [the real estate group] was responsible for the problems." *Id.* at *5.

Thus, in *Presidio Wealth Management, LLC*, and *State Farm Fire & Casualty Co.*, the communications at issue clearly demonstrated that the demanding party believed the insured had committed some wrong and that it expected the insured to implement a specific course of action to remedy that wrong, such as liquifying illiquid investments or correcting faulty construction work. The same cannot be said of the February 20 Email in this case. Although the Haidets were seeking "action" in the form of Plaintiff "enforc[ing] [the Haidets'] rights as an owner under the CC&R's and R&Regs and promptly resolv[ing] the 250 DCC hardwood flooring issue," it is not clear the Haidets were demanding that Plaintiff take a specified action. Accordingly, *Phoenix Insurance Co.*, *Presidio Wealth Management, LLC*, and *State Farm Fire & Casualty Co.* lead the Court to conclude that the February 20 Email was not a "demand."

### c. The "Context" of the Communications Does Not Support that the February 20 Email Was a "Demand"

The parties dispute whether PIIC may rely on the entire context of the communications between the Haidets and Plaintiff in order to determine that a "demand" was made prior to the Policy's inception. In particular, PIIC explains that its "declination of coverage was based on (1) approximately eleven emails and (2) an extensive June 8, 2022 pre-suit demand letter between the Haidets and HOA" because "[t]hese communications provide the fuller context of the single sentence by Haidet in his email dated February 20, 2022, which demanded the HOA take action to remedy the improper hardwood flooring in the Yu[s'] upstairs unit." (ECF No. 21 at 3.) Plaintiff contends that the Policy defines a "Claim" to include a singular demand, not "a series of communications taken in context." (ECF No. 22 at 1–2.) Plaintiff also contends that some of the emails upon which PIIC relies include emails sent by Plaintiff's own Board members, which naturally cannot constitute a demand against the Board. (ECF No. 20 at 3.)

24-cv-0779-WQH-SBC

PIIC does not cite—and the Court has not found—any case holding that multiple communications can be considered together to constitute a single demand. At oral argument, PIIC contended that the February 20 Email, viewed on its own, constituted a "demand for non-monetary relief," but that the other communications in the record provide context for this "demand." The Court notes that some courts have considered the context of the parties' *previous* communications when determining whether a specific statement or communication constituted a demand. *See, e.g.*, *State Farm Fire & Cas. Co.*, 2024 WL 5428872, at *4 (explaining that "[t]he previous emails between [the property company] and [the real estate group] provide context that further supports this reading of the November 2021 email" as a demand, where the parties had previously discussed mediating the dispute, sent a "proposed settlement," and mentioned "a full release of any liability," which ultimately "culminated in the November 2021 email"). However, even if it is reasonable to assume that communications preceding a purported "demand" can provide context, the Court is skeptical that it can consider any communications received *after* the February 20 Email as providing context that, in hindsight, the February 20 Email constituted a "demand." In order to constitute a "demand for non-monetary relief," the February 20 Email must constitute a "demand" at the time it was received—it cannot require support and further context from *subsequent* communications in order to be viewed as a "demand."

In any event, considering the relevant "context" in this case only weakens PIIC's argument that the February 20 Email constituted a "demand." For example, the February 20 Email itself is largely devoted to discussing "extreme noise" in the Yus' unit that "upset" "[m]any of the owners" at Plaintiff's community and resulted in "the police" being called to the unit. (ECF No. 18-3 at 111.) One of Plaintiff's Board members describes this issue in a later email as "partying," and Gregory Haidet confirms that "[t]here are two issues – the constant early morning and evening daily footfall noise then the loud music and screaming." *Id.* at 110–11. Only the final sentence of the February 20 Email references the "hardwood flooring issue" that PIIC contends is a "demand," and it specifically

characterizes this as "a separate issue." *Id.* at 112. Thus, examining the context of the February 20 Email reveals that the flooring issue was not the primary focus of this communication that PIIC contends constitutes a "demand."

Furthermore, less than two hours after sending the February 20 Email, Gregory Haidet sent a follow-up email stating: "*I am not clear on how to proceed*. We had Jennifer Nunes come into our condo to experience the floor/footfall noise first hand [sic] - she stated she then sent a violation notice to David Yu. *What else can we do?* We are exasperated at this point." *Id.* at 64 (emphasis added). Haidet's expressions of confusion and requests for guidance from Plaintiff "on how to proceed" reinforce that the Haidets had not, at that time, demanded a specific kind of relief from Plaintiff or insisted that Plaintiff take a particular course of action.

A review of the Haidets' other communications with Plaintiff fails to provide context demonstrating that the February 20 Email constituted a "demand." For example, based upon the evidence submitted with the present motions, prior to the February 20 Email, the only communication that the Haidets sent to Plaintiff regarding the flooring in the Yus' unit was a series of emails on January 20, 2022. In those January emails, Gregory Haidet complained about the noise from the hardwood floors in the Yus' unit before stating that the Haidets had obtained quotes "to reconstruct and 'soundproof' the ceiling." *Id.* at 62. Later in that email thread, Haidet stated: "We agree the sound is always an issue so *we will plan to take care of it ourselves*." *Id.* at 61 (emphasis added). This communication does not indicate that the Haidets had any expectation that Plaintiff had a responsibility to take any action with respect to the flooring in the Yus' unit, as Gregory Haidet stated that the Haidets planned to handle the issue themselves.

Furthermore, even if the Court were to consider communications subsequent to the February 20 Email as providing relevant context for determining whether the February 20 Email was a demand, these later communications do not lead to such a conclusion. For example, while PIIC contends that the March 7 Email "confirmed [the Haidets'] proposed course of action" and "communicated the urgency of their demand" (ECF No. 21 at 5), the

Court finds that the March 7 Email fails to demonstrate that the previous February 20 Email was a "demand." The March 7 Email does not support that the Haidets had previously identified a specific course of action that they expected Plaintiff to take to resolve the flooring issue. Indeed, the March 7 Email was itself nothing more than "[a] mere request for an explanation." *Westrec*, 163 Cal. App. 4th at 1392. Kathleen Haidet specifically sought "some clarification" from Plaintiff's property manager and asked a series of questions: "Was the ADR Request for Resolution sent to David Yu on our behalf? Did he respond within 30 days of receipt? Is this what the hearing with the Board is about on March 15?" (ECF No. 18-3 at 68.) Kathleen Haidet's statements that the subject is "time-sensitive" and that the Haidets "need resolution" do not transform the March 7 Email (or the February 20 Email) into a demand. Indeed, Kathleen Haidet ultimately requested nothing more than a meeting with Plaintiff's property manager, asking: "Do you have a few minutes to speak with us by phone for an update?" *Cf. Playboy Enters., Inc. v. Indian Harbor Ins. Co.*, B315763, 2022 WL 4880146, at *1 (Cal. Ct. App. Oct. 4, 2022) (concluding that an email was not a "claim" in part because it did not demand "money or nonmonetary relief of the type a court might order," but instead merely "requested a meeting"). The March 7 Email fails to demonstrate that the Haidets had previously made a "demand" for non-monetary relief against Plaintiff.

PIIC also references an email from Plaintiff's community manager to the Haidets and several of Plaintiff's board members as evidence that Plaintiff's community manager "[r]ecogniz[ed] the seriousness of the situation and possible legal action." (ECF No. 19 at 9.) Specifically, on February 22, 2022, Plaintiff's community manager emailed Haidet and three of Plaintiff's board members, stating in relevant part that "the flooring issue is not an owner to owner issue. This is an unauthorized architectural modification, which is HOA. A few weeks ago we discussed that I put a call in to your general counsel about the flooring – this is the same unit." (ECF No. 18-3 at 63.) However, the community manager's reference to contacting Plaintiff's general counsel does not indicate that Plaintiff considered the Haidets to have made a "demand" against it. Instead, Plaintiff could have

been seeking general guidance on how to approach the dispute between the Haidets and the Yus, including clarification on whether Plaintiff was required to take some action and what responsibilities and authority Plaintiff had under the Governing Documents. Without more information, the community manager's reference to contacting "general counsel about the flooring" does not demonstrate that Plaintiff—at that point in time—understood that the Haidets had made a "demand" against Plaintiff or that the Haidets expected Plaintiff to take a specific course of action.

### d.     The Demand Letter and the Haidets' Complaint in the Underlying Action Do Not Determine When a "Demand" Was Made

Relatedly, PIIC also relies on the June 8 Demand Letter to "provide the fuller context of the single sentence" in the February 20 Email. (ECF No. 21 at 3.) PIIC also draws upon the Haidets' complaint in the Underlying Action because it "repeated and summarized the history of Haidet's pre-inception written demands for relief from [Plaintiff]." (ECF No. 19 at 10.)

Plaintiff contends that the Haidets' counsel's characterizations of prior communications as a "formal demand" do not establish when a "demand" was made. (*See* ECF No. 20 at 4–5.) Plaintiff contends that the Demand Letter "is simply statements of the Haidets' counsel and does not provide any evidence … on whether a written demand for non-monetary relief was made prior to March 25, 2022." (*See, e.g.*, ECF No. 20-2 at 3.) Plaintiff contends that the allegations in the Haidets' Complaint contain only hearsay and "do not constitute any form of admissible evidence which PIIC could have based its denial on." (ECF No. 20 at 5.)

The Demand Letter contains statements like: "it is our understanding the Haidets submitted a *formal demand* to the Board to issue a directive to the Yus to remove the flooring so the nuisance could be abated" and "On February 20, 2022, the Haidets *demanded* the Board take action to enforce the CC&Rs and Rules and Regulations." (ECF No. 18-3 at 71 (emphasis added).) To the extent PIIC seeks to offer the Demand Letter so that the Court may consider these statements for the truth of the matter asserted therein—

that the Haidets made "demands" against Plaintiff before sending the Demand Letter—such statements are impermissible hearsay, and PIIC does not identify an applicable hearsay exception. *See* Fed. R. Evid. 801(c) (defining "hearsay" as a statement that "the declarant does not make while testifying at the current trial or hearing" and that is "offer[ed] in evidence to prove the truth of the matter asserted in the statement"). Moreover, the Demand Letter also references a March 2 communication, a March 9 "demand," and communications on March 17 and March 24. (ECF No. 18-3 at 71.) However, none of these emails or communications appear in the evidence before the Court in connection with the pending cross-motions. The Court cannot rely upon the assertions in the Demand Letter to establish that a demand was made on any of those dates, as such a finding would impermissibly rely on the hearsay statements in the Demand Letter for the "truth of the matter asserted." Fed. R. Evid. 801(c).

Furthermore, even if the Court were to set aside the hearsay issues and consider the statements in the Demand Letter for the truth of the matter asserted, it is not evident that the Haidets' counsel was referencing a "demand" as it would be understood in the context of the Policy, which is the only characterization of "demand" that is pertinent to the present cross-motions. The Demand Letter is addressed only to Plaintiff and makes no reference to the Policy or how it defines "demand." There is no indication that the Haidets' counsel had any reason to apply *Westrec*'s definition of "demand" (or the Policy's definition of a "Claim") when making the assertions in the Demand Letter. The Court accordingly agrees with Plaintiff that the Demand Letter's statements about prior "demands" do not determine when a "demand" was made under the Policy.

Similarly, to the extent PIIC seeks to offer the Haidets' Complaint so that the Court may determine when a "demand" was made by relying upon allegations like "[the Haidets] *demanded* [Plaintiff] enforce the CC&Rs and GOVERNING DOCUMENTS by ordering YU to remove the hard wood flooring from the YU UNIT" (ECF No. 18-3 at 50 ¶ 23 (emphasis added)), PIIC impermissibly seeks to offer the Haidets' Complaint for "the truth of the matter asserted." Fed. R. Evid. 801(c)(2). The Court may not consider the allegations

in pleadings for such a purpose. *Compare Newman v. Underhill*, No. 5:23-cv-00033-SP, 2024 WL 1151676, at *3 n.3 (C.D. Cal. Feb. 29, 2024) (noting that the court had not considered the plaintiff's evidence of a complaint "from a different lawsuit" "because plaintiff offer[ed] its allegations for the truth of the matter asserted," rendering "the allegations … hearsay under the Federal Rules of Evidence"), *aff'd*, 134 F.4th 1025 (9th Cir. 2025), *with Envitech, LLC v. Everest Indem. Ins. Co.*, No. C17-6053RBL, 2018 WL 3819030, at *5 (W.D. Wash. Aug. 10, 2018) (determining, in an insurance coverage dispute, that the underlying complaint was not hearsay because it was not submitted "to prove that the underlying allegations are true"). In sum, the Court finds that it is not the Haidets' counsel's interpretation or characterization of when a demand was made that is pertinent, but rather whether the communication in question constitutes a "demand" in light of the language of the Policy and California law governing the interpretation of insurance policies. Accordingly, the statements in the Demand Letter and the allegations in the Haidets' Complaint fail to persuade the Court that the Haidets made a "demand" against Plaintiff in the February 20 Email or on any other date preceding the Policy's inception.

### 4. The February 20 Email Did Not Seek "Non-Monetary Relief"

The Court also concludes that the February 20 Email did not constitute a "Claim" under the Policy because it did not seek "non-monetary relief." The term "non-monetary relief" is not defined in the Policy, and neither party provides a definition in the briefing.[6]

---

[6] At oral argument, PIIC contended that "non-monetary relief" should be interpreted to include a request for services, citing *Abifadel v. Cigna Insurance Co.* in support of this proposition. 8 Cal. App. 4th 145 (Ct. App. 1992). *Abifadel*, however, involved a policy that, unlike the Policy here, did not define a "claim." *See id.* at 160–61 (explaining that, because the policy defined "potential claim" but not "claim," the court would reference the definition of "potential claim" in the policy to determine whether a "claim" had been made). In defining a "claim," *Abifadel* explained that "[a] claim is a demand or challenge of something as a right and asserts the liability of the party from whom a service or sum of money is requested." *Id.* at 160. In other words, *Abifadel* referenced demands for "service" in defining a "claim," rather than defining "non-monetary relief." *See id.* In any event, to the extent the February 20 Email can be interpreted as the Haidets requesting "a service" from Plaintiff, it is not clear what service is being requested. As discussed above, the February 20 Email does not request a specific course of action—the Haidets' vague references

28

In the context of other insurance policies that similarly lacked definitions for "non-monetary relief," federal district courts have interpreted the term to mean "a 'court-ordered benefit,' such as an injunction or specific performance" or "non-monetary relief of the nature ordered by courts." *Pac. Coast Surgical Ctr., L.P. v. Scottsdale Ins. Co.*, No. 18-3904 PSG (KSx), 2019 WL 4390565, at *4 (C.D. Cal. June 25, 2019) (quoting *St. Paul Mercury Ins. Co.*, 2012 WL 2069677, at *4). The California Court of Appeal also relied on a similar version of this definition of "non-monetary relief" in an unpublished opinion. *See Playboy Enters., Inc.*, 2022 WL 4880146, at *1 (concluding that an email was not a "claim" in part because it did not demand "money or nonmonetary relief of the type a court might order," but instead merely "requested a meeting"). Here, the February 20 Email's vague reference to Plaintiff "enforc[ing] [the Haidets'] rights as an owner under the CC&R's and R&Regs" and "promptly resolv[ing] the 250 DCC hardwood flooring issue" does not clarify the form of relief the Haidets were seeking or demonstrate that they were requesting "relief of the type a court might order." *Id.* It is also not sufficiently clear that the February 20 Email sought relief that could be construed as Plaintiff's "specific

---

to "enforc[ing] our rights" and "promptly resolv[ing] the 250 DCC hardwood flooring issue" do not indicate how the Haidets expected Plaintiff to proceed.

Moreover, other aspects of *Abifadel* lead to the conclusion that the February 20 Email was not a demand or claim. *Abifadel* stated that "[i]n defining 'claims,' the law focuses on the claimant's *formal demands* for service or payment." *Id.* at 160 (emphasis added). Here, there is no indication that the Haidets' February 20 Email constitutes a "formal demand." Additionally, under *Abifadel*, a "claim" must "assert[ ] the liability of the party from whom a service or sum of money is requested." *Id.* In particular, *Abifadel* held that certain communications did not "constitute[ ] demands for services or sums of money" because "[t]hey did not threaten any formal consequences against the former directors for failure to correct the deficiencies, nor propose to hold the former directors personally liable." *Id.* at 166. Here, too, the February 20 Email does not assert "the liability" of Plaintiff or otherwise indicate that the Haidets believed that, at that time, Plaintiff had committed some wrong or acted improperly, or that the Haidets intended to seek "formal consequences" against Plaintiff based upon its failure to act. Instead, the February 20 Email merely communicates the Haidets' "expectation" that Plaintiff would act in some unspecified manner. As in *Abifadel*, the February 20 Email was, at most, "notice" of a situation that "could subsequently give rise to a claim," but did not itself constitute a claim. *See id.* at 166–67 (finding that various communications did not constitute "claims" against the former directors of a bank but were instead "potential claims" under the policy because, at most, they provided "notice of specific behavior or acts which could subsequently give rise to a claim against [the former directors] if not corrected").

performance," such as Plaintiff's performance of its own obligations under the CC&Rs or other governing documents. While the February 20 Email mentions the enforcement of the Haidets' own "rights as an owner," it does not mention any duty Plaintiff owed under the governing documents to effectuate an enforcement of the Haidets' rights or address the Haidets' grievance. As a result, the Court concludes that, in addition to failing to rise to the level of a "demand," the February 20 Email also did not constitute a "Claim" because it did not seek "non-monetary relief."

### 5.    The Demand Letter Constituted a "Demand" Under the Policy

In contrast to the February 20 Email, the Demand Letter the Haidets' counsel sent to Plaintiff on June 8, 2022, identifies a specific, concrete action that the Haidets expected Plaintiff to take: "We look forward to hearing from you the Board will take action to enforce the CC&Rs and require the Yus to remove the hard wood flooring as presently installed." (ECF No. 18-3 at 73.) The Demand Letter discusses Plaintiff's duty to enforce its Governing Documents and goes on to state that "[t]he Haidets have a viable nuisance claim against the Yus. Because [Plaintiff's] Board has failed to act, the Haidets have an ostensible claim against [Plaintiff] for the same damages, as well as claims for breach of contract and breach of fiduciary duty." *Id.* The Demand Letter also details Plaintiff's alleged failure to take any action when the Haidets refused to approve the Yus' belatedly submitted Architectural Committee request form, despite such a form being "required" by the CC&Rs and Rules. *Id.* at 70–71. The Demand Letter clearly demonstrates the Haidets' "insistence" that Plaintiff take a particular "course of action," not only to enforce the CC&Rs, but also to remove the hardwood flooring. *Westrec*, 163 Cal. App. 4th at 1392. In making this request, the Demand Letter references the Rules governing Architectural Committee request forms, the CC&Rs provision governing remedies for "nuisance," and a homeowners' association's fiduciary duty to enforce its governing documents, thereby making this request "under an assertion of right." *Id.* The Demand Letter accordingly meets *Westrec*'s definition of a "demand."

The Demand Letter also meets the definition of a "Claim" under the Policy because it seeks "non-monetary relief." (*See* ECF No. 18-3 at 17 (defining a "Claim" to mean, in relevant part, "a written demand for monetary or non-monetary relief against an Insured").) As explained above, "non-monetary relief" has been defined as "a 'court-ordered benefit,' such as an injunction or specific performance" or "non-monetary relief of the nature ordered by courts." *Pac. Coast Surgical Ctr., L.P.*, 2019 WL 4390565, at *4 (quoting *St. Paul Mercury Ins. Co.*, 2012 WL 2069677, at *4); *see also Playboy Enters., Inc.*, 2022 WL 4880146, at *1. Here, the Demand Letter requests that Plaintiff "enforce the CC&Rs and require the Yus to remove the hard wood flooring as presently installed," specifically referencing Plaintiff's right to "exercise[ ]" "every remedy allowed by law or equity against a nuisance" under Section 12.2 of the CC&Rs, as well as a homeowners' association's fiduciary duty to enforce its governing documents. (ECF No. 18-3 at 71–73.) Thus, the Demand Letter essentially seeks Plaintiff's specific performance under the CC&Rs, thereby constituting a demand for "non-monetary relief."

The Court accordingly finds that the Demand Letter constituted a "demand" for non-monetary relief under the Policy. Plaintiff received the Demand Letter on June 8, 2022, which falls within the Policy Period of March 25, 2022, through March 25, 2023. Beyond the February 20 Email, which the Court has already determined was not a "demand," PIIC has not identified any other written communication that occurred prior to the Demand Letter that would constitute a "demand" under the Policy. Accordingly, the Haidets' "Claim" against Plaintiff was "first made" on June 8, 2022. Because this "Claim" was "first made" during the Policy Period, PIIC owed a duty to defend Plaintiff in the Underlying Action.

### 6.    The "Related Claim" Exclusion Is Inapplicable

PIIC also contends that coverage is barred under the Policy's "Related Claim" exclusion because the Underlying Action is "based upon, arising from, or in any way related to" and alleges "the same or substantially the same facts, circumstances, or allegations" as the Haidets' correspondence with Plaintiff, which occurred before the

inception of the Policy. (ECF No. 17 at 16–17.) The Policy's "Related Claim" exclusion provides:

> **4.    Claim Exclusions:** This Policy does not apply to any **Claim** made against any **Insured**
>
> …
>
> **4.5**    based upon, arising from, or in any way related to:
> **(a)** any demand, suit, or other proceeding against any **Insured** which has been made, which existed, or was pending prior to the applicable Prior Litigation Date set forth in Item V of the Declarations; or
> **(b)** the same or substantially the same facts, circumstances or allegations involved in such demand, suit, or other proceeding ….

(ECF No. 18-3 at 11–12.) The Policy defines the "Prior Litigation Date" as March 25, 2022, the same date that the Policy incepted. *Id.* at 10.

Plaintiff contends that the applicability of this exclusion "relies upon [PIIC's] erroneous conclusion that a written demand was made somewhere between January and June of 2022," which is not "established by the evidence." (ECF No. 22 at 5–6.)[7]

The plain language of the exclusion states that it applies only where a "demand, suit, or other proceeding" has preceded a related "Claim" made during the Policy Period. Although provision 4.5(b) encompasses a "Claim" related to "the same or substantially the same facts, circumstances or allegations," it still links the applicability of the exclusion to "such" a "demand, suit, or other proceeding." In other words, the exclusion does not apply simply because "the same or substantially the same facts, circumstances, or allegations" arose or occurred prior to the Policy Period.

Since it is undisputed that the Haidets did not institute a suit or other proceeding prior to the Policy's inception, the application of Exclusion 4.5 rests upon whether a "demand" "ha[d] been made," "existed," or "was pending" prior to the Policy's inception.

---

[7] PIIC argues in its Reply brief that Plaintiff "completely fails to address" this argument. (ECF No. 21 at 2.) However, Plaintiff addresses the inapplicability of the exclusion in its Reply brief. (*See* ECF No. 22 at 5–6.) In any event, PIIC's contention regarding the applicability of the exclusion fails for the reasons described above.

As the Court has already determined, PIIC has not demonstrated that the Haidets made a "demand" against Plaintiff under the Policy prior to the Demand Letter dated June 8, 2022. As a result, PIIC has not established that a "demand" was made prior to the Policy's inception that would bar coverage under the "Related Claim" exclusion. PIIC has accordingly failed to meet its burden to demonstrate that Exclusion 4.5 bars coverage for the Underlying Action. *See Aydin Corp.*, 18 Cal. 4th at 1188.[8]

The Court finds that the "Claim" in the Underlying Action was first made when the Haidets made a "demand" via their Demand Letter dated June 8, 2022. Because this claim arose during the Policy Period, PIIC owed a duty to defend Plaintiff against the Haidets' claims in the Underlying Action.

## B.    Whether PIIC Breached the Duty to Defend

Plaintiff contends that it is entitled to summary judgment on its breach of contract claim because PIIC breached the Policy by declining to defend Plaintiff in the Underlying Action. PIIC contends that it owed Plaintiff no duty to defend because the "claim" was first made prior to the Policy's inception.

The duty to defend arises on tender and

> is discharged when the action is concluded. It may be extinguished earlier, if it is shown that no claim can in fact be covered. If it is so extinguished, however, it is extinguished only prospectively and not retroactively: before, the insurer had a duty to defend; after, it does not have a duty to defend further.

---

[8] For similar reasons, PIIC's contention that it was not obligated to defend Plaintiff because the Haidets' pre-Policy-inception communications and the Underlying Action arose from the same alleged "wrongful act" or "interrelated wrongful acts" is also unavailing. Although the Policy provides that "[a]ll Claims arising from the same Wrongful Act or Interrelated Wrongful Acts shall be deemed one Claim," it further explains that this singular claim "shall be deemed first made on the date the earliest of such Claims is first made." (ECF No. 18-3 at 14.) In other words, the key factor that determines coverage under the Policy is when "the earliest of such Claims is first made," not when the first of the interrelated wrongful acts occurred. *Id.* Here, the "Claim" was not "first made" until the Plaintiff received a communication qualifying as a "written demand for … non-monetary relief." *Id.* at 17. The Court has determined that no demand was made until Plaintiff received the Demand Letter on June 8, 2022. Accordingly, the fact that the pre-Policy-inception communications and the Underlying Action involve alleged "interrelated wrongful acts" does not discharge PIIC's duty to defend, because the earliest "Claim" was first made on June 8, 2022, during the Policy Period.

*Buss v. Superior Ct.*, 16 Cal. 4th 35, 46 (1997); *see Scottsdale Ins. Co.*, 36 Cal. 4th at 657 (the duty to defend lasts "until ... the potential for coverage which previously appeared cannot possibly materialize, or no longer exists"). "Breach of an insurer's duty to defend violates a contractual obligation[.]" *Amato v. Mercury Cas. Co.*, 53 Cal. App. 4th 825, 831 (Ct. App. 1997); *see also Oxnard Manor LP v. Hallmark Specialty Ins. Co.*, 709 F. Supp. 3d 971, 982 (C.D. Cal. 2023) (observing that "breach of contract claims may be based on a violation of the duty to defend").

Here, the Court has concluded that the undisputed facts demonstrate that a "demand" for "non-monetary relief" was first made against Plaintiff when it received the Demand Letter on June 8, 2022. Accordingly, the "Claim" was "first made" during the Policy Period, and PIIC owed a duty to defend Plaintiff from the Underlying Lawsuit. By declining to defend Plaintiff, PIIC breached its duty to defend Plaintiff under the Policy.[9] Plaintiff is entitled to summary judgment on its first cause of action for breach of contract based on PIIC's violation of the duty to defend.

## V.    CONCLUSION

IT IS HEREBY ORDERED that PIIC's Motion for Partial Summary Judgment or Adjudication of Issues (ECF No. 17) is denied.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment Regarding [PIIC's] Duty to Defend (ECF No. 18) is granted.

IT IS FURTHER ORDERED that, within ten (10) days of the entry of this Order, the parties must jointly contact Magistrate Judge Chu to coordinate rescheduling the

---

[9] PIIC also contends that because the Policy is a "claims-made" Policy, it is "enforceable without any showing of prejudice under the 'notice-prejudice rule.'" (ECF No. 17 at 15.) Plaintiff does not refute this contention in its briefing or contend that PIIC must demonstrate prejudice. Accordingly, the Court does not address PIIC's contention regarding the application of the notice-prejudice rule in ruling on the present motions.

deadlines in this case that the Court previously vacated pending the disposition of the cross-motions for summary judgment. (*See* ECF No. 16.)

Dated:  June 27, 2025

Hon. William Q. Hayes
United States District Court

24-cv-0779-WQH-SBC